[No. S033436. Aug. 24, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
ALBERT LEWIS and ANTHONY CEDRIC OLIVER, Defendants and
Appellants.

**COUNSEL**

Eric S. Multhaup, under appointment by the Supreme Court, for Defendant and Appellant Albert Lewis.

Robert M. Myers, under appointment by the Supreme Court, for Defendant and Appellant Anthony Cedric Oliver.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Sharlene A. Honnaka and Alan D. Tate, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

BAXTER, J.—A Los Angeles County jury convicted Albert Lewis and Anthony Cedric Oliver (defendants or Lewis and Oliver) of the first degree murders of Patrinella Luke and Eddie Mae Lee, and of the attempted murder of Peter Luke. (Pen. Code, §§ 187, subd. (a), 664.)[1] The jury sustained allegations that defendants were armed with a firearm (shotgun), personally used a firearm, and personally inflicted great bodily injury in committing the charged crimes. (§§ 12022, subd. (a)(1), 12022.5, subd. (a), 12022.7.) The jury further found true a multiple-murder special-circumstance allegation against each defendant. (§ 190.2, subd. (a)(3).) After a penalty trial, the jury returned a verdict of death against both defendants. The court denied defendants' motions for a new trial (§ 1181) and to modify the penalty verdict (§ 190.4, subd. (e)), and sentenced them to death. The present appeal is automatic. (§ 1239, subd. (b).)

The judgment will be affirmed in its entirety.[2]

## I. FACTS

### A. *Guilt Phase*

Two gunmen, each carrying a shotgun and hooded and dressed in black, raided the Mount Olive Church of God in Christ in Los Angeles on July 21, 1989. While one assailant stood guard and shot at a bystander outside, the other one entered and shot three churchgoers, two of whom died. Defendants were jointly charged with the crimes. They were tried in a single proceeding

---

[1] All unlabeled statutory references are to the Penal Code.

[2] The information alleged that the crimes charged against both defendants were serious felonies under section 1192.7, subdivision (c). An amendment to the information further alleged that Oliver had been convicted of two prior serious felonies under section 667, subdivision (a), and had served three prior prison terms under section 667.5, subdivision (b). During penalty proceedings, and outside the jury's presence, Oliver admitted the prior conviction allegations. The parties used these admissions to stipulate during the penalty trial that Oliver had sustained the prior felony convictions within the meaning of section 190.3, factor (c). Oliver's abstract of judgment does not show that the allegations under section 667, subdivision (a), or section 667.5, subdivision (b), were found true or used to enhance his sentence.

before the same jury. Oliver was 27 years old at the time of the capital crime. His half brother, Lewis, was 33 years old at the time.

1. *Prosecution Case*

The prosecution presented evidence that Lewis, embittered toward his estranged wife, Cynthia Mizell, mounted an escalating campaign of terror against her and her family. It culminated in the murder of her cousin, Patrinella Luke, the wounding and near-killing of Peter Luke, who was Patrinella's husband, and the killing of Eddie Mae Lee, a friend of Mizell's. The evidence also showed that Oliver joined in the campaign of terror and personally committed the murders.

Lewis met Mizell in 1985. At the time, Mizell lived with her parents, Iva Worthen and Edward Worthen, in a four-unit apartment house on 77th Street in Los Angeles. Other family members lived in the same building. They included Mizell's aunt, Betty Bates.

When Mizell and Lewis met, he was living with Jeanett Hudson a short distance away on 77th Street. Lewis told Mizell that Hudson was a friend who, along with her daughter, was staying with him. In fact, Lewis was married to Hudson.

Lewis and Mizell married on June 25, 1988, in a wedding ceremony at the Mount Olive Church. Afterwards, the couple moved to a house on 117th Street. Lewis, who stayed married to Hudson without Mizell's knowledge, soon began to abuse Mizell. In September 1988, he attacked her with a knife, drawing blood, and threatened to kill her. Mizell moved out. Lewis asked her to return to their house. She complied.

In February 1989, Lewis, wearing a black "ninja"-style suit, attacked Mizell in their kitchen. He ordered her to leave, but apparently changed his mind and said that if she did so, he would kill everyone living in her family's apartment house. Mizell stayed.

In March 1989, Mizell moved out, but continued to see Lewis. One night during that month, Lewis met Mizell after her church choir practice. He drove her to an alley, held a knife to her throat, and threatened to kill her. He then drove her to her parents' home. Thereafter, he called and asked her to return to their house. In June 1989, she complied out of fear for her family's safety.

On June 22, 1989, Lewis and Mizell were living together. She complained to him about forgetting her birthday. He responded by slapping and choking

her, and threatening to kill her. On June 25, shortly after this violent episode, Oliver moved into the couple's house, where he stayed until July 4. While there, Oliver was able to view Lewis and Mizell's wedding album. It contained pictures of her friends and relatives, and would have allowed him to memorize their likenesses.

Oliver told Mizell that Lewis was still married to Hudson. Mizell obtained Lewis and Hudson's marriage certificate from authorities in Las Vegas, Nevada, and confirmed that her own marriage was unlawful by reason of Lewis's existing marriage to Hudson. (See § 281.) Mizell ended her relationship with Lewis on July 18, 1989. She moved out of their home on that day, three days before the killings. Oliver helped her to move out.

Mizell's departure triggered threats of retaliation from Lewis. In a phone call on the evening of July 18, he promised to kill her. At some point the same day, Lewis bought a 12-gauge Mossberg shotgun and Winchester shotgun shells. That night, at 10:00 p.m., he rented a red Mustang automobile.[3]

On the night of July 18, Mizell stayed at the 77th Street apartment of her parents in a state of fear. Mizell and her mother, Iva Worthen, were in the residence early on the morning of July 19, when someone torched Worthen's automobile, a 1984 Ford Tempo. It was parked on the street outside. Defendants knew that Mizell sometimes drove the Ford. According to prosecution witnesses, a neighbor, Barbara Johnson, had seen the arsonist and described him as a Black male driving a red Mustang.

Later in the day on July 19, 1989, Mizell enlisted the help of the police to retrieve her automobile, a maroon Datsun 200SX, from the home she had shared with Lewis. Her car was blocked by another vehicle. The police extracted Oliver from the house, drawing their guns on him at one point. He was furious with Mizell, saying, in her words, "You let the police in on me." Mizell's mother, Iva Worthen, was present. She described Oliver as "very, very upset and shouting and ranting and raving and . . . cursing." Oliver left the scene in a red Mustang that Mizell did not recognize.[4] A license plate check revealed that the Mustang was registered to the Hertz Corporation. One police officer, Bret Richards, testified that he saw a pair of black leather gloves inside the Mustang.

---

[3] The red Mustang was one of three automobiles that Lewis rented from the Hertz Corporation between July 18 and July 22, 1989. He exchanged the red Mustang for a gold Nissan Maxima on July 19 at 10:22 p.m., and exchanged the Maxima for another Mustang of unknown color on July 21 at 11:26 p.m. Lewis owned his own car during this time.

[4] There was evidence that Barbara Johnson said the arsonist of Worthen's 1984 Ford Tempo, who drove a red Mustang, had a jheri-curl hairstyle. Other evidence indicated that Oliver was bald and had a mustache and goatee.

Also on July 19, Mizell obtained a temporary restraining order against Lewis. The order directed him to stay away from her, many of her relatives (each identified by name), and the Mount Olive Church. The order was served on Lewis on July 22, 1989, the day after the killings. It was entered into evidence by stipulation.

On July 20, 1989, someone used a firearm to vandalize a new Buick Skylark automobile belonging to Betty Bates, Mizell's aunt. The windows of the Buick were shot out by shotgun blasts. Shell casings found at the scene came from rounds fired from Lewis's Mossberg shotgun.

In response to these events, Mizell and several relatives decided to go to Las Vegas for their own safety. These plans were disclosed to few other people. The family left on the morning of July 21, 1989, and was in Las Vegas when the murders occurred in Los Angeles. Shortly before the family's trip, the fire department called and told Iva Worthen that Mizell's Datsun 200SX automobile had been destroyed by fire. Fire department investigators testified that the car fire had been deliberately set.

The murders took place on Friday evening, July 21, 1989, in the annex of the Mount Olive Church. Mizell and Lewis, and Mizell's family, regularly attended services at the church. Oliver had no ties to the church and never went there. Mizell, who had been the church organist for some time, ordinarily performed on Friday nights between 7:30 and 9:30 p.m. in the annex. Had she and her family not fled to Las Vegas, they would have been present for the services that evening.

About 70 people were in attendance, including 30 children. Two parishioners, Melvin Earl Johnson and Ruth Johnson, waited outside the church around 8:30 p.m. for Melvin Johnson's daughter and niece to emerge. Another parishioner, Larry Brown, also was outside. These witnesses saw two Black men wearing dark clothing and hoods, and carrying shotguns—one with a pistol grip. The pair came from a car that had circled nearby moments before with its headlights off. It was dark outside at the time.

The taller, heavier, and darker man (Oliver) approached the porch of the church, and covered his face with a hood or mask. Oliver, in his black clothing and armed with a shotgun, confronted Brown, who jumped over a ledge and bolted away in fear of his life. The smaller, lighter-skinned gunman (Lewis) was standing guard with his own shotgun. He shot twice at Brown, missing him.

Oliver entered the church while Lewis stood guard outside with his shotgun. Oliver walked calmly up and down the aisle and seemed to be

looking for particular worshipers. He wore black gloves with all or part of the fingers removed. Though Mizell and certain family members were out of town, other relatives and friends were present. Oliver shot and killed Mizell's cousin, 35-year-old Patrinella Luke, by inflicting a head wound at close range. Oliver also killed 76-year-old Eddie Mae Lee, Mizell's friend, shooting her in the back as she tried to flee. Oliver shot and wounded Patrinella's husband, Peter Luke, who suffered permanent, severe, and painful injuries as a result. Oliver then "calmly walked out like [there] was nothing to it," according to one witness, Vivian Worthen. Vivian Worthen was Patrinella Luke's mother and Mizell's aunt.

Detective Richard Aldahl led the investigation. He found two Winchester 12-gauge shotgun shell casings outside the church where shots were fired at parishioner Brown. Three more 12-gauge shotgun shells were found inside the church, including one Charles Daly shell. Shortly after the crimes, Mizell and other family members identified defendants as suspects to Detective Aldahl. Aldahl and his partner, Larry D. Bird, sought a warrant to search Lewis's home for shotguns, ammunition, and black clothing.

Meanwhile, Detective Jerry Lee Brooks performed surveillance duties. He arrested defendants on July 24, 1989, three days after the murders.

Specifically, Detective Brooks caught Lewis as he tried to leave his house with the barrel of the disassembled Mossberg shotgun. Executing the search warrant, Detective Frank Garcia found the Mossberg receiver inside Lewis's house. During the same search, Garcia and other detectives recovered black clothing items that included a "ninja" suit and hooded sweatshirt. Other evidence found in Lewis's house included a pair of black leather gloves with the fingers removed, a directory for the Mount Olive Church, an owner's manual for the Mossberg shotgun, and the restraining order that Mizell had served on Lewis.

Shortly after arresting Lewis, Detective Brooks arrested Oliver. At the time, Oliver was spotted in Lewis's yard, where he had jumped a fence and possibly tried to flee. After obtaining certain information from defendants' neighbor, discussed below, Detective Aldahl obtained a warrant to search a Chevrolet Monte Carlo to which Oliver had the keys. Inside the trunk, police found a fully loaded Savage model shotgun, with a pistol grip, and a Winchester ammunition box containing 12-gauge shotgun shells. There were 10 unexpended Winchester shells, one unexpended Charles Daly shell, and one expended Charles Daly shell. The trunk of the car also contained a black jacket.

Gunshot residue was detected on the black "ninja" suit taken from Lewis's house and on the black jacket taken from Oliver's Monte Carlo. Ballistics

tests established that the two Winchester shells found outside the church, expended in the attempt to shoot Larry Brown, were discharged by Lewis's Mossberg shotgun. Testing also established that the three expended shells retrieved from inside the church (one a Charles Daly) were fired by the Savage shotgun that Oliver possessed. Forensic analysis further revealed several impressions of Oliver's right palm print on the Savage shotgun.

Louise Holt, a neighbor of defendants, testified that on July 23, 1989, two days after the capital crime, Oliver took a shotgun from the trunk of his Monte Carlo, brandished it at her, and threatened to kill her and her 14-year-old daughter. He had argued with Holt's daughter, and Holt confronted him.

Lewis's supervisor at work, Gerald Dickinson, testified that Lewis expressed anger after the July 19, 1989, incident in which the police extracted Oliver from the Lewis home. On the day of the murders, Dickinson noticed that Lewis drove a gold Nissan Maxima, rather than his usual car. When asked why, Lewis replied that he had rented a car because he did not want to be seen in his own motor vehicle. The day after the murders, on July 22, 1989, Lewis told Dickinson that he would be accused of committing the killings, and that Iva Worthen's automobile had been torched. Regarding the latter act, Lewis told Dickinson, "No one can say they saw me do it." That was also the day on which Lewis was served with Mizell's temporary restraining order. Lewis showed Dickinson the document, which ordered him to avoid contact with Mizell's relatives. Lewis blamed them for his marital problems.

### 2. Defense Case

Lewis presented no evidence. For Oliver, Lee Smith, a fingerprint expert, testified as follows. The palm prints linked to Oliver on the Savage shotgun were consistent with his having handled the weapon, but not fired it. However, the palm prints were consistent with someone loading the shotgun. The shooter's use of gloves would explain the lack of additional palm prints on the gun. Prints would not be left in the "shooting position" by someone wearing gloves.

Maggie Crenshaw, a neighbor of defendants, in July 1989, testified that she saw Oliver's Monte Carlo arrive to the area by tow truck. She never saw Oliver drive it. However, she did see him work on the car. Crenshaw also had heard on the television news that a reward, possibly of $5,000, could be obtained for information about the murders.

Patricia James, Oliver's older half sister, testified, among other things, that Oliver's hair at trial was similar, but somewhat shorter, than when the crimes

occurred, and that he had facial hair in July 1989. James had heard a televised report of a reward for information about the murders.

Detective Aldahl testified that Melvin Johnson had reviewed a "six-pack" photographic lineup that included Oliver's photograph, but could not identify him. Johnson also could not eliminate Oliver as the gunman who entered the church. According to Aldahl, a small pair of pants, waist size 31 inches, was found in the trunk of Oliver's Monte Carlo. At the time of his arrest, Oliver weighed 207 pounds, and was five feet 11 inches tall. No reward was offered in the case, and no one ever asked Aldahl about a reward.

The parishioner accosted on the church porch, Larry Brown, testified that the man in the alley (Lewis) could have been Hispanic or Black, and that the armed man entering the church seemed smaller than Oliver, who weighed about 207 pounds at the time of the murders and 277 pounds during pretrial proceedings. Brown knew Lewis but did not recognize him as the gunman in the alley who shot at him. At the time, however, Brown was fleeing from the shotgun-wielding Oliver and did not register many details about Lewis. Moreover, Brown accurately described the assailants' relative height, weight, and complexion. Brown had also heard rumors of a reward for information about the murders.

B. *Penalty Phase*

 1. *Prosecution Case*

 a. *Oliver's Other Violent Crimes*

In early October 1986, Oliver committed a strong-arm robbery, taking $120 from Melvin Lee. Later that month, Oliver burglarized Lee's house by kicking open the front door, choking Lee, and taking his sister's television. On another occasion at the same place, Oliver assaulted one James Green, who moved out of Lee's residence after Oliver's attack.

 b. *Oliver's Prior Felony Convictions*

The parties stipulated to the admission of Oliver's prior felony convictions for the robberies of Melvin Lee in October 1986, the grand theft of an automobile in August 1984, and an armed robbery committed in December 1981. Oliver was sentenced to prison for these crimes.

 c. *Oliver's Misconduct in Prison*

In November 1984, while incarcerated in the California Institution for Men, Chino, Oliver was confined in a unit reserved for inmates with

disciplinary problems or in protective custody. He threw a carton of milk and coffee at Richard Valiente, the correctional officer serving a meal. Immediately beforehand, when the officer displayed a paper plate, Oliver had said, "I ought to throw this food at you." The coffee was hot, and it would have hit the officer had he not dodged it. Afterwards, Oliver said, "If I had any more food, I would throw that on you, too."

Sergeant Royal Towns testified that staff found a plastic shank, or knife, in Oliver's possession at San Quentin Prison in March 1985. It was located in a shampoo bottle in the rear of Oliver's cell. At the time, he was single-celled in a secure unit for high-profile inmates, such as gang members. The weapon was almost two inches wide, and sharpened to a point. Towns testified that inmates favored plastic weapons because they do not activate prison metal detectors.

### d. *Oliver's Misconduct in Jail*

In January 1990, Oliver saw another Los Angeles County jail inmate, Joseph Odem, rifling through his belongings and attacked him. Oliver told deputies that he "beat the shit out of" Odem. Oliver did, however, summon help for Odem.

In February 1991, Oliver flung a typewriter at another inmate in the Los Angeles County jail law library. Oliver then grabbed the sharp-edged typewriter cover, which had detached from the typewriter, and chased the other inmate with it. The pair scuffled. Oliver punched the inmate in the head. Oliver also lunged at him with the metal cover while being restrained by deputies. Oliver ignored deputies' orders to stop fighting. Sheriff's Deputy Pete Cacheiro testified that at the time of the incident, both Oliver and his victim were housed in a special unit reserved for inmates with prior violent histories in jail.

In April 1991, four Los Angeles County sheriff's deputies escorted Oliver to the attorney visiting room at the county jail. The number of escorts was extraordinary, and was required because of Oliver's history of violence. Oliver threatened, cursed, and resisted deputies the entire time. Oliver kicked one of the deputies in the knee.

### e. *Lewis's Domestic Violence*

Jeanett Hudson was already married to Lewis when he "married" Mizell. Hudson testified that, during their relationship, Lewis grew increasingly violent. He pushed and punched her. He threatened her life at knifepoint on

one occasion, and caused her to lose consciousness another time. Once, after she fled from him, he apparently feigned suicide to induce her return.

In November 1981, following a severe beating, Hudson moved out. She went to her parents' house, taking her young daughter with her. In the following days, numerous phone calls from Lewis or both defendants contained threats to kill Hudson and her family. For example, Oliver announced that "all of [them] . . . were going to die." In the same period, Hudson's parents' house was shot at, as was Hudson's car. The shooting of the house was particularly terrifying, Hudson testified. There were six adults and two preteen children in the house. As the shots penetrated the house, the children were placed in the bathtub and the adults lay on the floor and slept there that night. More phone calls followed, containing laughter. Thereafter, the house was shot up again. Hudson described "gunfire [coming] from everywhere." She testified that the "[h]ouse was full of smoke. You could hear the kids crying, everybody laying on the floor." The family quickly fled Los Angeles. On December 11, 1981, another house belonging to Hudson's parents was destroyed by the second of two deliberately set fires. Lewis later admitted to Hudson that he had done the shootings of the house and car. Hudson's sister, Nadine Burchett, testified that, around the same time, she received telephone calls at work from both Lewis and Oliver saying they were going to find Hudson and her family and kill them.

Despite all of this, Hudson married Lewis in March 1982. She was still married to him when she testified.

On July 21, 1989, the night of the murders, Lewis and Oliver arrived at Hudson's home. They were dressed in black clothing, some of which they removed. They showed Hudson two shotguns in the trunk of an apparent rental car. Lewis wanted to store the guns in Hudson's house. She refused, but allowed him to place them in the trunk of her car. Defendants left in a hurry, saying they needed to return the car to the rental agency. Later, the police questioned Hudson. She furnished a false alibi for Lewis, saying they were watching television when the murders occurred. She did so because she feared Lewis more than the police. When Hudson declined to provide a false alibi for the capital crimes at trial, Lewis threatened to kill her.

f. *Victim Impact Evidence*

Relatives and friends testified briefly about the victims' loving and caring natures, and the grief and loss their deaths had caused.

Ouida Faye Mitchell was the daughter of Eddie Mae Lee. Mitchell praised Lee as a mother, and said she was an important presence in her grandchildren's lives. Lee was dedicated to the church. The congregation recruited five

volunteers to do her charity work after her death. Lee spoke to skid row residents about her faith, and delivered blankets and food. She also visited convalescent homes, and cared for sick people in their own homes.

Dora Ballard was a close friend of the victims. She testified that the impact of their deaths was immeasurable. She confirmed Lee's prodigious work in the community, and described Patrinella Luke as a gifted and talented singer with the potential for a "wonderful future."

Patrinella Luke's mother, Vivian Worthen, and son, Peter Luke, Jr., saw the shootings inside the church. Worthen testified that everyone loved Patrinella Luke, who had a beautiful voice and was a good homemaker. Peter Luke, Jr., loved his mother very much and had experienced difficulty in school since her death. He could not stop thinking about her and the murders. Four years later, he continued to dream about her and cry over her death.

Peter Luke (Peter Luke, Sr.) was the husband of murder victim Patrinella Luke, and a shooting victim. He described Patrinella as "a beautiful person, very vibrant." He testified that her death had been hard on their son, Peter Luke, Jr. The shooting also had deprived the son of a father who could engage in activities with him. Peter Luke, Sr., asked jurors to "do the right thing."

Nobody testified for more than five minutes. The prosecutor played a short videotape of Eddie Mae Lee and Patrinella Luke in church.

### 2. *Defense Case*

Lewis's sister, Patricia James, testified that their father was diagnosed as a paranoid schizophrenic when Lewis was very young, and was continually hospitalized in the 1950's and 1960's. Lewis's father seemed to be supernaturally strong. He heard voices and behaved violently when not hospitalized or medicated. He would sometimes hit Lewis. Nevertheless, when Lewis was older, he tried to help his father with his mental illness. The father lived in Lewis's house for a year and a half, where Lewis cared for him.

James further testified that the family consisted of 10 children by five different fathers. Both the youngest sibling and Oliver's father had been in prison. The sibling was still incarcerated and used a wheelchair. Oliver's father was a "true to life swindler." In the 1960's, their mother suffered a stroke. After the mother's stroke, the children stayed with relatives. Their mother died of breast cancer. One of the mother's husbands was an abusive alcoholic. Lewis accidentally shot Oliver when Oliver was about age nine. Oliver was treated at a mental hospital as a boy.

Dr. Alvin E. Davis, a psychiatrist, examined Lewis on four occasions for a total of six hours in preparation for trial. He diagnosed him as having severe paranoid personality disorder and recurrent episodes of depression. Dr. Davis explained to the jury that Lewis's behavior throughout his life, including his treatment of his wives, was not surprising in light of his paranoia. Dr. Davis also testified that, while Lewis might think he was malingering or feigning mental disorders at various points in the trial, he was only fooling himself, as his disorders were real. Like Patricia James, Lewis's sister, Dr. Davis testified that Lewis's father had been diagnosed as a paranoid schizophrenic decades before, and that Lewis's father would beat him for no reason.

Defendants' first cousin, Brenda Roxie Wilson, and their second cousin, Lana Luvercie Moore Bastien, each asked the jury to spare defendants' lives. This testimony was the sole mitigation Oliver offered.

The parties stipulated that Oliver was stabbed by another inmate in jail midway through the trial. The jury learned that Oliver sustained more than 40 stab wounds, and that he suffered various ailments as a result (stroke, pneumonia, punctured lung, mild brain damage causing some speech impairment, partial paralysis of lower left leg, and residual lung infection).

## II. PRETRIAL ISSUES

### A. *Failure to Challenge Search Warrant; Ineffective Assistance (Lewis)*

Lewis contends he received constitutionally deficient representation because counsel did not move before trial to exclude evidence retrieved from his home, to wit, the Mossberg shotgun and owner's manual, and articles of black clothing that tested positive for gunshot residue. Counsel should have tried to quash the search warrant, Lewis claims, because the affidavit supporting it contained false statements. Specifically, he asserts the warrant affidavit falsely attributed to Mizell a statement that Lewis "possesse[d] a long rifle or shotgun." Lewis relies on police interview statements and on preliminary hearing testimony indicating that Mizell never saw or knew about any shotguns in Lewis's possession.

■ Ineffective assistance of counsel under the Sixth Amendment requires deficient performance under an objective standard of professional reasonableness. It also entails prejudice under a test of reasonable probability of an adverse effect on the outcome. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688, 694 [80 L.Ed.2d 674, 104 S.Ct. 2052].)

■ In addition, "a defendant has a limited right to challenge the veracity of statements contained in an affidavit of probable cause made in support of

the issuance of a search warrant. . . . [T]he lower court must conduct an evidentiary hearing [only if] a defendant makes a substantial showing that (1) the affidavit contains statements that are deliberately false or were made in reckless disregard of the truth, and (2) the affidavit's remaining contents, after the false statements are excised, are insufficient to support a finding of probable cause. . . . Innocent or negligent misrepresentations will not defeat a warrant. [Citation.] 'Moreover, "there is a presumption of validity with respect to the affidavit. . . ." ' " (*People v. Panah* (2005) 35 Cal.4th 395, 456 [25 Cal.Rptr.3d 672, 107 P.3d 790], citing *Franks v. Delaware* (1978) 438 U.S. 154 [57 L.Ed.2d 667, 98 S.Ct. 2674]; accord, *People v. Bradford* (1997) 15 Cal.4th 1229, 1297 [65 Cal.Rptr.2d 145, 939 P.2d 259]; see *People v. Luttenberger* (1990) 50 Cal.3d 1, 9–10 [265 Cal.Rptr. 690, 784 P.2d 633].)

As pertinent here, the police executed a search warrant of Lewis's home. The warrant authorized the seizure of, among other things, any 12-gauge shotguns, shotgun ammunition, and black clothing. The police found such clothing, which came into evidence. At the time of Lewis's arrest, he was carrying the barrel of the Mossberg shotgun. The rest of the gun was recovered on Lewis's bed during service of the search warrant. In the challenged affidavit, Detective Bird stated that two people had been murdered by shotgun blasts. The affidavit also described accounts of the clothing the assailants wore, and explained that Mizell, the intended murder victim, told police that Lewis "possesses a long rifle or shotgun, along with a black Ninja suit complete with hood."

In arguing that the affidavit contained false statements, Lewis observes that Mizell did not mention Lewis's possession of any kind of gun to police in a statement she gave shortly after the murders. He also observes that she testified at the preliminary hearing that he did not have a shotgun in the house. However, Lewis has not shown that Detective Bird lied about what Mizell said concerning long guns in Lewis's possession. Nor has Lewis shown that the detective knew Mizell was lying or mistaken, even assuming her statement to him was untrue. Under *Franks v. Delaware, supra,* 438 U.S. 154, and its progeny, the showing is insufficient. (*People v. Panah, supra,* 35 Cal.4th 395, 456.)

Lewis further fails to establish that any deficient performance was prejudicial or that the result would have changed had counsel acted differently. The alleged falsehood was neither "necessary" (*Franks v. Delaware, supra,* 438 U.S. 154, 156) nor "material" (*People v. Bradford, supra,* 15 Cal.4th 1229, 1297) to the probable cause finding. The affidavit amply justified the search of Lewis's house. In addition to Lewis's history of violence against Mizell and her family, including her aunt, Betty Bates, the affidavit alleged that (1) a small gray or silver car similar to Lewis's car was seen at both the

Bates Buick shooting and the church, (2) expended Winchester 12-gauge shotgun shells were found at both the Bates shooting and the church, and (3) Lewis owned a black, hooded "ninja" suit. We find no ineffective assistance.

B. *Motion to Dismiss the Information (Lewis, Oliver)*

Defendants contend the information should have been dismissed based on their motion for insufficient evidence to commit them to superior court for trial. (§ 995.) They challenge the trial court's ruling under state law, and claim it had the additional legal consequence of denying them due process under both the Fourteenth Amendment and parallel provisions of the state Constitution.[5]

The information was filed on December 21, 1989, and amended on February 21, 1990. On August 21, 1990, Lewis moved to set aside the information for insufficient evidence—a motion that Oliver joined. At a hearing on August 24, 1990, Lewis admitted that the motion lacked an adequate recitation of the relevant facts, and asked informally for a delay in adjudicating it. The trial court decided to proceed. It denied the motion, but offered to reconsider its ruling if defendants presented new reasons to do so. Defendants failed to renew the motion.

Irregularities in pretrial commitment proceedings that are not jurisdictional in the fundamental sense require reversal on appeal only where the defendant shows he was deprived of due process or suffered prejudice as a result. (*People v. Millwee* (1998) 18 Cal.4th 96, 121 [74 Cal.Rptr.2d 418, 954 P.2d 990], citing *People v. Pompa-Ortiz* (1980) 27 Cal.3d 519, 529 [165 Cal.Rptr. 851, 612 P.2d 941].) Errors in the denial of a section 995 motion

---

[5] Consistent with recent cases (e.g., *People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17 [42 Cal.Rptr.3d 677, 133 P.3d 581]), we note that defendants urge that this and almost every other error alleged on appeal infringed their constitutional rights to a fair and reliable trial. Insofar as defendants raised the issue at all below, they failed to articulate some or all of the constitutional arguments now advanced. In each such instance, it appears that either the appellate claim is the kind that required no trial court action to preserve it, or the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as each was wrong on grounds actually presented to that court, had the additional *legal consequence* of violating the Constitution. To that extent, defendants' new constitutional arguments are not forfeited on appeal. (See *People v. Partida* (2005) 37 Cal.4th 428, 433–439 [35 Cal.Rptr.3d 644, 122 P.3d 765] (*Partida*); see also *People v. Cole* (2004) 33 Cal.4th 1158, 1195, fn. 6 [17 Cal.Rptr.3d 532, 95 P.3d 811]; *People v. Yeoman* (2003) 31 Cal.4th 93, 117 [2 Cal.Rptr.3d 186, 72 P.3d 1166].) In the latter instance, of course, rejection on the merits of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional "gloss" as well. No separate constitutional discussion is required in such cases, and we therefore provide none.

claiming insufficiency of the evidence are not jurisdictional in the fundamental sense. (See, e.g., *People v. Mattson* (1990) 50 Cal.3d 826, 870 [268 Cal.Rptr. 802, 789 P.2d 983].) Thus, even assuming defendants have not forfeited their claim by abandoning their pretrial efforts to dismiss the case, they have not shown any prejudice warranting relief. As we shall discuss, the evidence was sufficient to support the guilt verdict.

C. Pitchess *Discovery Motion (Lewis)*

Lewis argues that the trial court wrongly denied his motion to discover information in police personnel files under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 [113 Cal.Rptr. 897, 522 P.2d 305] (*Pitchess*). He insists the error had the additional legal consequence of violating his right to due process under the Fifth Amendment, and that it violated his right to compulsory process under the Sixth Amendment.

█ Because "[a] party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct" (*Partida, supra,* 37 Cal.4th 428, 435), the compulsory process claim is forfeited. (*Ibid.*) We also find no state law error.

Representing himself, Lewis filed two motions to discover information in the personnel files of several investigators, including Detectives Richard Aldahl and Jerry Lee Brooks. Both times, Lewis alleged that the detectives were involved in a conspiracy with Mizell to steal $10,000 and to murder him. He claimed they attempted to murder him by using excessive force during his arrest that would provoke him into defending himself, and that would allow them to apply lethal force in return. He also alleged that the officers were violent men generally, and that they were conspiring to frame him for murders he did not commit.

In Lewis's first *Pitchess* motion, filed on April 18, 1991, he attached what appears to be a photograph of himself when he was booked for the murders. (He claims it shows he was beaten—a circumstance we do not discern from copies of the photograph in the record.) Also attached to Lewis's motion were photocopies of newspaper articles reporting allegations or episodes of police misconduct in unrelated cases. The trial court held a hearing on the motion on May 31, 1991. The court denied the motion because Lewis failed to include a police report, as statutorily required. (See Evid. Code, § 1046.)

On June 4, 1991, Lewis filed a second *Pitchess* motion. This time he included the required police report among the attachments, and excluded the booking photograph. The hearing on the second motion occurred on July 19, 1991. The trial court indicated that it had carefully reviewed the moving

papers. Ultimately, it found no prima facie evidence of a police conspiracy, and no basis for an in camera review of the requested personnel records. The court viewed the discovery request as a "fishing expedition," and said it was "miserably" supported.

We review the trial court's ruling for an abuse of discretion. (*Pitchess*, *supra*, 11 Cal.3d 531, 535.) None appears. Lewis did not show that a police conspiracy to murder or frame him "could or might have occurred." (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1016 [29 Cal.Rptr.3d 2, 112 P.3d 2]; see *id.* at p. 1026.) Lewis's moving papers alleged one or more grandiose conspiracies to frame and murder him. The trial court did not abuse its discretion in concluding that Lewis did not meet the standard for permitting discovery of information from police personnel files.

D. *Judicial Bias Claim (Lewis)*

Lewis claims he was denied due process and an impartial judge under the Fifth and Fourteenth Amendments. (See *Tumey v. Ohio* (1927) 273 U.S. 510 [71 L.Ed. 749, 47 S.Ct. 437].) We disagree.

By way of background, Lewis filed three disqualification motions in propria persona during the long interval between the filing of the information in December 1989 and the start of jury selection in January 1993. On August 15, 1991, Lewis filed a disqualification motion invoking Code of Civil Procedure section 170.1. On January 6, 1992, Lewis filed a disqualification motion invoking Code of Civil Procedure section 170.6. On December 9, 1992, Lewis orally presented another disqualification motion invoking Code of Civil Procedure section 170.1. At bottom, he claimed the trial court (Judge Jacqueline A. Connor) systematically favored the prosecution due to a bias against parties appearing in propria persona. He also complained about the denial of his *Pitchess* motions.

All three disqualification motions were denied. Proceedings were suspended after the first motion. A judge appointed by the Judicial Council (Orange County Superior Court Judge James L. Smith) found no bias on the part of the trial court. The superior court denied the second motion as untimely, and denied the third motion as lacking a sufficient factual basis. Defendant petitioned for a writ of mandate after the second motion. The Court of Appeal denied that petition as untimely. He also sought a writ of mandate after the third motion. The Court of Appeal denied that petition "for absence of facts and record showing entitlement to extraordinary relief."

Lewis now asserts, for the first time, that the trial court showed bias in (1) making evidentiary rulings unfavorable to the defense, such as excluding

a plastic bag containing a cocaine-like powder found at the crime scene, (2) mishandling *Marsden* issues (see *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44] (*Marsden*)), (3) making negative comments about Lewis's efforts to delay the trial and feign mental illness, and (4) mishandling Lewis's mental competence to stand trial. All such matters touch on substantive claims addressed later in this discussion. Meanwhile, in resolving the claim of judicial bias, we summarize the relevant facts as follows.

Following pretrial hearings in April and October 1992, the trial court rejected defense efforts to admit a plastic bag containing a cocaine-like substance found in the Mount Olive Church after the capital crime. Initially, the court posited that if defendants' fingerprints were not found on the bag, and the bag was found to contain cocaine, the bag could come into evidence to advance a theory, otherwise poorly supported, that someone else committed the murders and left cocaine at the crime scene. The defense checked the bag for fingerprints, but never sought to have the contents tested. The court ruled the evidence was irrelevant and therefore inadmissible.

On February 2, 1993, near the close of the prosecution's guilt case-in-chief, Lewis presented a *Marsden* motion. By then, Richard Leonard had represented Lewis either as counsel or advisory counsel for over two years. During that time, and as discussed later, Lewis vacillated between professional representation and self-representation. Hence, much like a brawl that defendants had caused in the courtroom the previous day, on February 1, the trial court apparently viewed the *Marsden* motion as another effort to delay the jury verdict.[6] The trial court emphasized that, aside from the courtroom brawl, Lewis had largely cooperated with, and behaved well toward, counsel. In denying the motion, the court relied, in part, on Lewis's apparent attempt to generate conflict and distrust by physically attacking counsel late in the case. Near the end of the *Marsden* hearing, Lewis declined to speak further and refused to remain in the courtroom.

On February 10, 1993, the day before the guilt verdict, the court noted outside the jury's presence that Lewis had "made an ineffectual attempt to injure himself," and that Lewis seemed to be trying to delay the proceedings

---

[6] Defendants disrupted the guilt trial on February 1, 1993, by launching a physical assault on counsel during the prosecution's case in front of the jury. Lewis initiated matters by leaping from his seat and attacking his counsel, Richard Leonard. As Lewis's other counsel, James Leonard, and court personnel reacted, Oliver joined the fray. James Leonard was cut and his clothing bloodied. Richard Leonard was bloodied and his clothing torn. Lewis bit Detective Aldahl, and broke his skin. The trial court ordered jurors to leave the courtroom. One juror suffered a head injury in the process. Numerous sheriff's deputies responded. One deputy apparently overheard defendants ask whether they were eligible to have the case dismissed because of the assault.

with disruptive behavior. On February 22, 1993, the trial court faced the issue of Lewis's mental competence between the guilt and penalty phases. The court commented on the "creative array [of] talents he has for delay."

Finally, Lewis's counsel, the trial court, and the prosecutor all believed that Lewis was competent to stand trial. Each indicated at times that various outbursts, including Lewis and Oliver's assault on counsel, were feigned attempts to persuade the court and the jury of mental illness that did not exist. For instance, the court commented that Lewis "behaved inappropriately, [but] there was no indication of any mental impairment observed by my deputies or anybody here in this courtroom, including myself."

█ When the foregoing events occurred, Lewis did not call the trial court's attention to the comments and rulings he now cites as evidence of judicial bias. In general, if the trial court refuses or fails to disqualify itself, the complaining party must seek disqualification at the earliest practicable opportunity after discovery of the facts constituting the ground for disqualification. In doing so, the party must bring to the trial court's attention "all of the facts" later cited on appeal in support of the judicial bias claim. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1111 [40 Cal.Rptr.3d 118, 129 P.3d 321].) By failing to do so when the relevant events occurred, Lewis has forfeited the right to complain about them on appeal. (*Ibid.*) For similar reasons, he has lost any additional claims that the trial court's alleged bias affected subsequent rulings. (*Ibid.*; cf. *People v. Harris* (2005) 37 Cal.4th 310, 346 [33 Cal.Rptr.3d 509, 118 P.3d 545] [declining to decide similar forfeiture issue when the substantive claim "lacks merit"]; *People v. Brown* (1993) 6 Cal.4th 322, 334–335 [24 Cal.Rptr.2d 710, 862 P.2d 710] [suggesting defendant may claim on appeal that judgment is constitutionally invalid due to judicial bias].)

In any event, we see no violation of Lewis's right to be tried before an impartial judge. As we later explain, the court correctly applied the law in excluding evidence of the "baggie" containing "cocaine." It made this ruling only after giving the defense ample opportunity to show relevance. Regarding the *Marsden* motion, the court reasonably found no actual breakdown in the attorney-client relationship. Again, it gave Lewis a fair chance to show the opposite was true. Finally, the comments suggesting Lewis was feigning mental incompetence, and had used outbursts and other tactics to manipulate and delay the proceedings, did not suggest that the court had prejudged competence or could not be fair. Such observations were supported by the record, including expert testimony introduced at a hearing on Lewis's competence. The bias claim fails on the merits.

### E. *Motion for Eyewitness Identification Expert (Lewis)*

Lewis challenges the pretrial denial of funds to retain an expert witness on eyewitness identification. He insists the ruling violated state law, and that it had the additional legal consequence of violating his right to due process and to present a defense under the Sixth and Fourteenth Amendments, and under parallel provisions of the state Constitution. As explained further below, a claim of ineffective assistance of counsel also is raised. We see no basis for relief.

On October 19, 1991, Lewis moved in propria persona under section 987.9 for funds to retain Dr. Elizabeth Loftus as an expert on eyewitness identification (I.D.). Lewis wanted Dr. Loftus to examine several potential eyewitnesses. At a hearing on October 28, 1991, Los Angeles County Superior Court Judge Gary Klausner, who was not the trial judge, denied the request. Judge Klausner doubted that Dr. Loftus was available for appointment or that the proposed testimony would be admitted at trial. He realized, however, that those issues were not before him, and that only funding for an identification expert was raised. Judge Klausner ruled that if "the trial court decides I.D. testimony would be admissible and says that it is appropriate to [appoint] an I.D. expert," then he "would go ahead and appoint him." Hence, Judge Klausner denied the motion without prejudice. It appears that neither Lewis, while acting in propria persona, nor appointed counsel, when later reinstated, sought a ruling from the trial judge on the admissibility of the proposed testimony.

Anticipating the Attorney General's forfeiture claim, Lewis suggests it does not matter whether he followed Judge Klausner's advice and sought an advance ruling from the trial judge on the admissibility of the proposed testimony. Rather, in Lewis's view, Judge Klausner's ruling was erroneous because it forced Lewis to litigate admissibility before being able to retain and consult with the expert, and without being able to formulate an offer of proof. Lewis also claims compliance with the funds ruling would have required him to disclose confidential information to the trial court. Finally, Lewis faults counsel for not offering exculpatory expert identification testimony at trial in any event.

■ No prejudicial error or ineffective assistance occurred. Expert testimony on the psychological factors affecting eyewitness identification is often unnecessary. For this reason, the trial court's discretion regulating its use is rarely disturbed. (*People v. McDonald* (1984) 37 Cal.3d 351, 377 [208 Cal.Rptr. 236, 690 P.2d 709].) Consistent with these principles, Lewis has not shown that such testimony would have made a difference here. No witness identified the masked perpetrators. The prosecution relied on circumstantial

evidence showing defendants' motive, intent, and opportunity to commit the crime, and their consciousness of guilt afterwards. Oliver called Larry Brown. Oliver stressed that neither Brown nor Melvin or Ruth Johnson was able to identify defendants. The record does not show what additional exculpatory inferences could have been drawn if an expert had testified. We reject the claim.

### F. *Bag Containing Suspicious White Powder (Lewis, Oliver)*

Defendants contend the trial court erred in excluding, as irrelevant, evidence that a plastic bag containing white powder resembling cocaine was found in the Mount Olive Church after the capital crime. (See Evid. Code, § 350.) Lewis further argues that counsel rendered ineffective assistance in failing to have the substance chemically tested. Citing the Fifth, Sixth, Eighth, and Fourteenth Amendments, and parallel provisions of the state Constitution, defendants assert the additional legal consequence that they were denied their constitutional right to present a defense. They also invoke their Sixth Amendment right to confront and cross-examine witnesses. (See *Davis v. Alaska* (1974) 415 U.S. 308, 318 [39 L.Ed.2d 347, 94 S.Ct. 1105].)

The confrontation claim is forfeited. (*Partida, supra,* 37 Cal.4th 428, 435.) We find no state law error, and no ineffective assistance of counsel.

In a police property report dated July 25, 1989, Detective Aldahl stated that, while inspecting the Mount Olive Church after the killings, he found a "[c]lear plastic zip-lock baggie containing a white powdery substance resembling cocaine[—]17.0 grams." At a hearing on April 20, 1992, the question arose of admitting the plastic bag and its contents into evidence. The prosecutor stated that the white powder had not been tested by anyone, that nothing connected it to the murder victims, and that its introduction would distract the jury by portraying the victims and prosecution witnesses in a false light. Defendants argued that if testing proved the bag contained cocaine but did not bear their fingerprints, then some third person must have shot the victims and either thrown or dropped the bag, possibly during a "drug deal gone bad." The trial court questioned relevance. The court said, however, that if defendants intended to rely on an abortive-drug-deal theory for the murders, it would admit the bag of powder. The defense promised to test the powder.

On October 14, 1992, the prosecution moved in writing to exclude, as irrelevant, the "baggie" evidence described in the police report. According to the motion, the item was found on the opposite side of the church from the victims, and at least 16 feet away from the shooter.

A hearing on the motion was held two days later, on October 16, 1992, while Lewis was representing himself. Oliver's counsel indicated that two

unnamed inmates could confirm, for reasons counsel did not describe, that the church was used for selling drugs. It became clear that defendants had not tested the substance for cocaine. They argued that, even so, the evidence would have shown the shooting was in retaliation for the sale of "bunk" cocaine. The trial court granted the motion, excluding the evidence as irrelevant.

The trial court properly could have denied outright the motion to admit the baggie evidence. (See *People v. Pride* (1992) 3 Cal.4th 195, 237–238 [10 Cal.Rptr.2d 636, 833 P.2d 643] [third party must be linked to " 'actual perpetration' " of charged crime (applying *People v. Hall* (1986) 41 Cal.3d 826 [226 Cal.Rptr. 112, 718 P.2d 99]), italics omitted]; see *Holmes v. South Carolina* (2006) 547 U.S. 319, ___, fn. * [164 L.Ed.2d 503, 126 S.Ct. 1727, 1733].) Whether the substance was cocaine or an innocuous white powder resembling it, the mere presence of a saleable quantity of suspicious powder in the church does not tend to prove that someone other than defendants committed murder as part of a drug deal, or that the police overlooked such evidence. Even assuming the presence of the substance suggested drug dealing or gang activity inside the church, the suspicious powder does not raise a reasonable doubt as to defendants' guilt of the crimes they committed. No error or incompetence occurred.

G. *Severance Motions (Lewis, Oliver)*

Defendants assert the court erred in denying their oral motions to sever their cases for trial. Both claim violations of their right to due process and to an impartial jury under the Fifth, Sixth, and Fourteenth Amendments, and under parallel provisions of the state Constitution. Oliver also invokes his right to an individualized penalty determination under the Eighth Amendment.

Except for due process, the constitutional claims are forfeited. (*Partida, supra*, 37 Cal.4th 428, 435.) We find no error under state law.

1. *Oliver*

On April 28, 1992, Oliver moved to sever his trial from Lewis's because Lewis had flashed a thumbs-down sign to him, and because Oliver thought Lewis might turn "State's evidence." The trial court denied the motion. On appeal, Oliver invokes different grounds in arguing that the severance motion should have been granted, citing events that happened after the severance motion. They concern the admission of evidence that Lewis alone committed certain uncharged crimes, the risk that jurors would find defendants—who are half brothers—guilty by association, Lewis's outbursts in court after the "thumbs-down" incident, and the lack of separate penalty trials.

### 2. *Lewis*

On November 18, 1992, Lewis, appearing in propria persona, moved to sever his trial from Oliver's immediately after Oliver was ejected from court for unruly behavior. Lewis complained that "this is highly prejudicial on the part of [his] defense." The trial court denied the motion. Like Oliver, Lewis now invokes different grounds, based on later events, in arguing that the severance motion should have been granted. Such events are that Oliver joined the courtroom brawl that later happened in front of the jury, and that Lewis ultimately decided not to testify against Oliver.

### 3. *Discussion*

We question defendants' apparent assumption that they could mandate severance through their own misconduct. In any event, denial of a severance motion is generally reviewed for an abuse of discretion. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 41 [17 Cal.Rptr.3d 710, 96 P.3d 30].) The reviewing court assesses the ruling based on the record before the trial court at the time. (*People v. Arias* (1996) 13 Cal.4th 92, 127 [51 Cal.Rptr.2d 770, 913 P.2d 980]; *People v. Price* (1991) 1 Cal.4th 324, 388 [3 Cal.Rptr.2d 106, 821 P.2d 610].) Of course, even a ruling that was correct when made cannot stand if joinder caused such " 'gross unfairness' " as to violate defendants' due process rights. (*People v. Arias, supra,* at p. 127.)

■ Defendants fail to advance sufficient grounds to disturb the ruling below. This was, after all, the classic situation in favor of a joint trial, given that defendants were charged with common crimes involving common events and victims. (E.g., *People v. Coffman and Marlow, supra,* 34 Cal.4th 1, 40; *People v. Pinholster* (1992) 1 Cal.4th 865, 932 [4 Cal.Rptr.2d 765, 824 P.2d 571].) Given the "legislative preference for joinder, separate trials are usually ordered only ' "in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony." ' " (*People v. Box* (2000) 23 Cal.4th 1153, 1195 [99 Cal.Rptr.2d 69, 5 P.3d 130].) None of these factors exists here. Both defendants denied committing the crimes, faced essentially the same charges and allegations, bore equal criminal responsibility, and relied on a defense of mistaken identity. There was no indication either defendant would have given exonerating testimony at a separate trial. No abuse of discretion or gross unfairness appears.

### H. Trombetta *Motion (Lewis, Oliver)*

Defendants contend the trial court erred by concluding that their due process rights under *California v. Trombetta* (1984) 467 U.S. 479 [81 L.Ed.2d

413, 104 S.Ct. 2528] (*Trombetta*) were not violated when the police discarded two shotgun shells recovered from the shooting of an automobile belonging to Betty Bates, Mizell's aunt. In particular, defendants insist both that a *Trombetta* violation occurred and that they were not allowed to make an adequate record on the issue. Lewis invokes, as an additional legal consequence, a violation of due process under the state Constitution.

Bates's Buick Skylark was vandalized by shotgun blasts the day before the murders. Los Angeles Police Department Detective Kempton Lockwood, a prosecution firearms expert, testified at trial that he test-fired Lewis's Mossberg weapon. He compared the test-fired casings to the two spent Winchester shells found near Bates's damaged automobile. He determined that the Bates shells came from the Mossberg and from "no other weapon."

On March 6, 1992, well before the trial began, the prosecutor mentioned in court for the record that the two shells recovered from the scene of the Bates Buick shooting had been discarded after they were photographed and after experts for both defendants examined the evidence.

At a pretrial hearing on April 14, 1992, Lewis claimed a *Trombetta* violation had occurred. He asserted that his expert, James Warner, examined the five shells found at the church, but that he did not examine the Bates shells. Lewis claimed *Trombetta* was violated insofar as the shells had been discarded. The prosecutor responded that, before being discarded, the shells had been made available to Warner and he had examined them. However, they were maintained under a different case number, which might explain Lewis's confusion over his expert's access to them. The court deferred a ruling until it could hear more facts.

The trial court revisited the *Trombetta* issue at another pretrial hearing on April 20, 1992. The court received no response when it asked Oliver whether he joined Lewis's *Trombetta* motion. Lewis then withdrew the motion. He noted for the record that his expert had received access to the Bates shells.

On January 4, 1993, at another hearing that took place two days before trial began, the prosecutor described the evidence logs, which supported her ongoing view that the Bates shells were in the firearms laboratory and had been made available some time before to Warner and Mr. Morton, Oliver's expert, both of whom had visited the laboratory to examine them. Lewis then renewed his *Trombetta* motion. The trial court summarily denied it.

Contrary to what defendants now argue, they were not prevented from making a record before their *Trombetta* claim was denied. Lewis expressly relinquished his right to do so despite the court's offer to entertain any

additional facts defendants might present. When asked to explain this stance, Lewis conceded that his expert had a chance to examine the Bates shells and to assess their relevance before they were discarded. Oliver stood mute when asked his views. Defendants suggest no way in which they could have added to the record. In sum, the trial court adequately protected defendants' fair hearing rights.

Defendants also claim the trial court erred in failing to suppress Lockwood's testimony about the Bates shells as a remedy for what they perceived to be a *Trombetta* violation. The due process rights conferred by *Trombetta* apply only when the "evidence . . . possess[es] an exculpatory value that was apparent [to the authorities] before the evidence was destroyed." (*Trombetta, supra,* 467 U.S. 479, 489.) The prosecution's expert determined conclusively that the shells used to damage Bates's Buick came from Lewis's Mossberg shotgun—a conclusion that linked him both to the vandalism of Bates's automobile and to the murders. This information negates any inference that the shells possessed exculpatory value manifest to the authorities when discarded before trial. Accordingly, no *Trombetta* violation appears.

I. *Uncharged Criminal Acts (Lewis, Oliver)*

Defendants argue here, as below, that evidence of uncharged conduct was improperly admitted to show their violent character or disposition. (Evid. Code, § 1101, subd. (a).) This evidence was not relevant, defendants claim, for any valid nondispositional purpose. (*Id.,* subd. (b).) Oliver also alleges violations of his right to due process under the Fifth Amendment and to a reliable penalty determination under the Eighth Amendment. He also invokes generally the Sixth Amendment and the state Constitution. Lewis claims a violation of his right to due process under the Fifth Amendment and his right to be free of cruel and unusual punishment under the Eighth Amendment.

Except for due process, the constitutional claims are forfeited. (*Partida, supra,* 37 Cal.4th 428, 435.) No error occurred under state law.

On April 9, 1992, the prosecution moved, in writing, to admit five uncharged incidents in which Lewis abused Mizell and threatened to kill her and her family. Such evidence showed that Lewis (1) threatened to kill Mizell with a knife and nicked her with it in September 1988, (2) threatened to kill her and choked her in February 1989, (3) threatened to kill her and held a knife to her throat in an alley in March 1989, (4) assaulted and threatened to kill her in June 1989, and (5) threatened to kill her on July 18, 1989, after she moved out. Other uncharged acts the prosecution moved to introduce included the arsons of Iva Worthen's Ford Tempo and Mizell's Datsun 200SX on July 19 and 21, 1989; the confrontation involving Mizell, Oliver, and the

police on July 19, 1989; the shooting of Betty Bates's Buick Skylark on July 20, 1989; and Oliver's act of threatening Louise Holt with his Savage shotgun on July 23, 1989. Defendants opposed this evidence at pretrial hearings on April 14 and 20, 1992.

The trial court agreed with the prosecution that the evidence permitted reasonable inferences about defendants' motive, identity, and opportunity to commit the charged crimes. The court stressed the close timing and similar nature of the acts, the relationship between the victims and defendants, defendants' familiarity with the victims' property, and defendants' access to the murder weapon. The court found no substantial risk of prejudice under Evidence Code section 352. The court later instructed the jury that Lewis's "threats" against Mizell could not be used against Oliver. The court also instructed jurors on the limited purpose for which other-crimes evidence can be used.

The court's ruling is consistent with the law. (*People v. Gray* (2005) 37 Cal.4th 168, 202 [33 Cal.Rptr.3d 451, 118 P.3d 496]; *People v. Catlin* (2001) 26 Cal.4th 81, 145–146 [109 Cal.Rptr.2d 31, 26 P.3d 357].) It is entitled to deference on appeal. (*People v. Jablonski* (2006) 37 Cal.4th 774, 821, 824 [38 Cal.Rptr.3d 98, 126 P.3d 938].) No abuse of discretion occurred. The uncharged acts showed an escalating campaign to retaliate against Mizell and her family for the marital breakup. This motive also suggested that defendants were the perpetrators, and that they intended and premeditated the victims' deaths. The incident with Louise Holt, which occurred a few days later, showed defendants had the means to commit the murders.

J. Faretta *Claim (Oliver)*

Oliver claims that two withdrawals from his constitutional right to represent himself (*Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525] (*Faretta*)) before trial began in January 1993 were ineffective, because they were the product of the trial court's improper attempt to discourage self-representation. Oliver complains that the court's actions generally violated his rights under the Sixth and Fourteenth Amendments, and under parallel provisions of the state Constitution. He claims as an additional legal consequence that a related hearing held on September 9, 1991, violated due process under the Fifth Amendment, because he did not receive an adequate opportunity to be heard. The record does not support the claims.

■ Criminal defendants have the right both to be represented by counsel at all critical stages of the prosecution and the right, based on the Sixth Amendment as interpreted in *Faretta, supra,* 422 U.S. 806, to represent themselves. (*People v. Marshall* (1997) 15 Cal.4th 1, 20 [61 Cal.Rptr.2d 84,

931 P.2d 262].) However, this right of self-representation is not a license to abuse the dignity of the courtroom or disrupt the proceedings. (*Ibid.*) *Faretta* motions must be both timely and unequivocal. Otherwise, defendants could plant reversible error in the record. (*Marshall*, at pp. 21, 22; accord, *People v. Valdez* (2004) 32 Cal.4th 73, 98–99 [8 Cal.Rptr.3d 271, 82 P.3d 296].) Equivocation of the right of self-representation may occur where the defendant tries to manipulate the proceedings by switching between requests for counsel and for self-representation, or where such actions are the product of whim or frustration. (*Marshall, supra*, at pp. 21, 22.) Of course, a defendant may withdraw his *Faretta* motion before a ruling is made. (See, e.g., *People v. Snow* (2003) 30 Cal.4th 43, 68–70 [132 Cal.Rptr.2d 271, 65 P.3d 749].)

Oliver made unsuccessful motions to act as cocounsel and for library privileges on March 1 and 19, 1990, and on June 21, 1990. He also made an initial *Faretta* motion on June 29, 1990, which he withdrew on July 11, 1990, and a second *Faretta* motion on October 12, 1990, accompanied by a refusal to accept appointed counsel as advisory counsel. He reaffirmed his desire to represent himself, coupled with the appointment of new advisory counsel, on October 24 and 30, 1990, and the court allowed him to do so. He relinquished his self-representation for the second time on March 8, 1991.

Oliver made and withdrew two more *Faretta* motions. They form the basis of his claims on appeal. One of these motions was litigated during hearings held on August 23, 1991, and September 9, 1991, and withdrawn on the latter date. The second motion arose much closer to trial, and was addressed on November 18 and 19, 1992. The trial court cautioned that it viewed the latter motion as untimely, but was willing to continue it to the next day and entertain it further. On that next day, Oliver equivocated, refusing to give the court a clear answer on whether he still wished to proceed in propria persona. The court ruled that he had withdrawn his motion.

Oliver maintains that his actual or constructive withdrawals of the two *Faretta* motions at issue were ineffective because they were the product of the trial court's improper attempt to discourage him from representing himself. Specifically, Oliver complains that the court improperly delayed acting on the August 23, 1991 motion, inducing him to withdraw it on September 9, 1991, and that it erroneously denied his November 18, 1992 request as untimely.

The trial court did not improperly delay acting on Oliver's August 23, 1991 motion, or induce him to withdraw it on September 9, 1991. During these two hearings, the court had a serious discussion with Oliver and his counsel, Charles E. Lloyd, who stepped forward to represent him, about the security risks that self-representation would present. Oliver admitted that he had

"abused the pro. per. perks" before. He became frustrated, however, over the tenor of the discussion, and over the possibility that valid security concerns might interfere with his unfettered right of self-representation. The court made no ruling on August 23, 1991, and continued the matter until September 9, 1991, so that it could review Oliver's jail records and consider additional evidence related to security. When Oliver withdrew his *Faretta* motion at the latter hearing, and accepted representation by Lloyd and his associate, William E. Turner, Oliver's actions were not the result of any error by the court, but of his own frustration over legitimate security concerns.

A similar conclusion applies to Oliver's claim regarding the *Faretta* proceedings held in November 1992. The only reference to the timeliness of this motion occurred when the trial court asked on November 18 that Oliver join Lewis in waiving time to start the trial, which was imminent. Oliver refused and asked to appear in propria persona. As noted, the court said the motion was untimely, but postponed its ruling until the next day. Oliver became hostile and said he would refuse to return to court the next day. On November 19, when Oliver nonetheless appeared, he and the court debated whether he wanted to pursue or withdraw his request for self-representation. The court found a withdrawal. In the process, Oliver agreed with Lewis to delay the start of the trial until January 1993. Nothing more was said about whether Oliver's request for self-representation was timely. Oliver's acceptance of the court's conclusion that the *Faretta* motion was withdrawn was not the product of any ruling—erroneous or otherwise—on the timeliness of the motion.

K. Marsden *Claim (Oliver)*

Oliver challenges the denial of his pretrial motion to replace counsel under *Marsden, supra,* 2 Cal.3d 118. He claims a Sixth Amendment violation as an additional legal consequence of the court's ruling. No error occurred.

█ Replacing counsel lies within the court's discretion. "The court does not abuse its discretion in denying the motion unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel." (*People v. Smith* (2003) 30 Cal.4th 581, 604 [134 Cal.Rptr.2d 1, 68 P.3d 302].)

In September 1991, after Oliver withdrew one of his many *Faretta* motions, the trial court appointed Charles Lloyd and William Turner to represent him. A short time later, in October 1991, the court learned that Oliver might wish to replace counsel under *Marsden*. Oliver had apparently sent the court a letter requesting a *Marsden* hearing, but then indicated that his motion was premature and withdrew it for the time being. The same issue

was broached in June 1992, but Oliver denied wanting to file a *Marsden* motion. Eventually, on December 9, 1992, Oliver moved to replace counsel. This motion occurred between his last *Faretta* motion, which he made on November 19, 1992, and the start of trial, which occurred on January 6, 1993. Oliver and Turner attended the *Marsden* hearing.

In that hearing, Oliver complained of counsel's inattentiveness, lack of loyalty, and inadequacy of trial preparation. Specifically regarding the first point, Oliver asserted that counsel did not visit him in jail. Turner replied that he visited Oliver at least weekly in jail, but that in the last two weeks "they didn't have the personnel to bring him down because Mr. Oliver has to be escorted by 10 other subjects." Oliver acknowledged that Turner was correct about the frequency of his visits to him in jail, but that he still wanted him relieved because he was not "preparing my case properly." The court asked Oliver for examples as to what Turner had not done in preparing for the guilt trial. Oliver said only that Turner had promised to withdraw. Also, the court asked Turner about Lloyd's preparation for the penalty trial. Turner reported that Lloyd had tried to contact witnesses, and that Oliver was not cooperating in the matter. Regarding loyalty, Oliver questioned counsel's loyalty to him based on their failure to honor an alleged promise to withdraw from representing him. The trial court denied the motion as to Turner, and deferred it as to Lloyd. On December 16, 1992, Oliver withdrew his *Marsden* motion as to Lloyd without explanation.

On appeal, Oliver contends that the trial court denied him an adequate opportunity to make a showing that he was entitled to replace counsel under *Marsden*. He primarily faults the court for not asking Turner either to defend his own trial preparation or to address the state of their relationship.

The record does not support the foregoing claim. Oliver had a full and fair opportunity to voice his objections about counsel's performance. Oliver offered no specific information to which either Turner or the trial court could meaningfully respond. Indeed, given the timing and nature of the motion, it appears to have been made primarily to delay the trial. In any event, since Oliver declined to elaborate on his complaints about counsel, the court had no duty to inquire still further. (See, e.g., *People v. Lucky* (1988) 45 Cal.3d 259, 280–283 [247 Cal.Rptr. 1, 753 P.2d 1052] [no *Marsden* violation where, among other things, defendant declined to criticize counsel].)

Oliver also asserts that the trial court violated his *Marsden* rights when it refused to let him subpoena records of the frequency of visits by Lloyd. He claims a related violation of his due process rights under the Fourteenth Amendment. However, the court agreed to accept Oliver's version of events without seeing the records. Thus, Oliver was not deprived of any information needed to support his *Marsden* claim.

## L. Faretta *Claim (Lewis)*

Lewis claims the trial court erred by allowing him to relinquish his Sixth Amendment right to represent himself (see *Faretta, supra,* 422 U.S. 806) without ascertaining that he was mentally sound at the time. We disagree.

Counsel was appointed early in the case. Lewis also had library privileges to help with his defense. Nevertheless, and possibly in an attempt to delay the proceedings, Lewis brought numerous motions regarding his representation, vacillating about whether he wanted to represent himself or be represented by counsel. Lewis first moved to represent himself with Richard Leonard as cocounsel. On October 24, 1990, the trial court denied the motion. On October 30, 1990, Lewis moved to represent himself under *Faretta.* At a hearing on November 2, 1990, the court appointed a psychiatrist, Dr. Michael Coburn, who found that Lewis could knowingly and intelligently waive his right to appointed counsel. After the court warned Lewis about the risks of self-representation, he sought and received more time to decide the issue. On December 14, 1990, his *Faretta* motion was granted, and his counsel was placed on advisory status.

At hearings on April 14 and 20, 1992, the trial court and Lewis discussed whether he wanted to continue representing himself. Lewis sought to forgo self-representation if he could retain his library privileges. The court apparently agreed and reappointed Richard Leonard as counsel.

On May 19, 1992, Lewis asked to represent himself again. On June 5, 1992, the trial court warned that Lewis would not be allowed to "go back unpro. per.," but granted his second *Faretta* motion. Two days before trial, on January 4, 1993, Lewis asked to relinquish his in propria persona status a second time. After warning Lewis that he "can't change [his] mind," the court granted the request. It reappointed Richard Leonard as lead counsel, and appointed his brother James Leonard as cocounsel.

Meanwhile, at an evidentiary hearing on December 9, 1992, the trial court learned that Lewis had accused his alibi witness and first wife, Jeanett Hudson, of involvement in the murder of one Frankie Hudson in 1975 or 1977. On January 19, 1993, the prosecutor moved to have Lewis's telephone privileges revoked, explaining that Lewis had been calling Jeanett Hudson and threatening her. The prosecutor stated, "These threats entailed his intent to have her and her daughter killed, as well as threats to find a way to get her fired." On January 20, 1993, after counsel was reappointed, Lewis declined to

appear in court because other inmates had made upsetting comments about his mother's death, which had occurred about a year beforehand.[7]

Citing *Brown v. Wainwright* (1982) 665 F.2d 607, 612, Lewis argues that a defendant may not forgo self-representation absent a "dialogue" with the court, at least where "special circumstances" are present. Such conditions supposedly existed here in the form of what he characterizes as his aberrant behavior before and after the January 4, 1993 hearing. He claims the court erred in not questioning him or ordering a new psychiatric examination to determine whether the renewed request for counsel resulted from a mental defect.

The record suggests that Lewis acted "intentionally and voluntarily" (*People v. Dunkle* (2005) 36 Cal.4th 861, 909 [32 Cal.Rptr.3d 23, 116 P.3d 494]) when he requested counsel on January 4, 1993, and was not incompetent or suffering from any mental defect. (See *ibid.*, citing *Brown v. Wainwright, supra*, 665 F.2d 607, for general rule that *Faretta* may be waived through silence or equivocation.) After all, Lewis had taken a similar step once before and was familiar with the differences involved in self-representation as opposed to representation by counsel. In addition, the trial court alerted Lewis to the consequences of abandoning his role as his own counsel so near the start of trial. A short time later, as we shall discuss, the trial court declined to declare a doubt as to Lewis's competence to stand trial. (See *Dunkle, supra*, at pp. 909–910 [defendant found competent around time of request for counsel].) There was no substantial evidence that Lewis was mentally incapable of surrendering his *Faretta* rights. The asserted error did not occur.

## III. JURY SELECTION ISSUES

### A. *Excusal for Cause (Lewis, Oliver)*

Defendants claim the trial court erred in granting the prosecution's motion to excuse a prospective juror, A.L., based on his views on capital punishment. The error allegedly violated defendants' right to an impartial sentencing jury under the Sixth and Fourteenth Amendments. We reject the claim.

 A prospective juror may be excused if his views would " 'prevent or substantially impair' " the performance of his duties as a juror in accordance with his instructions and oath. (*Wainwright v. Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844].) Because this determination involves an

---

[7] At a hearing on January 21, 1993, at which Lewis was present, the court granted the prosecution's motion and revoked Lewis's telephone privileges.

assessment of the juror's demeanor and credibility, it is one "peculiarly within a trial judge's province." (*Id.* at p. 428, fn. omitted.) "When applying these rules, the trial court's assessment of a prospective juror's state of mind will generally be binding on the reviewing court if the juror's responses are equivocal or conflicting." (*People v. Hayes* (2001) 21 Cal.4th 1211, 1285 [91 Cal.Rptr.2d 211, 989 P.2d 645].) In other words, the reviewing court generally must defer to the judge who sees and hears the prospective juror, and who has the "definite impression" that he is biased, despite a failure to express clear views. (*Wainwright v. Witt, supra,* at pp. 425–426.)

A.L. admitted several past negative encounters with law enforcement, including a misdemeanor conviction and a gang fight in which he was hit with a police nightstick. A.L. indicated that intentional killers should "never" get death. However, in apparent self-contradiction, he also said the verdict might "depend[]" upon how the victims were killed. A.L. could see himself voting for life imprisonment even where the murder was "brutal" and aggravation outweighed mitigation.

The prospective juror's views seemed to harden when the prosecutor asked how he would assess culpability and punishment where, as here, a shooter and nonshooter were both accused of the same crime. A.L. indicated that he would not convict anyone of an intentional killing, or impose death, unless he were the actual killer. A.L. said he would adhere to these views notwithstanding the evidence or instructions. At first, the trial court denied the motion to excuse A.L. for cause. Ultimately, however, the court granted the request.

The prospective juror's answers were equivocal and conflicting. Those answers, in combination with the trial court's firsthand observations, could give rise to a definite impression that A.L.'s views on the death penalty would substantially impair the performance of his duties. We therefore defer to the court's ruling.[8]

---

[8] The Attorney General argues that defendants have forfeited their challenge to A.L.'s excusal for cause, because counsel failed to object to the trial court's ruling or to seek clarification of an inaudible answer A.L. gave to the last question posed by the trial court.

Before the trial court asked its final question, the prosecutor asked A.L.: "I understood you to say you could not see yourself ever voting for the death penalty as to the person who did not do the actual shooting?" A.L. answered: "That's correct." The prosecutor asked: "In other words, no matter what I proved to you, if that person did not actually fire the shot, you are not going to say he is eligible for the death penalty no matter what?" A.L. answered: "That's right." The trial court then inquired, "if I instructed you that the law says that a person aids another with the intent, that [if] somebody helps they are liable whether they did the shooting or did the robbing or whatever, the law tells you that is a fact, can you follow that law or it just doesn't seem fair to you?" The prospective juror did not respond audibly. Defense counsel did not ask the court or juror to repeat his response. The court then excused A.L. for cause.

The law is unclear as to whether a procedural bar applies to defendants' challenge to A.L.'s excusal for cause. (Compare *People v. Hill* (1992) 3 Cal.4th 959, 1005 [13 Cal.Rptr.2d 475,

## B. Batson-Wheeler *Claims (Lewis, Oliver)*

Defendants contend that by failing to grant their motions challenging the prosecution's excusal of seven Black male prospective jurors, made over defense objection, the trial court violated the federal constitutional guaranty of equal protection of the laws *(Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] *(Batson))*, and the state constitutional right to a jury drawn from a representative cross-section of the community. *(People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] *(Wheeler)*.)[9]

**▄▄▄** A prosecutor's use of peremptory challenges to strike prospective jurors on the basis of group bias—that is, bias against "members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds"—violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the state Constitution. *(Wheeler, supra,* 22 Cal.3d 258, 276–277; see *People v. Griffin* (2004) 33 Cal.4th 536, 553 [15 Cal.Rptr.3d 743, 93 P.3d 344].) Such a practice also violates the defendant's right to equal protection under the Fourteenth Amendment. *(Batson, supra,* 476 U.S. 79, 88; see *People v. Cornwell* (2005) 37 Cal.4th 50, 66 [33 Cal.Rptr.3d 1, 117 P.3d 622]; *People v. Cleveland* (2004) 32 Cal.4th 704, 732 [11 Cal.Rptr.3d 236, 86 P.3d 302].)

The United States Supreme Court has recently reaffirmed that *Batson* states the procedure and standard trial courts should use when handling motions challenging peremptory strikes. "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the

---

839 P.2d 984] [holding defendant "waived any error" by "failing to object to the prosecutor's challenges"], with *People v. Holt* (1997) 15 Cal.4th 619, 652, fn. 4 [63 Cal.Rptr.2d 782, 937 P.2d 213] [stating "controlling federal precedent holds that *Witherspoon* error is not waived by 'mere' failure to object"]; see *Witherspoon v. Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770].) "Because the question whether defendants have preserved their right to raise this issue on appeal is close and difficult, we assume that defendants have preserved their right." *(People v. Champion* (1995) 9 Cal.4th 879, 908, fn. 6 [39 Cal.Rptr.2d 547, 891 P.2d 93].)

[9] Oliver, joined by Lewis, invoked *Wheeler,* not *Batson,* below. Oliver concedes as much. Nevertheless, the *Wheeler* objection preserves the *Batson* claims. *(People v. Yeoman, supra,* 31 Cal.4th 93, 117–118.)

strike has proved purposeful racial discrimination.' [Citation.]" (*Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129, 125 S.Ct. 2410, 2416], fn. omitted.)

We review the trial court's ruling on purposeful racial discrimination for substantial evidence. (*People v. McDermott* (2002) 28 Cal.4th 946, 971 [123 Cal.Rptr.2d 654, 51 P.3d 874].) It is presumed that the prosecutor uses peremptory challenges in a constitutional manner. We defer to the court's ability to distinguish "bona fide reasons from sham excuses." (*People v. Burgener* (2003) 29 Cal.4th 833, 864 [129 Cal.Rptr.2d 747, 62 P.3d 1].) As long as the court makes "a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal." (*Ibid.*)

We now turn to defendants' contentions regarding the seven prospective jurors. Defendants assert the prospective jurors were subjected to peremptory challenge in violation of *Batson* and *Wheeler*. The trial court disagreed. We will sustain its rulings.

### 1. *Defense Motions*

There were four *Batson-Wheeler* motions. The first expressly covered three Black males against whom the prosecutor had exercised peremptory challenges: L.W., L.T., and C.W. (See *People v. Avila* (2006) 38 Cal.4th 491, 549, 552 [43 Cal.Rptr.3d 1, 133 P.3d 1076] [scope of motion affects scope of inquiry into reasons for excusal].) The trial court stated that it saw nothing amounting to a prima facie case of improper group bias, but directed the prosecutor to explain her reasons for the challenges. After hearing these explanations, the court denied the motion without elaboration.

In their second *Batson-Wheeler* motion, defendants expressly challenged the excusals of L.B. and K.B. The trial court found a prima facie case of improper group bias, but denied relief after hearing the prosecutor's reasons. It accepted without elaboration the prosecutor's reasons regarding L.B. With regard to K.B., the court commented that he showed an anti-capital-punishment bias throughout the process.

In their third *Batson-Wheeler* motion, defendants expressly challenged the excusal of V.H. The trial court first granted the motion, but changed its mind and denied it the next day. The court did so following an extensive hearing in which the prosecutor insisted that she had no reason or desire to discriminate, and argued that "[no] prosecutor would allow a man like [V.H.] to sit on this jury." The court observed that "all 6 of the People's peremptories have been of male Blacks." The court nonetheless concluded, "I don't see anything that

appears to be inherently racial" in the prosecutor's reasons for excusing prospective jurors, and that the prosecutor had excused V.H. for a "race neutral" reason.

In their fourth *Batson-Wheeler* motion, defendants expressly challenged the excusal of N.S. The trial court denied this motion too, with little discussion, stating, "I accept the prosecution's explanation and reason as valid."

The parties agreed that several Blacks served on the jury. The prosecutor also asserted, in response to the *Batson-Wheeler* motion concerning V.H., that the defense had peremptorily challenged three Black prospective jurors and sought stipulations to the excusal of another three. The foreperson of the jury at the guilt phase was a Black man, and the foreperson of the jury at the penalty phase was a Black woman.

### 2. *Prosecutor's Reasons*

We assume solely for purposes of argument that, for each prospective juror, we must proceed to the third step of the *Batson-Wheeler* inquiry, i.e., whether substantial evidence supported the trial court's finding that the prosecution had articulated a permissible, race-neutral reason for the excusal. (See *People v. Ward* (2005) 36 Cal.4th 186, 200–201 [30 Cal.Rptr.3d 464, 114 P.3d 717].) In each case, it is plain that there was.

As noted, the first *Batson-Wheeler* motion expressly challenged the excusals of L.W., C.W., and L.T. Prospective Juror L.W. testified that a half brother had been in and out of jail in Oklahoma since age 15 and was currently in state prison there. L.W. asserted he was once stopped by police on false pretenses. The police cited him for running a red light but he denied having done so. In his view, the police stopped him to see if he might have been driving a stolen car, and the citation was pretextual. He denied that this experience would cause him to tend to disbelieve police testimony.

The prosecutor stated that the juror questionnaire and voir dire of L.W. warranted a peremptory challenge. For example, he "had the brother in the Oklahoma prison. He indicated that his brother was in and out of jail . . . ." Also, L.W. had "a difficult time with the questionnaire" in terms of understanding some of the legal concepts. And he "gave me a bad feeling . . . right from the start, especially when he indicated he was . . . stopped for running a red light, [and] felt that the police simply used an excuse to stop him because they actually thought he was driving a hot car. And it was definitely my feeling that he thought he was being discriminated against because he was Black. [¶] I did not believe him when he said that he would not hold that against us. Everything about his demeanor . . . was very negative. I didn't feel like there was any hope the People had of getting a fair trial" from him.

On this record, it is apparent that the prosecutor had reason for her expressed skepticism that L.W. would be fair to the People. On this basis, she was entitled to excuse him.

C.W. seemed to have trouble hearing two of the trial court's initial questions. Also, voir dire began with C.W.'s admission that he would rather not have been called to the stand. He later explained that he might have to help his disabled daughter-in-law, and that the possibility of having to do so might distract him during trial. In a conflicting response, however, he insisted he could give full attention to the case if on the jury.

C.W. and members of his family had been crime victims, and he felt that the police response to crime reports in general is slow when the victims are poorer. Many years before, he had spent a couple of hours in jail after being arrested for drinking in a night spot after legal hours. The charges were dismissed. One son was once charged with burglary but not convicted (C.W. believed his son was innocent), another son had died of a drug overdose, and his daughter was charged with shoplifting and was convicted. The police had beaten one of his sons in a county facility. None of these incidents, he testified, would affect his ability to be fair in a trial of defendants, including his ability to impose the death penalty if warranted. Finally, C.W. was familiar with the Mount Olive Church or at least the surrounding area, though he was not aware of the murders that had occurred there.

The prosecutor explained that given C.W.'s testimony, he would be unduly reluctant to convict the defendants. "[H]e indicated that he feels the police serve the rich . . . better than the poor . . . . He himself, his son and his daughter have all been busted. . . . He himself, his son was beaten in custody by police officers. [¶] He is familiar with the area of the Mount Olive Church. He has a concern about having to go and take care of his son's wife, who is apparently paralyzed. He also indicated that he visited his son in L.A. County Jail, his son's case was thrown out. He felt that his son was innocent. [¶] This would definitely give somebody a feeling that somebody who is in court might well be innocent as well as in occasions where defendants are poor, it would definitely bias them in their favor given his feeling about law enforcement[,] given the fact he and his son were beaten by the police."[10]

Despite C.W.'s contrary assurances, the prosecutor had reason for her expressed skepticism that he would be fair to the People. On this basis, she was entitled to excuse him.

L.T. circled an answer on his juror questionnaire that justice was not served in the Rodney King beating case in which police officers were acquitted and

---

[10] The prosecutor may have misrecollected one item of the information C.W. provided. The record suggests that C.W.'s son was once beaten by the police, but not C.W. himself.

declined to explain why. On voir dire, L.T. stated that he felt that police officers could be both good and bad. A friend of his was once wrongfully accused of starting a fire that was large enough to be seen from a freeway. L.T. commented on then-recent events involving Rodney King and Reginald Denny, who was beaten by one or more rioters following the police beating of King. He stated that justice had not been served because the King incident had been treated differently from the Denny incident. He felt that the respective incidents showed that the law applied differently to Blacks than to Whites, now and then.

The prosecutor explained that she challenged L.T. because "he has a very large chip on his shoulder as was evidenced by the fact he felt the King verdict was unjust. . . . [¶] He feels that the death penalty is imposed more often on Blacks than on Whites. He feels that he got bad treatment from the police. And he was probably the most strident [prospective] juror we heard from yet with respect to the King case and the racial issues involved." Here again, the prosecutor had reason for her expressed skepticism that a prospective juror would be fair to the People. On this basis, she was entitled to excuse him.[11]

As noted, defendants' second *Batson-Wheeler* motion expressly challenged the excusals of L.B. and K.B.

L.B. began voir dire by explaining that his brother was in confinement for a pending robbery charge, even though the prosecution did not have enough evidence to convict him. He testified that the police told their mother that his brother should turn himself in or they would shoot him. His own experiences with police officers had been mixed: "you have some good ones, you [have] some bad ones." In general, he expressed a willingness to be fair in the case against defendants.

The prosecutor said that L.B.'s answers about his brother and the police showed a hostility to the state that warranted a peremptory challenge. "I could not imagine him possibly being fair in any way in which a defendant who was Black was being tried for a crime." She also said, "It's obvious that

---

[11] Lewis argues that L.T. never said that the death penalty is imposed more often on Blacks than on Whites. But the prosecutor fairly inferred that view from L.T.'s written comment that he once believed "they should not have the death penalty because the law seem[s] to be different for Black[s] than Whites." L.T. felt that he now believed the death penalty was acceptable, but he did not say that he thought it was applied in a statistically proportionate manner. In fact, his oral voir dire suggests that he still thought there was an imbalance in the justice system's treatment of Whites and Blacks and had not retreated from that view, but that the death penalty was nevertheless permissible because "something has to be done." In any event, nothing in Lewis's assertion undermines the prosecutor's larger conclusions about the attitudes of L.T.

he feels unhappy about the situation his brother finds himself in." Despite L.B.'s assurances, the prosecutor had reason for her expressed skepticism that the prospective juror could be fair to the People. She was entitled to excuse him.

In his questionnaire, K.B. said that he would find it difficult to serve on a jury in a capital case and could not be objective. Elsewhere on his questionnaire, he suggested that he would always reject the death penalty and vote for life imprisonment without possibility of parole. He "agree[d] somewhat" that anyone who intentionally kills another should never get the death penalty. He would prefer not to serve on the jury out of "sympathy."

On voir dire, K.B. testified that although he had expressed reservations about the death penalty on his questionnaire, he was more comfortable with it now, evidently from having observed the voir dire proceedings. He, too, expressed a willingness to be fair in the case against defendants. But the record reflects a rote quality to his answers about his open-mindedness, and the prosecutor began her questioning of him by commenting that, "I feel like sometimes we get to the point where we start programming your responses and people start to try to conform to what everybody else says . . . ." She then asked him if he was disavowing a prior statement that his religious scruples would make it difficult to sit in judgment of another in a capital case. K.B. replied that he did not realize then that the trial court would tell the jury what to do regarding the penalty phase, and the prosecutor explained that his first instinct was correct: the court would not tell the jury what sentence to impose. K.B. gave a vague response, and the prosecutor pressed, "how does that make it easier?" K.B. replied: "I'm just more at ease after listening to everything and after she [the court] said everything, explained everything to us and just listening to her."

The prosecutor then asked K.B. about two other questionnaire responses: his feelings about the death penalty would interfere with his objectivity at the guilt phase, and he could never see himself voting for death. K.B. essentially disavowed those responses.

The prosecutor stated with regard to K.B., "I just don't believe a word this man said. His questionnaire is so completely down the line anti-death penalty and every single answer is consistent, anti-death, anti-death, 'I can't be fair,' anti-death. Then he when questioned says no, everything is fine, everything has changed."

On this record, it is apparent that the prosecutor had reason for her expressed skepticism that K.B. would be fair to the People. His juror questionnaire showed considerable antipathy toward the death penalty and

suggested that he would automatically vote for life imprisonment without possibility of parole. His answers on voir dire did not persuasively convey a different impression. On this basis, the prosecutor was entitled to excuse him.

As noted, defendants' third *Batson-Wheeler* motion expressly challenged the excusal of V.H.

V.H. had recently served on a jury that acquitted someone else of rape. The jury did not believe the victim. V.H.'s son had had trouble with the law at least since age 15 and was currently incarcerated. Despite this, neither was bitter toward the state, and V.H. had encouraged his son to do his time without complaining. He generally professed an ability to be fair in the case against defendants.

The prosecution explained that she found V.H. "very acceptable" until she learned he had voted to acquit someone on a rape charge. "Unfortunately, it is my feeling that once a juror has had the experience of acquitting a defendant, it does create a certain mind set and the readiness to acquit. It certainly shows that he was able to reject the prosecutor's argument, reject the People's proof and reject the word of a woman. [¶] In this trial, we will have women testifying to the history of abuse by one of the defendants. Their believability and credibility will become crucial with this case." The prosecutor noted that the defense had properly exercised a peremptory challenge against a prospective juror for having rendered a verdict of death in another case, and "[t]hat's what a peremptory challenge is all about."

In light of V.H.'s vote to acquit another criminal defendant of rape, rejecting the testimony of a female victim of violence, the prosecutor had reason to be skeptical about V.H.'s willingness to be fair in this case, in which the testimony of female victims of violence would be crucial. On this basis, she was entitled to excuse him.

As noted, defendants' fourth *Batson-Wheeler* motion challenged the excusal of N.S. This individual had a brother in the custody of what is now called the California Department of Corrections and Rehabilitation. His brother would not reveal the nature of the offense, and N.S. did not know what it was. He believed his brother was fairly incarcerated, and that circumstance would not affect N.S.'s ability to be fair in the case against defendants.

N.S. testified that because a prisoner dies in prison whether sentenced to death or to life imprisonment without possibility of parole, he viewed the two penalties as equal. He added that for a Black person a life sentence to prison would be "like death," according to what his brother had told him. He

thought that because Robert Alton Harris (see *People v. Harris* (1981) 28 Cal.3d 935 [171 Cal.Rptr. 679, 623 P.2d 240]) was White, his case had gotten better treatment from the courts than a condemned Black man who had been executed "for killing a San Francisco cop. I don't feel he was guilty. They had to drag him away screaming. No one looked into his case after he was convicted. If they did, they probably would have found him innocent." N.S. assured the trial court that despite these views he could be fair to both sides in the trial against defendants.

The prosecutor explained that she believed N.S. "felt the death penalty and life without would be torture . . . . This is a juror whose beliefs concerning the death penalty are at the very least bizarre, but most likely not fair, I believe, to the People." She also explained that his comments contrasting Robert Alton Harris and the Black condemned prisoner reflected that he "did not feel that Blacks receive justice in the justice system. He does have an agenda. He does not like the death penalty, that reason alone." Earlier, in presenting a challenge for cause against N.S., the prosecutor said, "the truth of the matter is he could not be fair based on his feelings, his racial bias in terms of what he thinks a Black man goes through in prison, and what he thinks might happen if [giving] the death sentence in terms of the possibility of finding later on he was innocent." "[H]e has a clear racial bias in favor of any Black defendant that would prevent him from fairly convicting or sentencing someone to death."

The prosecutor had reason to be skeptical about the willingness of N.S. to convict defendants and vote for a verdict of death in this case. On this basis, she was entitled to excuse the prospective juror.

Defendants further contend that the prosecution's reasons could hardly be race neutral insofar as the prosecutor commented on the racial attitudes of three prospective jurors: L.W., L.B., and N.S. In particular, defendants insist that it is unconstitutional to exercise peremptory challenges against prospective jurors because they harbor views gleaned from their individual experiences as Black persons or carry attitudes representing viewpoints that predominate or are held more widely in their community than in society at large. Lewis admits that "[t]he prosecutor without a doubt identified factors relating to each of the excluded [prospective] jurors that made them less desirable from her perspective," and that her conduct "does not appear to be a vendetta against black skin per se." But he argues that when "a prosecutor strikes a minority [prospective] juror because [he or she] has in fact had an experience or expresses an opinion reflective of the minority perspective, the prosecutor cannot constitutionally seize upon that experience or opinion as an 'individualized' reason for striking [him or her] . . . . even if [his or her] attitude or experience might be . . . suggestive of a less conviction-prone attitude than [that of] other jurors from different backgrounds."

Under *Batson, supra,* 476 U.S. 79, and *Wheeler, supra,* 22 Cal.3d 258, a party cannot *assume* in exercising its peremptories that because a prospective juror belongs to a cognizable minority group, that person holds biased views common to that group, and therefore is undesirable as a juror. (*Batson, supra,* at pp. 86, 91, 96, 97, 99.) But the prosecutor may excuse prospective jurors, including members of cognizable groups, based on personal, individual biases those individuals *actually express.* (*Wheeler, supra,* at p. 277 & fn. 18.) That is so even if the biased view or attitude may be more widely held inside the cognizable group than outside of it.

*Batson* and *Wheeler* are intended to limit reliance on stereotypes about certain groups in exercising peremptory challenges. Defendants invoke *Batson* and *Wheeler* to preclude the excusal of a member of a cognizable group who expresses personal biases—and thus to foreclose individualized treatment of that prospective juror—if the biases expressed are presumably common to that group. Such an approach stands the law on its head, and promotes the very group stereotyping that *Batson* and *Wheeler* forbid. A party does not offend *Batson* or *Wheeler* when it excuses prospective jurors who have shown orally or in writing, or through their conduct in court, that they personally harbor biased views.

### 3. *Comparative Analysis*

Defendants further seek to show the pretextual nature of the prosecutor's excusals of the Black prospective jurors by comparing their questionnaires and voir dire responses with those of prospective jurors, both Black and non-Black, whom the prosecutor did not challenge.[12] Defendants present an array of comparisons among the two groups in an effort to show that they were similarly situated. Oliver emphasizes, though not to the exclusion of other factors, prospective jurors' attitudes toward then recent events involving the Rodney King beating case.

The King beating case lies in the background of the proceedings. On May 4, 1992, the trial court granted Oliver's mistrial motion following the verdicts of acquittal of police officers in that case, which involved the beating of Rodney King, a Black man, and the subsequent "civil unrest in Los Angeles since April 29, 1992," which included a well-publicized assault on Reginald

---

[12] Lewis now argues that the focus should be on Black men, rather than Blacks of both genders. We note, however, that all of defendants' motions at trial were directed at the prosecutor's peremptory challenges of Blacks, not Black men, and the trial court responded in kind. It is not necessary for us to decide whether the foregoing procedural posture results in a forfeiture of this aspect of the claim. Whether or not it is preserved for review, individualized consideration of each challenged prospective juror against those who were not challenged reveals that the claim overall lacks merit, as we will explain.

Denny, a White man, by rioters. On May 7, the court granted Lewis's mistrial motion on the same grounds, and dismissed the original jury venire as to both defendants. Because the King beating case had so recently ended when the new venire was summoned, some prospective jurors mentioned the case in answer to the questions, "What serious criminal case have you followed in the media within the last five years?" and "Do you feel justice was served[?]"

Defendants did not engage in a comparative prospective juror analysis in the trial court. In earlier cases, we have declined to engage in comparative juror analysis for the first time on appeal, stating that such an analysis was unreliable in evaluating the prosecutor's justifications for excusing minority prospective jurors. (*People v. Box, supra,* 23 Cal.4th 1153, 1190; *People v. Ervin* (2000) 22 Cal.4th 48, 76 [91 Cal.Rptr.2d 623, 990 P.2d 506]; *People v. Johnson* (1989) 47 Cal.3d 1194, 1220–1221 [255 Cal.Rptr. 569, 767 P.2d 1047].) Since then, of course, the United States Supreme Court has issued its decision in *Miller-El v. Dretke* (2005) 545 U.S. 231 [162 L.Ed.2d 196, 125 S.Ct. 2317] (*Miller-El*), which conducts a comparative juror analysis, albeit not on direct appeal.

In *Miller-El,* the United States Supreme Court held that, in the context of a challenge of a Black prospective juror, the defendant had established purposeful discrimination under *Batson, supra,* 476 U.S. 79, and was entitled to relief on that ground in federal habeas corpus proceedings (28 U.S.C. § 2254). (*Miller-El, supra,* 545 U.S. at p. 235 [125 S.Ct. at p. 2322].) In so holding, the high court observed: "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." (*Id.* at p. 241 [125 S.Ct. at p. 2325].)

Assuming, without deciding, that comparative juror analysis must be undertaken for the first time on appeal in the present case, we conclude that defendants' proffered analysis fails to demonstrate purposeful discrimination.

Defendants urge, in essence, that one of the prosecutor's stated reasons for excusing L.T., who said justice had not been served because the Rodney King incident had been treated differently from the Reginald Denny incident, showed evidence of pretext because the reason applied equally to prospective jurors M.C. (a White man), A.R. (a White woman), M.R. (a Hispanic man), and M.J. (a Black woman), whom the prosecutor did not challenge. They also assert that the prosecutor asked no questions of M.C., A.R., or M.R. about the King beating case. (See *Miller-El, supra,* 545 U.S. at p. 245 [125 S.Ct. at p. 2328]; *id.* at p. 250, fn. 8 [125 S.Ct. at p. 2330, fn. 8] [failure to engage in meaningful voir dire on a subject a party claims is important suggests the stated concern is pretextual].)

As will appear, however, none of the foregoing prospective jurors was similarly situated to L.T.[13]

M.C., A.R., M.R., and M.J. mentioned the Rodney King beating trial verdicts on their questionnaires. Unlike L.T., who condemned the trial outcome as the unjust product of a race-based double standard, who circled "no" on the question asking whether justice was served and declined to explain why, and whom the prosecutor accordingly evaluated as "strident . . . with respect to the King case," M.C. and A.R. believed that the trial's outcome was a fair result and gave written answers that obviated the need for followup questions on oral voir dire. (See *People v. Huggins* (2006) 38 Cal.4th 175, 235 [41 Cal.Rptr.3d 593, 131 P.3d 995] [failure to ask questions of prospective jurors did not show any impropriety].)[14]

Specifically, M.C. wrote that although he was surprised at the verdict, the jury in the Rodney King case "did its job" in acquitting the accused police officers. He circled "yes" in answer to a question whether justice had been served. A.R. criticized media sources that, in her view, manipulated her emotions in an effort to make the verdict in the King case look "not just." By inference, she felt that it was just. Also, A.R. stated on her questionnaire that her opinions were provisional, i.e., based on incomplete information and

---

[13] M.C. was a prospective alternate juror. In general, neither party questioned prospective alternates as exhaustively as other prospective jurors. However, the alternate jurors were not similarly situated for *Batson-Wheeler* purposes to the jurors who were originally sworn to try the case. For the originally constituted jury, each side (i.e., defendants together and the prosecution) was entitled to 30 peremptory challenges. (Code Civ. Proc., § 231, subd. (a).) The number of available peremptory challenges to prospective alternate jurors was significantly smaller. (See Pen. Code, § 1089, 2d par. [providing that each defendant in joint trial receives "as many peremptory challenges to the alternate jurors as there are alternate jurors called"].) Here, the court elected to have six alternate jurors, giving each defendant six peremptory challenges. This number could have affected voir dire strategy. To exhaust peremptory challenges on prospective alternates who were less than ideal but marginally acceptable would have left the defense with little recourse if they had been replaced by worse prospective alternate jurors. Accordingly, counsel could reasonably have decided not to challenge a prospective alternate juror even if counsel would have challenged a person with similar views who was being considered for service on the originally constituted jury.

[14] Lewis asserts that the prosecutor sometimes failed to examine one or more prospective jurors on topics that she cited in excusing other prospective jurors, or cited a reason for excusing one or more prospective jurors without citing the same reason as to other prospective jurors whom she also excused. However, any such disparity does not show a failure to engage in meaningful voir dire, and was not necessarily improper. The prosecutor, using permissible criteria, may have made up her mind about a prospective juror without venturing into a particular matter, and/or may have found no need to comment later on every reason for challenging a prospective juror. One inference that may be drawn from any such decision to ask few or no questions is that the prosecutor had already properly determined that a challenge was warranted based on the questionnaire or existing voir dire answers, and that further questioning was unnecessary. Indeed, lawyers must use their voir dire time judiciously, and should not be penalized for doing so.

subject to change. A.R. declined to circle either answer to the was-justice-served question and explained, "I really cannot make a judgment[;] I was not in the court listening to the evidence, even though the media exposed some facts." Their answers were markedly unlike those of L.T.

Also, the questionnaires and voir dire of M.C. and A.R. showed pro-prosecution views that L.T. did not share or shared only in certain respects. In general, during his brief voir dire as an alternate prospective juror, M.C. showed willingness to support the prosecution's position if the evidence warranted it, to be open-minded and fair, and to follow the law. He understood and accepted the concept of accomplice liability, and agreed that a nonshooter could receive the death penalty.[15] A.R. showed a willingness to follow the law and be open-minded and fair to both parties, including the People. She said, for example, "I feel very comfortable with weighing the mitigating and aggravating circumstances involved in the penalty phase." She had no problem with accomplice liability, even if it led to imposing the death penalty on a nonshooter. She had a friend in a district attorney's office.

M.R. circled an answer that justice was not served in the King beating case, but, like A.R., made clear that this was a tentative conclusion based on imperfect information. He wrote that his view of the outcome was based on media accounts and that "[p]erhaps if I knew all the facts or most of the fact[s] I could give a more intelligent answer." M.R. also indicated familiarity with the Reginald Denny beating case but did not opine that justice was not served in that case. M.R.'s responses were thus unlike those of L.T. in significant respects.

Also, the questionnaire and voir dire of M.R. showed pro-prosecution views that L.T. did not share or shared only in certain respects. M.R. showed a willingness to support the prosecution's position if the evidence warranted it, and generally to be fair, open-minded, and follow the law. He understood and accepted the concept of accomplice liability, and agreed a nonshooter could receive the death penalty. Expressing views that strongly contrasted with those of L.T., M.R. wrote on his juror questionnaire, "I feel very confident & comfortable with our Law Enforcement," and opined, "I feel

---

[15] That there were "isolated and discrete similarities" (*People v. Huggins, supra,* 38 Cal.4th 175, 234) in the views of M.C. and L.T. does not make the two prospective jurors similarly situated for comparative analysis purposes. (See *id.* at p. 235.) As stated in the text, imposing equal criminal responsibility on an accomplice who was not the actual killer did not trouble M.C. He volunteered on his questionnaire, "Often without the aid of another the crime may not have taken place." L.T. gave a similar response. Nevertheless, as discussed in the text, L.T.'s answers, viewed as a whole, were problematic in many respects that did not apply to M.C.

very strongly about our judicial system. Without it we would be [in a] mess." With regard to the death penalty, he wrote that "the punishment should fit the crime."

As for M.J., because she was Black, even if one of the prosecutor's stated justifications for striking L.T. applied to her, that is not evidence tending to prove purposeful discrimination. (See *Miller-El, supra,* 545 U.S. at p. 239 [125 S.Ct. at p. 2325].) Moreover, although M.J. opined that the police officers in the Rodney King beating case were guilty and that justice was not served, she generally held pro-prosecution, pro-death-penalty attitudes. She wrote on her questionnaire, "I believe in the death penalty because I feel if you take a life that your life should be taken also." She added in response to another question on the death penalty, "I just believe that a person will reap what they sow." She would want anyone who murdered one of her family members to receive the death penalty. She appeared to be open-minded, fair, and willing to follow the law. Viewed as a whole, her attitudes were markedly different from those of L.T., who believed that the justice system was unjust.

In sum, a side-by-side comparison of the prospective jurors in question reveals that they were not "similarly situated." (*Miller-El, supra,* 545 U.S. at p. 247 [125 S.Ct. at p. 2329].)

Defendants further urge in essence that one of the prosecutor's proffered reasons for striking L.W., C.W., L.B., V.H., and N.S., i.e., that they had family members or loved ones with criminal histories, applied equally to Prospective Jurors A.C. (who was Black and also Hispanic), M.C., V.R. (who was Hispanic), T.F. (who was White), and M.J. But, as will appear, the prospective jurors were not similarly situated.

As stated, A.C. and M.J. were Black, so defendants' attempted comparison is inapposite from the beginning. Even if one of the prosecutor's stated justifications for striking L.W., C.W., L.B., V.H., and N.S. applied to A.C. or M.J., that is not evidence tending to prove purposeful discrimination. (See *Miller-El, supra,* 545 U.S. at p. 239 [125 S.Ct. at p. 2325].)

In any event, a side-by-side comparison of the prospective jurors in question reveals that they were not "similarly situated" (*Miller-El, supra,* 545 U.S. at p. 247 [125 S.Ct. at p. 2329]). A.C. was different in notable respects from the aforementioned prospective jurors whom the prosecutor peremptorily challenged. To be sure, A.C. stated that her brother had a criminal and gang-involvement history, had been in prison for manslaughter, and later was killed in a drive-by shooting, and yet the prosecutor did not peremptorily challenge her.

A.C. stated, however, that her brother had been treated fairly by the law and that she had "no complaint," which would give the prosecutor less reason

to be concerned about a relative's criminal history, and although V.H. and N.S. voiced similar sentiments, L.W., C.W. and L.B. did not. Also, A.C.'s brother had committed the crime 25 to 35 years before she filled out the questionnaire, had been released from prison decades ago, and had died in the drive-by shooting 25 to 30 years before she filled out the questionnaire. Thus, unlike the family members of L.W., L.B., V.H., N.S., and possibly C.W., the criminal history of A.C.'s brother was remote in time. A.C. distanced herself from her brother. She was not close to him, and events involving him were "over with" and "done."

More generally, and of paramount importance from the prosecutor's point of view, A.C. consistently appeared willing to impose the death penalty in a proper case, unlike L.W., C.W., L.B., V.H., and N.S. (hereafter L.W. et al.), and yet to be fair and follow the law. She wrote, "If the person is guilty they should [accept] the punishment the law gives." Her uncle was a sheriff in Louisiana. She had never had any unpleasant experiences with law enforcement officers. She said she would be able to impose the death penalty on a nonshooter in a capital crime under a theory of accomplice liability.

As noted, M.C. was a prospective alternate juror. His brother was serving a 10-year sentence in Michigan for selling cocaine. M.C. offered only mild criticism of his brother's sentence, stating that it "[s]eems . . . long . . . ." On voir dire, he said his brother, a habitual offender, was treated fairly. Despite the one superficial commonality in the situations of M.C. and those of L.W. et al., those prospective jurors were not similarly situated because, as stated above, M.C. showed pro-prosecution views that differed from those of the other prospective jurors in question, and he was a prospective alternate juror.

As for V.R.'s purported similar situation to L.W. et al., the record shows that she also was not similarly situated to those other prospective jurors. To begin with, she was a prospective alternate juror.

To be sure, two of V.R.'s six brothers had convictions for driving under the influence, a relatively minor offense. Nonetheless, V.R. had vigorous pro-prosecution views. She stated her brothers were treated fairly; in fact, she insisted that they were guilty even though she predicted they would deny it. She showed a willingness to follow the law and be open-minded and fair to both parties, including the People, writing on her questionnaire, "I don't believe in an eye for an eye but if evidence shows premeditated guilt I do believe in [the] death penalty." "When a person plans another['s] death they should think what is going to happen to them." "I think people should think twice before taking another['s] life. The higher power did not make them judge & jury." She held these views even though her church opposed capital punishment—a view she flatly rejected. She accepted the concept of accomplice liability. In sum, V.R.'s pro-prosecution views set her apart from L.W.

et al. It is not surprising that the prosecutor did not challenge V.R. She was not similarly situated to the prospective jurors in question whom the prosecutor did challenge.

T.F. was another prospective alternate juror, which set her apart from L.W. et al. Defendants note that T.F.'s former boyfriend had been convicted of driving under the influence two years beforehand and that she had visited him in custody. Defendants complain that the prosecutor asked no questions of T.F. about the conviction.

However, T.F. showed a pro-prosecution attitude that obviated any need to do so. Both in her questionnaire and on voir dire, T.F. emphatically renounced her former boyfriend. She wrote, "I feel that he was a potential danger, not only to himself, but to the public while driving drunk and he deserved what he got." She said the same on voir dire. On her questionnaire, she wrote, "when a crime has been committed that is so serious, such as taking someone else's life, a punishment must be reached that would stop that person from again committing that crime and also serve justice for the families and victims left behind." With regard to the death penalty, she wrote, "I am a firm believer in what comes around must go around." She expressed a general willingness to follow the law and to be fair and open-minded toward both parties, including the People. She believed in the concept of accomplice liability sufficiently to volunteer in writing, "If the person who aids knowingly is doing so and consents to helping—[he or she is] therefore causing a crime," and she could impose the death penalty on a nonshooter who was an accomplice.

Again, it is not surprising that the prosecutor did not challenge T.F. She was not similarly situated to L.W. et al. The same may be said of M.J., who, as described, held pro-prosecution views, an attitude that set her apart in significant respects from L.W. et al.

Lewis urges that a prospective juror whom the prosecutor did not challenge, T.M., a Black woman, was similarly situated in numerous respects to K.B., whom she did. For example, both had friends in law enforcement, both knew people who had died by violence, and both were employed by well-established businesses. Moreover, T.M., like L.W. et al., had a relative with a criminal history.

As is the case with M.J. and A.C., because T.M. was Black, even if one or more of the prosecutor's stated justifications for striking the other prospective jurors in question applied to her, that is not evidence tending to prove purposeful discrimination. (See *Miller-El, supra,* 545 U.S. at p. 239 [125 S.Ct. at p. 2325].) In any event, in important respects the other prospective jurors

in question were not similarly situated to her. Although T.M.'s brother had been in custody for a drug offense, she did not think he had been treated unfairly, and unlike the other prospective jurors in question, she had pro-prosecution views. She wrote, "Depending upon the nature of the crime I would be inclined to support the death penalty. . . . I would support the death penalty for a mass murderer for sure." She had a friend in the Los Angeles County District Attorney's Office. She understood and accepted the concept of accomplice liability. Her views caused the defense to peremptorily challenge her. Thus, the prosecutor could conclude that T.M. was acceptable and not feel the same way about the other prospective jurors.[16]

Defendants further urge that S.P. (who was perceived as possibly Hispanic), like V.H., had served on a jury that tried a criminal case, and yet the prosecutor did not peremptorily challenge her or attempt to learn whether her jury voted to acquit the defendant, which was a stated reason for peremptorily challenging V.H. But the two prospective jurors were not similarly situated. The charges in the case in which S.P. participated consisted of trespassing and assault. She expressed a willingness to be fair and open-minded toward both parties, including the People, and was willing to follow the law, except that she would hold the prosecution to a higher standard of proof than beyond a reasonable doubt in a capital case.[17]

Although the prosecutor stated she found V.H. acceptable until she learned he voted to acquit another defendant of rape, and did not inquire about the verdict S.P.'s jury returned, nevertheless the two were not similarly situated. As the prosecutor emphasized, V.H.'s case involved rejecting the allegations of a woman who had been the subject of a violent and felonious assault against her, whereas the case S.P. heard does not appear on this record to have been similarly serious. As described, the prosecutor stated of V.H. that his vote to acquit someone charged with rape "shows that he was able to reject the prosecutor's argument, reject the People's proof and reject the word of a woman. [¶] In this trial, we will have women testifying to the history of abuse by one of the defendants. Their believability and credibility will become crucial with this case." The prosecutor's concern with prospective jurors who had served on rape trials extended to others. On learning that M.J. had served on a jury trying a rape case, that the jurors disagreed on the verdict, and that the disagreement centered on the alleged victim's credibility as a witness, the prosecutor wanted to know which way M.J. had voted.

---

[16] Lewis mentions that T.M. felt that justice had not been served in the Rodney King beating case. That is true, but she explained that she felt that way because "[t]he case was tried in the media before it came to trial." This would appear to be a view that favored law enforcement, even if it was not precisely pro-prosecution with regard to that case.

[17] On the basis of S.P.'s views on the burden of proof, the prosecutor challenged her for cause.

Defense counsel objected and the trial court sustained the objection. Nevertheless, the prosecutor asked numerous questions of M.J. concerning the rape case jury on which she had previously served. On this record, S.P. does not appear similarly situated to V.H.

We emphasize that, unlike the Black prospective jurors whom the prosecutor peremptorily challenged, the unchallenged prospective jurors showed by their questionnaires and voir dire answers that they were comfortable serving on the jury, were open-minded and dedicated to following the law, including possibly imposing the death penalty if the evidence warranted it, gave written answers consistent with their oral voir dire, and did not appear to have difficulty understanding questions. In conclusion, a side-by-side comparison of the Black prospective jurors in question whom the prosecutor peremptorily challenged and those, Black and non-Black, whom she did not reveals that they were not "similarly situated." (*Miller-El, supra,* 545 U.S. at p. 247 [125 S.Ct. at p. 2329].) Defendants are not entitled to relief on the basis of a comparative prospective juror analysis for the first time on appeal, assuming for purposes of discussion that such an analysis is required.[18]

## IV. GUILT PHASE ISSUES

### A. *Evidentiary Rulings (Lewis, Oliver)*

Defendants claim numerous evidentiary rulings violated state law. Invoking the Fifth, Sixth, Eighth, and Fourteenth Amendments, and parallel provisions of the state Constitution, defendants assert related violations of their rights to due process, to a reliable death sentence, and to confront and cross-examine witnesses.

Except for due process, the constitutional claims are forfeited. (*Partida, supra,* 37 Cal.4th 428, 435.) No reversible error occurred under state law.

Over defense objection (noted in parentheses that follow), the trial court admitted evidence during the guilt phase, that (1) Oliver was unemployed between June 25 and July 4, 1989 (relevance); (2) Mizell might have shown Oliver an album of family photographs (asked and answered); (3) Iva

---

[18] Lewis also relies on raw numbers, and argues that the prosecutor's peremptory challenges to seven out of eight Black male prospective jurors show that her explanations for the challenges were pretextual. (See *Miller-El, supra,* 545 U.S. at p. 266 [125 S.Ct. at p. 2340].) However, Lewis overlooks contrary evidence in the record showing that the prosecutor had a legitimate reason, not based on improper group bias, for challenging each one of the same prospective jurors. Also, while the *Miller-El* court thought it fitting to note that "the State had peremptorily challenged 12% of qualified nonblack panel members, but eliminated 91% of the black ones" (*id.* at p. 266 [125 S.Ct. at p. 2340]), the use of raw statistics was not a significant factor in its analysis. (*People v. Huggins, supra,* 38 Cal.4th 175, 233.)

Worthen, Mizell's mother, learned from a witness to the arson of her car that a red Mustang was seen nearby similar to the one defendants had rented (impermissible hearsay); (4) Melvin Johnson's daughter suffered psychological problems because she witnessed the shootings in church (relevance); (5) Johnson's daughter was too upset for him to spend much time talking to police at the crime scene (nonresponsive and irrelevant); (6) Vivian Worthen, after being prompted by the prosecutor, thought that the shooter (i.e., Oliver) had looked at her for a couple of seconds (leading); (7) Louise Holt learned that her daughter and Oliver had quarreled (lack of personal knowledge); (8) Holt believed Oliver tried to flee from the police as they sought to arrest him (relevance); (9) and (10) Detective Jerry Lee Brooks spoke to Holt about her interaction with Oliver (impermissible hearsay); (11) Detective Jerry Franklin Stephens learned about a conversation between Detective Brooks and Holt (impermissible hearsay); and (12) Detective Richard Aldahl spoke to Johnson about the identity of the shooter (impermissible hearsay). Using the same chronology, we now address, and reject, challenges to this evidence.

(1) The defense objected on relevance grounds (Evid. Code, § 350) to Mizell's testimony that Oliver was unemployed in the weeks before the capital crime. However, Oliver's work history prompted further questioning that showed he was alone in Lewis's home throughout the day, and had access to the wedding album containing photographs of Mizell's relatives— people he later targeted for murder. Hence, such evidence served a foundational purpose. It also tended to show that Oliver was dependent, emotionally and financially, on Lewis, and thereby had a possible motive for helping Lewis harm his estranged wife and in-laws. The court did not err in overruling the objection.

(2) The prosecutor asked Mizell whether she remembered showing Oliver the photo album. She said she did not have a specific memory of doing so. The prosecutor asked whether she might have done so. Defendants objected, unsuccessfully, on the ground the question had been asked and answered. (Evid. Code, § 765, subd. (a).) But the question whether Mizell might have shown Oliver the album had not been asked at the time the objection was made. Only *after* the trial court overruled the objection did Mizell answer that, indeed, she might have shown Oliver the wedding album. No error occurred.

(3) Iva Worthen, Mizell's mother, testified that the red Mustang Oliver drove on July 19, 1989, after being ejected from Lewis's house by the police, was distinctive, because a neighbor had told Worthen that a similar car was used by the person who torched Worthen's Ford Tempo. Defendants objected on hearsay grounds. (Evid. Code, § 1200, subds. (a), (b).) However, Worthen did not testify about the truth of what her neighbor had seen, but about the

reason she noticed and remembered the red Mustang, i.e., a relevant state of mind. This was not impermissible hearsay. (*Id.*, § 1250, subd. (a)(2).) The court did not err in overruling the defense objection.

(4) Melvin Johnson was waiting outside the church for his daughter and niece to emerge when the capital crime occurred. Defense counsel questioned him on his recollection of events, and he implied that it was better now than before, when the police interviewed him. He had seen a newspaper article about the murders, but his recollection was his own and his family did not discuss the article. He denied that the family was trying to conceal exposure to the article. On redirect examination, the prosecutor asked him why the family did not discuss the article. Johnson explained that his daughter had been traumatized by witnessing the murders, and that the family agreed not to discuss the case in her presence. The court overruled a relevance objection. (Evid. Code, § 350.)

Since defense counsel impugned Johnson's integrity, the prosecution was entitled to rehabilitate him by showing that the Johnson family had a legitimate reason for not mentioning the capital crime at home. The court did not err in overruling the objection.

(5) As stated, defense counsel had asked Melvin Johnson about having a better recollection of events at trial than during police interviews. Answering a prosecution question on redirect examination whether a police officer had spent much time with him at the crime scene, Johnson replied, "no." He explained that he and his family wanted to leave quickly, because his daughter was shaken by what she had seen. Defense counsel objected to the answer as nonresponsive and to followup questions as irrelevant. (Evid. Code, §§ 350, 766.) The trial court overruled the objections. Johnson further testified that he and his wife entered the church and found a grisly crime scene.

Again, the challenged testimony sought to refute a defense implication that Johnson was inventing facts on the witness stand that he had not related to police earlier. The daughter's upset explained why Johnson did not linger at the crime scene and provide police with as detailed an account as he gave in court. The testimony was responsive and relevant. No error occurred.

(6) On direct examination, the prosecutor asked Vivian Worthen, the mother of murder victim Patrinella Luke, whether the shooter faced her. She responded, "He was looking right at me." The prosecutor asked, "And that was for a period of a couple [of] seconds?" The trial court overruled an objection that the question was impermissibly leading. (Evid. Code, §§ 764, 767, subd. (a)(1).)

The Attorney General does not dispute that the objection should have been sustained. Even assuming the trial court should have required the question to be rephrased in open-ended form, any error was insignificant. Vivian Worthen did not identify Oliver as the shooter despite the eye contact she described. Reversal is not compelled. (See *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

(7) Louise Holt testified that Oliver and her daughter quarreled two days after the capital crime, and that Oliver threatened to kill them at gunpoint. Defendants objected that Holt lacked personal knowledge about the argument (Evid. Code, § 702) because she did not know its nature. However, Holt did not relay the content of the argument, but only that one occurred. The key point was that Oliver reacted by displaying the murder weapon. The court did not err in overruling the objection.

(8) Louise Holt testified that Oliver seemed to be attempting to avoid arrest by jumping fences in the yard outside Lewis's house shortly beforehand. Defendants unsuccessfully objected on relevance grounds. (Evid. Code, § 350.) There was no error in overruling the objection. Oliver's apparent attempt to avoid arrest bore on his consciousness of guilt.

(9) Defendants raised a hearsay objection during the testimony of Detective Jerry Lee Brooks. (Evid. Code, § 1200, subds. (a), (b).) Previously, defense counsel had challenged Louise Holt on the consistency of her prior statements about the kind of gun Oliver displayed. Detective Brooks testified that Holt told him it was a shotgun—a statement consistent with her testimony that it could have been a shotgun. The out-of-court statement was admissible as a prior consistent statement. (Evid. Code, §§ 791, 1236.) The trial court properly overruled defendants' objection.

(10) The defense made another hearsay objection to Detective Brooks's testimony when he indicated that Holt never mentioned the possibility of receiving a financial reward for helping to apprehend the murderers. The court did not err in overruling the objection. The evidence bore on a relevant mental state, namely, Holt's apparent lack of knowledge of any reward that might have tainted her cooperation with police.

(11) Defendants registered a hearsay objection (Evid. Code, § 1200, subds. (a), (b)) to the testimony of Detective Jerry Franklin Stephens. Detective Stephens confirmed that Louise Holt, when speaking with Detective Brooks, said she saw a gun that may have been a shotgun. Also, Detective Stephens was allowed to testify, without a defense objection, that Holt said someone had the nickname of "Lotto." Oliver speculates that the jury might have wondered if it was his gang moniker, even though Detective Stephens also testified he had no idea to whom the pseudonym belonged.

For the reasons stated in item (9), Detective Stephens's testimony about the gun was admissible as relating a prior consistent statement. (Evid. Code, §§ 791, 1236.) The trial court did not err in overruling defendants' hearsay objection. As for the reference to someone named "Lotto," we agree with the Attorney General that the claim is forfeited because defendants failed to object to this evidence. (Evid. Code, § 353, subd. (a).) In any event Detective Stephens had no idea to whom the nickname referred. Oliver's suggestion that it disparaged him in front of the jury is speculative and meritless.

(12) Detective Richard Aldahl testified that Melvin Johnson told him he could not identify Oliver in a photographic lineup. Defendants objected to this testimony as impermissible hearsay. (Evid. Code, § 1200, subds. (a), (b).) However, Johnson's admission to police that he could not identify Oliver before trial benefited Oliver. Any error in its introduction was harmless. (See *People v. Watson, supra,* 46 Cal.2d 818, 836.)[19]

---

[19] Defendants further argue that the introduction of extrajudicial statements made to Detectives Brooks, Stephens, and Aldahl by Louise Holt about Oliver and his shotgun, and by Melvin Johnson about the photographic lineup, violated the confrontation clause, as construed by *Ohio v. Roberts* (1980) 448 U.S. 56 [65 L.Ed.2d 597, 100 S.Ct. 2531]. We reiterate that defendants have forfeited this confrontation clause claim by failing to raise it below. (*Partida, supra,* 37 Cal.4th 428, 435; e.g., *People v. Alvarez* (1991) 14 Cal.4th 155, 186 [58 Cal.Rptr.2d 385, 926 P.2d 365].) In any event, the claim lacks merit. In *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*), the high court repudiated *Ohio v. Roberts, supra,* 448 U.S. 56, which had permitted hearsay evidence in criminal cases if it fell within a traditional exception or was particularly trustworthy. (See *People v. Roldan* (2005) 35 Cal.4th 646, 711, fn. 25 [27 Cal.Rptr.3d 360, 110 P.3d 289]; *People v. Harrison* (2005) 35 Cal.4th 208, 239 [25 Cal.Rptr.3d 224, 106 P.3d 895]; *People v. Combs* (2004) 34 Cal.4th 821, 842 [22 Cal.Rptr.3d 61, 101 P.3d 1007]; *People v. Monterroso* (2004) 34 Cal.4th 743, 763–764 [22 Cal.Rptr.3d 1, 101 P.3d 956].) *Crawford* held that "testimonial" statements, including at least some "police interrogations," are barred under the Sixth Amendment unless the declarant is "unavailabl[e]" and the defendant had "a prior opportunity for cross-examination." (*Crawford, supra,* 541 U.S. 36, 68; see *id.* at pp. 52, 53 & fn. 4, 54.)

Neither Holt's nor Johnson's extrajudicial statements implicate *Crawford*'s confrontation concerns. According to *Crawford*, the reliability of testimonial hearsay is best established by "the crucible of cross-examination." (*Crawford, supra,* 541 U.S. at p. 61.) While *Crawford* literally says there must be both witness "*unavailability*" and a "*prior*" opportunity for cross-examination" (*id.* at p. 68, italics added), we do not read it to mean that the extrajudicial statements of declarants who *are* available for *current* cross-examination must be excluded. Where the declarant is unavailable at trial, the prosecution cannot admit such evidence against the defendant unless the defendant previously had the chance to test its veracity in an adversarial setting. But *Crawford* cannot reasonably be understood as barring such evidence where the declarant *was* available for that purpose at trial, and the defendant *could* have cross-examined him.

Such is the case here. Holt and Johnson testified in the capital trial, and were subject to cross-examination about their role in the case. It would serve no purpose, and would be absurd, to bar their statements even though they were not "unavailable" within the meaning of *Crawford.* In any event, Holt's statements merely augmented other incriminating evidence, including the Savage shotgun itself. As noted above in the text, Johnson's admission to police that he could not identify Oliver before trial benefited Oliver.

B. *Motions for Mistrial (Lewis, Oliver)*

Defendants claim the trial court erred under state law by failing to grant three mistrial motions during the guilt phase. Oliver asserts related violations of his due process rights under the Fifth Amendment, of his Sixth Amendment rights generally, of his Eighth Amendment right to a reliable penalty determination, and of his rights under parallel provisions of the state Constitution. Lewis claims the trial court violated his Fifth Amendment right to due process, his Sixth Amendment right to conflict-free counsel, and his Eighth Amendment right to be free from cruel and unusual punishment. Lewis further complains about the court's failure to "control all proceedings during the trial" under section 1044.

Except for due process, the constitutional claims and the section 1044 claim are forfeited. (*Partida, supra,* 37 Cal.4th 428, 435.) No state law error occurred.

Oliver faults the trial court for denying two mistrial motions he made on a single day, January 28, 1993, during the prosecution's case-in-chief. The first one followed testimony by Vivian Worthen, the mother of murder victim Patrinella Luke. As Worthen left the witness stand, she made a disparaging comment to Oliver. William Turner, Oliver's counsel, heard her call him a "dirty black dog" or "you mad dog." From five feet away, Richard Leonard, Lewis's counsel, heard her call Oliver "you mad dog." The bailiff said he thought Worthen had called Oliver a "dog." Oliver's counsel moved for a mistrial because he assumed the jury heard the comment and would be prejudiced against Oliver. Counsel also asked the court to inquire of the jurors whether they had heard Worthen's comment.

██ A motion for mistrial should be granted only when a party's chances of receiving a fair trial have been irreparably damaged. (*People v. Ayala* (2000) 24 Cal.4th 243, 284 [99 Cal.Rptr.2d 532, 6 P.3d 193].) We review a ruling denying a motion for mistrial for abuse of discretion. (*Id.* at p. 283.) None appears here. The trial court reasonably found that the comment added nothing to what the jury knew—that Worthen scorned Oliver because she saw him gun down her daughter in church. In addition, the court and the prosecutor both said they had not heard Worthen's comment. The court was closer to Worthen at the time than was the jury. Richard Leonard opined that he did not think the jury heard the comment. The court could reasonably conclude that the jury never heard the comment. Oliver maintains the court should have asked the jury about the effect of the comment. However, such an approach might have highlighted the incident, which was otherwise quite minor. We find no abuse of discretion.

Oliver personally (and not through counsel) made a second mistrial motion on January 28, 1993. He blurted out the word "mistrial" after another prosecution witness, Louise Holt, testified that he was "uglier" than he used to be. At the time, Holt was answering a defense question about changes in Oliver's appearance since the crimes. Holt insisted that she meant what she said, and that she was not deriding Oliver gratuitously.

However, *counsel* never requested any relief based on Holt's remark. The court's failure to address Oliver's spontaneous personal reaction was not unreasonable. In any event, Holt's remark did not concern Oliver's criminal culpability or moral character. It did not risk an unfair trial, or warrant a mistrial.

Next, both defendants claim the trial court erred in not granting their motion for mistrial on February 2, 1993, the day after they assaulted counsel in court and disrupted the prosecution's case. In the alternative, Oliver suggests the trial court should have excused multiple jurors because the incident had turned them against him. We disagree.

In *People v. Williams* (1988) 44 Cal.3d 1127 [245 Cal.Rptr. 635, 751 P.2d 901], we affirmed the judgment in the face of a claim that disruptive courtroom conduct had prejudiced the jury. (*Id.* at pp. 1155–1157.) "As a matter of policy, a defendant is not permitted to profit from his own misconduct." (*Id.* at p. 1156.) We adhere to that commonsense view here. Defendants may not complain on appeal about the possible effect on jurors of their own calculated misdeeds. (*People v. Arias, supra,* 13 Cal.4th 92, 148; *People v. Pride, supra,* 3 Cal.4th 195, 253–254; *People v. Hendricks* (1988) 44 Cal.3d 635, 643 [244 Cal.Rptr. 181, 749 P.2d 836]; see *People v. Hines* (1997) 15 Cal.4th 997, 1054 [64 Cal.Rptr.2d 594, 938 P.2d 388]; see also *People v. Gomez* (1953) 41 Cal.2d 150, 162 [258 P.2d 825].) Defendants' reliance on *Fain v. Superior Court* (1970) 2 Cal.3d 46 [84 Cal.Rptr. 135, 465 P.2d 23] is misplaced for reasons *Fain* itself explains. "A defendant should not be permitted to disrupt courtroom proceedings without justification [citation] and then urge that same disruption as grounds for a mistrial." (*Id.* at p. 53.)[20]

Defendants also assert that the trial court failed to adequately probe for juror bias, erred in retaining one juror, L.S., who at one point said he was unsure he could continue to be unbiased, and improperly told jurors to avoid discussions with outsiders by lying about having seen the assault. As to the

---

[20] Lewis implies that because Oliver actively participated in the assault, Lewis was not solely responsible and should not suffer the consequences on appeal of misconduct that was not his alone. We find no merit in the contention. Lewis started the attack and Oliver joined in. Had Lewis not launched the assault on his own counsel, Oliver might not have followed suit and the entire incident might not have occurred.

last point, defendants failed to object to the comment and thus have forfeited the claim. (*People v. Monterroso, supra,* 34 Cal.4th 743, 759.) Overall, the remedial steps taken by the court adequately addressed defendants' concerns. The court accommodated defendants' request to ask jurors whether they could be fair or had heard press accounts. Examinations were conducted of individual jurors who thought the incident might have affected them. At defendants' request, the court excused the one juror injured when the courtroom was hastily evacuated. Defendants did not seek to remove L.S., whose answers showed that he fundamentally remained impartial and would not be more inclined to find defendants guilty or to prejudge penalty. Indeed, the court said of L.S., "[f]or the record, [he] is a young Black male. He strikes me as being very honest and if he says he can put it aside, I believe him." This record gives us no reason to doubt the court's conclusion.

## C. Shackling Orders (Oliver)

Oliver maintains the trial court violated *People v. Duran* (1976) 16 Cal.3d 282 [127 Cal.Rptr. 618, 545 P.2d 1322] (*Duran*), when it ordered (1) a leg brace on April 20, 1992, several months before trial began, and (2) a leg-waist-and-wrist chain on February 2, 1993, the day after Oliver joined Lewis in attacking counsel in court. Oliver claims the decision to restrain him before trial, and to impose heavier restraints after the midtrial assault, violated his rights generally under the Fifth, Sixth, and Fourteenth Amendments, and under parallel provisions of the state Constitution. He asserts that the court's rulings had the additional legal consequence of violating his due process rights under the Fifth Amendment.

Except for due process, the constitutional claims are forfeited. (*Partida, supra,* 37 Cal.4th 428, 435.) No state law error occurred.

Under *Duran, supra,* 16 Cal.3d 282, a criminal defendant may be subjected to physical restraints in the jury's presence upon "a showing of a manifest need for such restraints." (*Id.* at pp. 290–291; see *People v. Mar* (2002) 28 Cal.4th 1201, 1216–1217 [124 Cal.Rptr.2d 161, 52 P.3d 95].) This requirement is satisfied by evidence that the defendant has threatened jail deputies, possessed weapons in custody, threatened or assaulted other inmates, and/or engaged in violent outbursts in court. (*People v. Combs, supra,* 34 Cal.4th 821, 837–838 [psychologist found defendant was "a serious suicidal and homicidal risk" and prosecutor stated he had possessed two shanks in jail and threatened jail deputies]; *People v. Medina* (1995) 11 Cal.4th 694, 730 [47 Cal.Rptr.2d 165, 906 P.2d 2] [prosecutor stated defendant had a history of attempted and completed escapes and of violent conduct in the courtroom and in custody]; *People v. Hawkins* (1995) 10 Cal.4th 920, 943–944 [42 Cal.Rptr.2d 636, 897 P.2d 574] [defendant had a history of criminal

violence and court security advised that he had been violent in jail]; *People v. Stankewitz* (1990) 51 Cal.3d 72, 95–97 [270 Cal.Rptr. 817, 793 P.2d 23] [court security advised that defendant had attempted to escape from a holding cell and engaged in violent conduct in the courtroom and in custody, and was planning to escape again and to shoot sheriff's deputies; defendant also threatened the trial judge and bailiffs].)

The trial court's decision to physically restrain a defendant cannot be based on rumor or innuendo. (*People v. Combs, supra,* 34 Cal.4th 821, 837.) However, a formal evidentiary hearing is not required. (*People v. Medina, supra,* 11 Cal.4th 694, 731.) A shackling decision will be upheld absent a manifest abuse of discretion. (*Duran, supra,* 16 Cal.3d 282, 293, fn. 12.)

On appeal, as at trial, Oliver claims there was no "manifest need" under *Duran* and its progeny, for the restraints he endured. He faults the court for not holding a formal hearing in which witnesses were required to testify under oath as to whether he presented a credible threat of violence in the courtroom. Oliver also claims the court failed to consider less onerous restraints.

However, contrary to what Oliver implies, the trial court invoked *Duran* at both shackling hearings. At the hearing on April 20, 1992, the court cited credible reports that Oliver had attacked another inmate with a typewriter and threatened to kill deputies. It added, "I've seen his demeanor here in court. This is not a compliant person." The court followed the advice of the sheriff's department and ordered a leg brace, noting that it would be less visible and noisy than chains. The court also believed that a leg brace would allow fewer deputies to be present in court. Later, on February 2, 1993, when it ordered additional restraints, the court stressed that the leg brace had not prevented Oliver from attacking counsel. The court properly found, based on its own observations, that Oliver was dangerous in the courtroom. It did not need to summon outside witnesses to resolve the shackling question. No abuse of discretion occurred.[21]

## D. Marsden *Claim (Lewis)*

Lewis complains the trial court erred in denying his *Marsden* motion, and in not giving him an adequate opportunity to show that counsel should be

---

[21] Oliver also claims article 5 of the Universal Declaration of Human Rights prohibited the physical restraints he wore before and during trial. However, as noted in the text, the trial court's shackling orders did not violate applicable state or federal law. Oliver fails to show how international law differs from domestic law on this issue. The claim therefore lacks merit. (See *People v. Blair* (2005) 36 Cal.4th 686, 755 [31 Cal.Rptr.3d 485, 115 P.3d 1145] [defendant establishes no violation of international law absent any federal or state violation compelling reversal of death judgment]; accord, *People v. Hillhouse* (2002) 27 Cal.4th 469, 511 [117 Cal.Rptr.2d 45, 40 P.3d 754].)

replaced. He also argues that the court's actions had the additional legal consequence of violating his due process rights under the Fifth Amendment and the state Constitution. A claim of deficient representation also is raised under the Sixth Amendment and the state Constitution.

As previously described, the issue arose on February 2, 1993, near the close of the prosecution's case at the guilt phase, and the day after the assault on counsel that Lewis initiated in the courtroom. By then, Richard Leonard had represented Lewis as either counsel or advisory counsel for over two years. Between December 14, 1990, and January 4, 1993, Lewis had twice assumed, and then relinquished, in propria persona status. On December 14, 1990, he assumed in propria persona status. On April 20, 1992, he relinquished it. On June 5, 1992, he again assumed in propria persona status. On January 4, 1993, he again relinquished it. Two days later, on January 6, 1993, shortly before jury selection began, James Leonard became cocounsel to Richard Leonard.

In the *Marsden* hearing Lewis complained that counsel did not accept his innocence, did not visit him sufficiently, and had caused Jeanett Hudson to become a witness against him, harming his alibi defense. He said that he did not trust counsel and would not cooperate with them. He also cited the "big confrontation" in court the previous day.

Richard Leonard replied that he had visited Lewis "at least once a week for the last two years," felt comfortable representing him, and harbored no lingering resentment over the assault. James Leonard acknowledged that Lewis had acted badly and pushed him the preceding week. However, James Leonard also felt no resentment and could continue representing Lewis.

The trial court allowed Lewis to respond to counsel's arguments, including Richard Leonard's claim that he regularly visited Lewis. Lewis ended the exchange by twice refusing to say anything further. He also refused to attend trial the next day.

In denying the *Marsden* motion, the trial court noted that Lewis generally appeared to be cooperating with his attorneys in court, and that the prosecution was almost done presenting its case. The court praised counsel as being "professional" and "the best you can get." The court also commented on Lewis's apparent attempt to "generate" conflict and distrust by physically attacking counsel "late" in the case. Lewis did not dispute those observations.

No abuse of discretion occurred. In particular, we reject Lewis's claim that the trial court denied him an adequate opportunity to show the need for replacement counsel. The court also did not summarily resolve factual

disputes against him (e.g., the number of counsel's jail visits). The court apparently viewed the *Marsden* motion—much like the courtroom assault—as a last-ditch effort to delay the jury verdict, and as having little bearing on the attorney-client relationship. Indeed, the court emphasized that, aside from the brawl, Lewis had largely cooperated with, and behaved well toward, counsel. We see no basis on which to disturb the ruling on appeal. (See *People v. Whitt* (1990) 51 Cal.3d 620, 659 [274 Cal.Rptr. 252, 798 P.2d 849] [defendant's delay in expressing dissatisfaction with counsel gave the court "reasonable grounds to question the sincerity of his current criticisms"].)

E. *Motions for Continuance (Oliver)*

Oliver contends the trial court violated state law in denying his various requests for a continuance during the guilt phase. He claims the rulings had the additional legal consequence of violating his right to due process under the Fifth Amendment and the state Constitution, and to effective representation under the Sixth Amendment and the state Constitution. We disagree.

For context, we note that Oliver first moved for a continuance on Monday, February 8, 1993. Such motion occurred one week after defendants' assault on counsel (which happened on February 1, 1993), and four days after the prosecution rested its case on Thursday, February 4, 1993.

Of relevance here is that on Thursday morning, February 4, the trial court asked Lewis's counsel if he was ready to proceed. Counsel for Lewis replied he would be ready on the following Monday morning, i.e., February 8. Oliver's counsel said he would be "ready when [Lewis's counsel] finishes." Lewis's counsel informed the court that his case-in-chief would take "at the most . . . probably a day." Thus, before noon on Thursday, Oliver's counsel knew that he must be ready to present his case on Monday, because Lewis's case might take less than an entire day.[22]

That Monday, February 8, 1993, Oliver's counsel broke his promise to begin calling witnesses. He did so even though the trial court granted multiple recesses to allow him to call and find them, or to otherwise decide how to proceed. Lewis had just concluded his case. Lewis decided not to testify, and Lewis's counsel could not locate his sole other witness, Larry Brown, the parishioner accosted by defendants outside the church. At that point, counsel for Oliver volunteered that his client also considered Brown "an essential witness in our case," but admitted that Oliver had never served

---

[22] On the following Monday, Lewis's counsel said he had anticipated his case-in-chief would take the full day. But that is not what he told the court and counsel for Oliver on the preceding Thursday.

him. The court observed that "[t]his case is three years old. Do you expect me to sit and wait for another three years on the chance he might come in?"

It was at this juncture that Oliver's counsel announced that, despite his promise to be ready when Lewis's case concluded, he was not prepared to proceed. Oliver's counsel admitted he had not decided whether Oliver should take the stand, the first of several such equivocations by Oliver's counsel or Oliver himself. The trial court proposed doing an in limine hearing on another witness for Oliver, one Shon Yokely. Oliver's counsel agreed, but then moved for a continuance so that he could start presenting evidence to the jury on the following day. The court denied the motion, saying: "No, sir. That's not going to happen. . . . Mr. Turner, you were on notice we would be starting today. [¶] You had the weekend plus the entire day Friday plus almost an entire day on Thursday. We are proceeding today." Oliver's counsel started to make excuses about the nonappearance of certain witnesses.

The trial court and Oliver's counsel attempted to begin the in limine hearing on Shon Yokely, the previously mentioned witness for Oliver. Yokely entered the courtroom. Oliver's counsel then announced that Yokely was awaiting sentencing elsewhere in the courthouse and, exercising his Fifth Amendment rights, might not wish to testify. Oliver's counsel had not called Yokely's counsel to ensure that Yokely would testify. Yokely said, "I plead the Fifth," and refused to testify. Oliver's counsel complained that the court had not given him enough time to interview Yokely. The court reminded him that he had had several days in which to do so.

At that point, Oliver's counsel renewed his request for a one-day continuance. The court again denied the motion. Oliver's counsel mentioned fingerprint expert Lee Smith, another witness he planned to present on Oliver's behalf. The court inquired whether Smith had been subpoenaed. Oliver's counsel admitted that he had not done so, offering instead that, "I talked to him on the phone Thursday" and he "expressed to me he would be here tomorrow." The trial court said that, without a subpoena, it would not find good cause to grant a continuance.

After making some phone calls, Oliver's counsel again moved for a continuance. The trial court again denied the motion. Oliver's counsel asked again some minutes later, and the court answered, "You had two years. You don't have the rest of the day. Don't ask me again, I am not going to let you have a continuance."

Eventually, during the course of the morning, Oliver's counsel located his witnesses, namely Maggie Crenshaw, Patricia James, and Lee Smith. He presented their testimony later that day. The court also allowed Oliver to

reopen his case-in-chief on Tuesday, February 9, 1993, following the prosecution's rebuttal case, to present the testimony of Larry Brown. As noted, Brown was the witness Oliver's counsel had described as essential, but who had not been located on Monday or served with a summons. The court indicated that it was willing to let Oliver present a second witness during his reopened case-in-chief, one Maurice Rhodes. However, Oliver's defense team still had not been able to find Rhodes.

 We review a ruling on a motion for a continuance for an abuse of discretion. (*People v. Wilson* (2005) 36 Cal.4th 309, 352 [30 Cal.Rptr.3d 513, 114 P.3d 758]; *People v. Howard* (1992) 1 Cal.4th 1132, 1171–1172 [5 Cal.Rptr.2d 268, 824 P.2d 1315].) In order to show the court abused its discretion in denying a continuance in the midst of trial, the defendant must demonstrate, among other things, that he diligently attempted to secure the attendance of witnesses. (*Howard, supra,* at p. 1171.) Far from being diligent, the efforts of Oliver's defense team to subpoena and ensure the attendance of witnesses were tardy and inadequate. Yet, the trial court accommodated Oliver by allowing him to reopen his case to present the testimony of Larry Brown, a witness Oliver was inexplicably unprepared to call earlier, when he knew his case was set to begin.

In sum, Oliver's counsel was not ready to proceed at the promised time despite ample notice and opportunity to do so. However, the trial court's response to the problem did not cause him to lose valuable witnesses as a result. Contrary to Oliver's further claim, the court's denial of a continuance did not impair his right to testify. Both Oliver's counsel and Oliver himself repeatedly declined to say on February 8, 1993, that Oliver would testify. The court never stated or implied that Oliver could not exercise that right if he chose to do so.

As for Oliver's argument that denial of the continuance denied him the right to effective assistance of counsel, it appears that, even assuming counsel's performance was constitutionally deficient, Oliver presented all witnesses available to him. He does not indicate what additional evidence, if any, he would have presented on his own behalf had counsel behaved differently. There was no reasonable probability of an adverse effect on the outcome. (*Strickland v. Washington, supra,* 466 U.S. 668, 687–688, 694.)

F. *Instructions on Uncharged Criminal Acts (Oliver)*

Defendants have argued on appeal that evidence of uncharged crimes was wrongly admitted to show their violent character and disposition. We now address Oliver's related contention that the trial court failed to adequately instruct the jury on how to evaluate such evidence. Oliver claims as an

additional legal consequence that his due process rights were violated under the Fifth and Fourteenth Amendments, and under parallel provisions of the state Constitution.

The trial court instructed the jury that it could consider whether Lewis made "threats" against Mizell. However, the instruction also stated that such evidence was not admitted against Oliver and could not be considered against him. The court also gave an instruction closely conforming to the standard instruction, CALJIC No. 2.50 (5th ed. 1988), on the manner in which the jury generally was to evaluate the other-crimes evidence admitted against one defendant or both. Specifically, the evidence could not be considered for dispositional reasons, but solely to establish intent, identity, knowledge, or means to commit a crime. (See Evid. Code, § 1101, subd. (b).)

Oliver mainly argues that in four of the five incidents in which Lewis abused Mizell and threatened to kill her and her family, the evidence showed that Lewis not only made "threats," but also engaged in physical violence. Thus, according to Oliver, the instruction's limiting command to consider incidents involving "threats" solely against Lewis left the jury free to consider four out of the five violent incidents against Oliver as well.

Oliver has forfeited this claim. Because he did not seek clarification of the instructions concerning the "threats" and uncharged acts, he cannot complain about their lack of clarity on appeal. (*People v. Coffman and Marlow, supra,* 34 Cal.4th 1, 122.)

Also, no error occurred. The instruction's reference to threats was not misleading, confusing, or incomplete. The jury could not have misapplied the instruction to Oliver's detriment. In the five incidents in question, namely, that Lewis threatened to kill Mizell with a knife and nicked her with it in September 1988, threatened to kill her and choked her in February 1989, threatened to kill her and held a knife to her throat in an alley in March 1989, assaulted and threatened to kill her in June 1989, and threatened to kill her on July 18, 1989, after she moved out, the testimony focused on Lewis's threats, whether or not those threats were made more real to Mizell by Lewis's use of physical violence. More to the point, there was no evidence that Oliver was present during any of the incidents in question. Hence, the jury had no basis on which to attribute Lewis's violent conduct to Oliver.

G. *Hastening the Verdict (Lewis, Oliver)*

Defendants contend the trial court hastened jury deliberations and coerced the guilt verdicts in violation of state law. In addition, defendants claim they were denied due process under the Fifth Amendment, an impartial jury under

the Sixth Amendment, and a reliable penalty determination under the Eighth Amendment. Violations of analogous state constitutional rights also are alleged. For reasons we explain, all claims are procedurally barred and lack merit.

Defendants maintain that the trial court improperly suggested to the jurors that if they did not complete deliberations by February 11, 1993, they would have to continue them during the week of February 15. The record indicates that Friday, February 12, was the Lincoln's Birthday holiday, and that Monday, February 15, was the Presidents' Day holiday. The court had told jurors previously that trial would be in recess from February 12–19.

However, on February 4, the court responded to a report that a recent appellate decision had held that to interrupt deliberations would constitute reversible error even with counsel's consent. Hence, the court alerted the jury that it might have to continue with trial if deliberations began before the holiday period. The court asked the jurors if continuing to deliberate would cause any scheduling problems. Two jurors spoke up. One said that she needed to go to Sacramento on Friday, February 19. The court stated that doing so presented no problem, because court would not be in session that day even if deliberations continued during the holiday week. Another juror said she had made travel plans for the week of February 15. On February 9, however, before deliberations began, and hence before any pressure to hasten a verdict could emerge, the court stated that the juror had resolved the scheduling conflict, presumably by altering her travel plans. The jury reached its verdict on February 11, 1993, and thus did not have to work through the holiday week.

As a threshold matter, we note that the court and counsel discussed the handling of this matter outside the jury's presence beforehand. Counsel did not object to the court's approach. Counsel on both sides said they had "no problem" with it. Because defendants did not object to the trial court's comments regarding scheduling, they have forfeited their state law claim that it interfered with the jury's deliberations and coerced a verdict. (See *People v. Cleveland, supra,* 32 Cal.4th 704, 754.) They also have forfeited their related constitutional claims. (*Partida, supra,* 37 Cal.4th 428, 435.)

In any event, no impropriety occurred. (See *People v. Beeler* (1995) 9 Cal.4th 953, 989–990 [39 Cal.Rptr.2d 607, 891 P.2d 153]; cf. *People v. Anderson* (1990) 52 Cal.3d 453, 469 [276 Cal.Rptr. 356, 801 P.2d 1107].) The first juror in question was not forced to choose between deliberating and traveling. The second juror—who might have been forced to make such a

choice if deliberations had continued past February 11—chose before deliberations began to give deliberations priority, and apparently altered her travel plans. Hence that juror could not have felt pressured to reach a verdict. We reject defendants' claim.

## H. *Absences Before and During the Guilt Phase (Oliver)*

Oliver claims the trial court violated his statutory and constitutional rights to be present at the proceedings, primarily by allowing the guilt verdict to be read on February 11, 1993, while he was hospitalized after being stabbed by another inmate. Oliver cites sections 977, 1043, and 1148. He also invokes the Fifth, Sixth, Eighth, and Fourteenth Amendments, as well as parallel provisions of the state Constitution.[23]

"Under the Sixth Amendment's confrontation clause, a criminal defendant does not have a right to be personally present at a particular proceeding unless his appearance is necessary to prevent 'interference with [his] opportunity for effective cross-examination.' [Citations.] [¶] Similarly, under the Fourteenth Amendment's due process clause, a criminal defendant does not have a right to be personally present at a particular proceeding unless he finds himself at a 'stage . . . that is critical to [the] outcome' and 'his presence would contribute to the fairness of the procedure.' [Citation.] [¶] Under section 15 of article I of the California Constitution, a criminal defendant does not have a right to be personally present 'either in chambers or at bench discussions that occur outside of the jury's presence on questions of law or other matters as to which [his] presence does not bear a " ' "reasonably substantial relation to the fullness of his opportunity to defend against the charge." ' " ' [Citations.] [¶] Lastly, under sections 977 and 1043 of the Penal Code, a criminal defendant does not have a right to be personally present where he does not have such a right under section 15 of article I of the California Constitution." (*People v. Waidla* (2000) 22 Cal.4th 690, 741–742 [94 Cal.Rptr.2d 396, 996 P.2d 46].)

Oliver insists the trial court erred in having the verdict read in court while he was in the hospital recovering from injuries received in the jailhouse attack. Oliver suggests that the court lacked sufficient information to decide

---

[23] The court and counsel debated whether, "in the interest of justice," section 1148 required that "the verdict be received in [Oliver's] absence." (*Ibid.*) Counsel indicated that Oliver must personally waive his right to presence, but identified no supporting constitutional theories. We nevertheless assume that the constitutional claims raised on appeal are preserved. Whether the constitutional right to presence may be lost by failing to object on that ground at trial is "close and difficult." (*People v. Champion, supra,* 9 Cal.4th 879, 908, fn. 6; see *People v. Edwards* (1991) 54 Cal.3d 787, 809–810 [1 Cal.Rptr.2d 696, 819 P.2d 436]; *People v. Arias, supra,* 13 Cal.4th 92, 146–148; *People v. Robertson* (1989) 48 Cal.3d 18, 59–61 [255 Cal.Rptr. 631, 767 P.2d 1109].)

the issue, and that it should have either waited for his full recovery or received the verdict in his hospital room. In Oliver's view, the verdict is a nullity.

The claim lacks merit under state law. Invoking section 1148, the trial court determined that "the interest of justice" required departure from the general rule that the verdict must be "received" in "the presence of the defendant." (*Ibid.*) Under any applicable standard, the ruling was substantiated and sound. The court learned during jury deliberations that Oliver was "in very critical condition with numerous stab wounds." When the jury later announced it had reached a verdict, the court knew that his condition was still dire and that he was in an intensive care unit. The length of Oliver's incapacitation could not be known at the time. Hence, a delay in announcing the verdict might have disrupted the proceedings or resulted in the loss of jurors. Nor can the court be faulted for not transferring the proceedings to Oliver's hospital room. That step might have been futile. Counsel described Oliver as "comatose" at the time. No state law violation occurred.

We reach the same result as to Oliver's due process and related claims. Assuming without deciding that there is a constitutional right to presence at the reading of the guilt verdict, none of the cases cited by Oliver addresses whether such right is subject to an interest-of-justice exception analogous to the one applied here under section 1148. (See *Rice v. Wood* (9th Cir. 1996) 77 F.3d 1138, 1140–1141, fn. 2 (en banc) [noting that existence and scope of constitutional right to presence when capital jury announces sentence is "an open question"].) Consistent with due process principles, we conclude that the trial court properly determined that any constitutional right to presence was not absolute, and that—in the interest of justice—the verdict could be read while Oliver was physically incapacitated and unable to attend court following a third party assault. (See, e.g., *People v. Richards* (N.Y.Sup.Ct. 1988) 140 Misc.2d 567 [531 N.Y.S.2d 474] [holding that verdict taken in defendant's absence did not offend federal Constitution where he was hospitalized with gunshot wound and could not attend court for one month without serious medical consequences].)

Specifically, as noted earlier, the trial court had ample reason to believe that Oliver's condition was serious, and that his prognosis was unclear. The court risked "exacting a heavy toll" on the jury if it had to wait for an uncertain or extended period to deliver its verdict while Oliver received medical treatment, emerged from his comatose state, recovered from his stab wounds, and returned to court. (*People v. Richards, supra,* 140 Misc.2d at p. 573 [531 N.Y.S.2d at p. 478].) Oliver has not shown that the trial court violated any federal constitutional right in accepting the verdict in his absence under such extenuating circumstances.

Oliver also asserts his right to be present was violated on other occasions. No prejudicial error occurred. (See *People v. Waidla, supra,* 22 Cal.4th 690, 741–742.)

(1) On October 30, 1990, an attorney, Joel Isaacson, was relieved of his appointment as advisory counsel following a conversation of which there is no record. As best we can discern, Oliver was present in court at all relevant times.

(2) On August 22, 1991, another attorney, Ezekiel Perlo, was removed from Oliver's case outside of his presence. However, nothing significant occurred. Perlo was new to the case and had done little or no work on it. He advised the trial court, after making preliminary inquiries, that he wished to be relieved from Oliver's case due to a conflict of interest with another capital client and to scheduling problems. The court granted Perlo's request. The rest of that session consumed perhaps a minute or two, and concerned routine calendaring matters. Oliver's absence could not have been prejudicial, because Perlo was not effectively representing him. Also, on the next court date, August 23, 1991, Oliver was present and voiced no objection to not being represented by Perlo. Instead, Oliver announced that he wished to proceed in propria persona.

(3) On May 7, 1992, three days after the court granted Oliver a mistrial and dismissed the original jury venire following the acquittals in the Rodney King case and the ensuing civil unrest in Los Angeles, Oliver was absent from a pretrial hearing involving Lewis's mistrial motion. At that time, counsel and the court discussed certain scheduling matters, and the prosecutor briefly mentioned the names of defense witnesses in conjunction with a discovery matter. However, the prosecutor accepted the comment of Charles Lloyd, counsel for Oliver, that "Mr. Oliver is not present and his matter is not before the court." Hence, nothing significant occurred. Oliver's absence could not have harmed his case.

(4) On September 24, 1992, neither Oliver nor, initially, his counsel was present during a pretrial discussion of scheduling, prospective juror question-naires, jury selection procedures, and witness statements. However, Oliver's counsel arrived later in the discussion, and was informed about the matters he had missed. Any error in beginning the discussion outside counsel's presence was sufficiently cured when counsel arrived. Oliver's own absence could not have harmed his case.

(5) On January 21, 1993, shortly before Oliver entered the courtroom, counsel and the court briefly discussed the question of stipulating to the excusals of a few prospective jurors and the views of one of them on the

death penalty. Almost all of this discussion involved issues relating solely to Lewis. The trial court was aware of Oliver's absence and ensured that nothing of substance occurred until he was present. Accordingly, when Oliver arrived, the parties had taken no action on stipulating to excusals of prospective jurors (although Lewis's counsel commented on what he might do on behalf of Lewis), or engaged in any meaningful substantive discussion about the reasons for so stipulating. Everyone waited until Oliver was present before engaging in the stipulations. Oliver could have told counsel at that time if he objected to any of the stipulated excusals, and he did not do so.

(6) On January 25, 1993, at the end of one trial day, the jury examined exhibits after Oliver—knowing that the jury would be doing so—sought to leave and was no longer present in the courtroom. Oliver knew what the jury was doing, and nonetheless chose to leave. He cannot claim error on appeal based on his own volitional actions at trial.

(7) On February 25, 1993, Oliver and his attorney missed a hearing primarily concerning Lewis's mental competence to stand trial. At that time, the court anticipated scheduling problems at the penalty phase due to Oliver's incapacity. However, nothing was decided. Discussions on scheduling matters continued in the presence of Oliver and his counsel on March 8, 1993, before the penalty phase began.

I. *Absences Before and During Guilt Phase (Lewis)*

Lewis claims violations of his statutory and constitutional rights to be present at various proceedings. He cites sections 977 and 1148. He also invokes his due process rights under the Fifth and Fourteenth Amendments, and under parallel provisions of the state Constitution.

The first incident occurred at a pretrial hearing on October 16, 1992. At that time, Lewis was representing himself, and was litigating the admissibility of the white powder found in a plastic bag at the Mount Olive Church after the capital crime. Oliver's counsel then requested an ex parte sidebar conference with the court. Lewis did not ask to approach the bench or join the legal discussion. Lewis now claims he was denied his right to be present at the bench conference.

Even assuming the claim is not waived in whole or part for failure to object below, it lacks merit. Lewis complains that both he and his advisory counsel were absent from sidebar. However, it appears the statutory and constitutional right to personal presence at a criminal proceeding does not apply in this situation. (See *People v. Waidla, supra,* 22 Cal.4th 690, 741–742.) Lewis cites no authority for the assumption that his right to be

present extended either to him *while acting as his own counsel*, or to advisory counsel who was assisting him in that capacity. We therefore decline to find error on this ground.

The next complained-of absences occurred on February 10 and 11, 1993, shortly after Lewis slit his wrists in jail, and was placed on a suicide watch. As we later discuss, the wounds were superficial and were made in an apparent attempt to establish his mental incompetence to stand trial.

Specifically, on February 10, 1993, the first day of jury deliberations at the guilt phase, the trial court announced that Lewis had "made an ineffectual attempt to injure himself" and was being held elsewhere, apparently under medical observation, in restraints. The court commented that it thought Lewis was again attempting to delay the proceedings, and asked Lewis's counsel how they wished to proceed. During the discussion, one of Lewis's attorneys said he thought Lewis was feigning behavior in another attempt to establish his incompetence to continue with the trial. On February 11, 1993, the trial court announced that the jury had reached a verdict. Lewis was under suicide watch at the time, and his counsel agreed to accept the verdict in his absence. The court received the verdict, and the clerk read it.

Lewis's self-inflicted injuries, which he apparently caused in order to feign incompetence and obstruct the proceedings, constituted volitional conduct for which he may properly be deemed to have absented himself from the proceedings, and to have waived any right to be present. (See *People v. Arias, supra*, 13 Cal.4th 92, 143–148 [defendant engaged in disruptive conduct within and without the courtroom and could not benefit on appeal from his own misconduct]; see also *Illinois v. Allen* (1970) 397 U.S. 337, 345–346 [25 L.Ed.2d 353, 90 S.Ct. 1057] [involving disruptive conduct within the courtroom]; *People v. Davis* (2005) 36 Cal.4th 510, 531 [31 Cal.Rptr.3d 96, 115 P.3d 417], citing § 1043, subd. (b)(1) [same]; *People v. Pride, supra*, 3 Cal.4th 195, 253–254 [same].)

In any event, the trial court implicitly found under section 1148 that the interest of justice required it to receive the verdict in Lewis's absence. It was unclear when Lewis would return to the courtroom. The court was understandably concerned that an open-ended delay would interfere with the proceedings. No error occurred.

The last challenged absence involves events on February 22, 1993. This incident occurred when Lewis's counsel sought a mental competence hearing between the time of the guilt and penalty trials. On that date, the court commented about the "creative array" of "talents [Lewis] has for delay." We believe that Lewis was present in court on this occasion. He was in the

adjoining holding cell and, the record explains, could hear the proceedings. It appears to have been the court's practice to pipe the court proceedings into the holding cell when one or more of defendants was there, as often occurred. Lewis was free to return to the courtroom at any time and to address the court's comment. We cannot conclude on this record that the court's remark was made in Lewis's absence.

J. *Sufficiency of the Evidence (Oliver)*

Oliver claims there was insufficient evidence to prove his guilt of the charged crimes. In his view, the convictions and ensuing death sentence violate the due process clause of the Fourteenth Amendment, and unspecified provisions of the Eighth Amendment. We disagree.

Our role is limited here. We review the entire record in the light most favorable to the judgment, and affirm the convictions as long as a rational trier of fact could have found guilt based on the evidence and inferences drawn therefrom. (*People v. Millwee, supra,* 18 Cal.4th 96, 132, citing *People v. Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738]; see *Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 99 S.Ct. 2781].)

The evidence refutes Oliver's claim of mistaken identity, and shows that he committed the capital crime. Oliver became enraged at Mizell when she had the police forcibly extract him from Lewis's house the day she ended her relationship with Lewis and moved out. The jury could reasonably infer that Oliver, out of loyalty to his brother Lewis, would be willing to help Lewis pursue his own vendetta against Mizell and her family after she left.

Of course, the hoods and masks worn by the two men who committed the capital crime at the Mount Olive Church prevented facial identification. However, witness descriptions of the killer's height, weight, and complexion matched Oliver's general appearance. In targeting Mizell and her immediate family for death inside the church (under the mistaken belief they would all be present, including Mizell), Oliver apparently entered and pulled the trigger (as opposed to Lewis), because parishioners were less likely to recognize Oliver (whom they did not know) than Lewis (whom they did know). Oliver had the opportunity in advance to study Mizell's photo album and learn the faces of the family members who were intended as victims.

Two days after the capital crime, Oliver threatened Holt with his Savage shotgun, which the police seized from his car. Forensic evidence conclusively linked Oliver's shotgun to the murders and attempted murder. Oliver's palm print impressions were found on the shotgun. Three shells fired by the same

weapon were retrieved from inside the church where the three shootings occurred. The police found a black jacket in Oliver's car similar to clothing that the killer wore. They also found gunshot residue on the jacket. A search of the house Oliver shared with Lewis uncovered fingerless gloves similar to the pair the killer wore while wielding the shotgun inside the church. In light of the foregoing, ample evidence supported the verdicts against Oliver of murder and attempted murder, and the related multiple-murder special-circumstance finding.[24]

## V. COMPETENCE ISSUES

Lewis and Oliver assert various claims of statutory and constitutional error concerning their mental competence to stand trial. In general, both defendants rely on section 1368 and the due process clause of the Fourteenth Amendment. More specifically, Lewis claims the trial court erred in not finding substantial evidence of incompetence to warrant a section 1368 hearing between the guilt and penalty phases. Oliver levels a similar charge. He claims the court ignored substantial evidence of mental incompetence caused by the physical injuries he sustained in the jailhouse stabbing before the penalty phase.

### A. *Lewis*

As noted, on January 20, 1993, after counsel was reappointed, Lewis declined to appear in court because other inmates had made upsetting

---

[24] As suggested in the discussion of defendants' pretrial motion to dismiss the information, the evidence was sufficient to support the guilt verdict against Lewis—a point he does not directly contest on appeal. The evidence at trial showed that Lewis became enraged at Mizell after she ended their relationship and returned to her family's home. Based on statements Lewis made at work, he blamed the breakup primarily on Mizell's family. The day Mizell left him, Lewis bought the Mossberg shotgun. The same shotgun was promptly used to vandalize the car belonging to Mizell's aunt. Mizell's car, which had been in Lewis's possession, was destroyed by fire.

The jury could infer the capital crime occurred at the Mount Olive Church because the perpetrators, presumably led by Lewis, expected Mizell and her family to follow their usual routine and attend services that night. When they did not encounter Mizell or her immediate family inside the church, the perpetrators targeted members of Mizell's extended family. Though the gunman who stood guard outside the church was disguised in "ninja" garb, witness descriptions suggested it was Lewis based on his height, weight, and complexion.

A search of Lewis's house uncovered, among other things, part of Lewis's Mossberg shotgun. The police arrested Lewis carrying another part of the weapon outside his house. The jury could infer that Lewis had disassembled it to conceal his role in the capital crime. Indeed, shells from the Mossberg weapon were found outside the church where Larry Brown had been fired upon. Lewis suspiciously rented three different automobiles in the days surrounding the capital crime despite owning his own car. Lewis told his work supervisor that he would be suspected of committing the murders, and that he did not want to be identified in his own motor vehicle. There was ample evidence to support the murder and attempted murder convictions against Lewis, and the multiple-murder special-circumstance finding.

comments about his mother's death, which had occurred about a year beforehand. The next day, during jury selection, Lewis was belligerent in the courtroom. Counsel told the court that Lewis described himself as a "1368 candidate," i.e., incompetent (see § 1368), and wanted to see a psychiatrist. The court and counsel agreed that Lewis seemed competent. However, in an abundance of caution, counsel planned to have him examined. Meanwhile, on January 25, 1993, the evidentiary phase of the guilt phase began. As noted, on February 1, 1993, before the end of the People's case-in-chief, defendants attacked counsel in court in an apparent attempt to obtain a mistrial.

The competence issue resurfaced between the start of the defense case on February 8, 1993, and the end of jury deliberations on February 11, 1993. During this time, Lewis again became belligerent, e.g., refusing to talk to anyone and screaming in the lockup behind the courtroom, stripping naked and taunting deputies, and superficially slitting his wrists. Discussing Lewis's behavior, the trial court and counsel each opined that Lewis was both manipulative and competent to stand trial. Lewis's counsel disclosed that Dr. Alvin Davis, and Michael Paul Maloney, Ph.D., a psychologist, had examined Lewis on February 6 and 7, respectively, and had reached a similar conclusion. However, counsel wanted Lewis reexamined for suicidal tendencies. Lewis's counsel agreed that the guilt verdict could be read in Lewis's absence.

On February 22, 1993, counsel said he had received a report from Dr. Davis opining that Lewis could not assist in his defense. Counsel moved for a competence hearing in front of a jury as a result. He noted that while Dr. Maloney had not yet finished his report, it likely would conclude that Lewis was feigning incompetence. The court was reluctant to act on counsel's request based solely on Dr. Davis's views, noting he "is rather well known in the system." The court agreed to accumulate more information before deciding whether there was substantial evidence of incompetence to warrant a full section 1368 hearing.

To this end, on February 24 and 25, 1993, the court heard the testimony of three experts. E. Eugene Kunzman, M.D., a psychiatrist, and Dr. Maloney opined that Lewis was malingering and was competent for trial purposes. By contrast, Dr. Davis, the psychiatrist who would later testify on defendant's behalf at the penalty phase, testified that although Lewis was malingering, that conduct masked genuine and severe paranoia, and that Lewis was incompetent to continue with the trial because he distrusted counsel and could not assist in his defense.

After hearing the testimony of Drs. Kunzman, Maloney, and Davis, the trial court denied Lewis's request for a full competence hearing. It explained

its reasons at length. It concluded that Dr. Davis had said nothing to connect Lewis's mental difficulties with his competence to stand trial. The court stated: "I do not find that the evidence has raised any reasonable doubt concerning [Lewis's] competence, nor do I harbor any doubt as to his competence or mental impairment. [¶] The defendant has displayed a history of manipulation and delay. I found Dr. Davis to be less than credible and I have no confidence in his conclusion. . . . [¶] I find his conclusions are not supported by any factual basis and he disregards evidence that is contrary to what appears to be a prefixed opinion. . . . Dr. Davis never acknowledged any alternative other than [that Lewis was incompetent]. It would be a travesty to have the defendant succeed in his efforts."

 The criminal trial of a mentally incompetent person violates due process. (*Cooper v. Oklahoma* (1996) 517 U.S. 348, 354 [134 L.Ed.2d 498, 116 S.Ct. 1373].) However, a defendant is not incompetent if he can understand the nature of the legal proceedings and assist counsel in conducting a defense in a rational manner. (See *ibid.*; § 1367.) Only when the accused presents "substantial evidence" of incompetence does due process require a full competency hearing. (*People v. Lawley* (2002) 27 Cal.4th 102, 131 [115 Cal.Rptr.2d 614, 38 P.3d 461].) A reviewing court generally defers to the trial court's observations and assessments in this regard. (See *People v. Marshall, supra,* 15 Cal.4th 1, 33.)

Evidence is not substantial enough to mandate a mental competence hearing unless it raises a reasonable doubt on the issue. (*People v. Young* (2005) 34 Cal.4th 1149, 1217 [24 Cal.Rptr.3d 112, 105 P.3d 487].) We have said that this standard is satisfied if at least one expert who is competent to render such an opinion, and who has had a sufficient opportunity to conduct an examination, testifies under oath with particularity that, because of mental illness, the accused is incapable of understanding the proceedings or assisting in his defense. (*Ibid.*, quoting *People v. Pennington* (1967) 66 Cal.2d 508, 519 [58 Cal.Rptr. 374, 426 P.2d 942]; accord, *People v. Welch* (1999) 20 Cal.4th 701, 738 [85 Cal.Rptr.2d 203, 976 P.2d 754].)

Here, the trial court did not err in finding no substantial evidence of mental incompetence and no reason to suspend the criminal proceedings. Relevant factors alluded to by the court included the suspicious timing of the wrist-slitting incident and other bizarre behavior near the end of the guilt phase. Before then, Lewis (aided at times by Oliver) used various tactics to delay and derail the trial, including the physical attack on counsel in open court. Notwithstanding Dr. Davis's opinion that Lewis could not assist in his defense, counsel indicated in candid discussions with the court that Lewis understood the proceedings and could help counsel in conducting a defense if he chose to do so.

Lewis suggests here, as below, that the testimony of Dr. Davis compels a contrary result. We disagree. The trial court found such evidence to be "less than credible." Moreover, independent of both its doubts about Dr. Davis's credibility and the contrary testimony of other experts, the court could conclude that Davis's opinion did not satisfy the substantial-evidence standard described above.

Specifically, the record supports the court's view that Dr. Davis's opinion was "pre-fixed." Dr. Davis acknowledged that he did not consider Lewis's psychiatric history in the Army or in jail. Dr. Davis admitted that he never reviewed the materials Lewis prepared while acting in propria persona. According to Dr. Kunzman, Dr. Davis did not consult with him or examine the charts he had prepared concerning his interviews with Lewis. Moreover, Dr. Davis conceded that his conclusion regarding Lewis's competence was tentative and not definitive. The psychiatrist volunteered that "what may be crucial matter . . . for final psychiatric diagnosis" was lacking.

As for the trial court's additional conclusion that Dr. Davis ignored "alternative" scenarios, the psychiatrist agreed that a defendant might engage in hostile or bizarre behavior to derail a trial, but refused to see any reason for Lewis to do so here. Dr. Davis also suggested that no normal person could feign mental illness, and that only a mentally disturbed person would attack counsel. Dr. Davis held these views even though he admitted that Lewis attacked counsel because they disagreed over tactics, that Lewis learned on February 6, 1993, that his cellmate had feigned mental illness during trial, and that Lewis might have slit his wrists to manipulate the proceedings.

Finally, the record supported the court's conclusion that Dr. Davis "disregard[ed]" contrary evidence. Dr. Davis was recalled to the stand after Dr. Maloney and Dr. Kunzman testified. Dr. Davis adhered to the views he had previously expressed even though he had learned that Lewis announced his suicide plan in advance, inflicted only bloodless scratches, and laughed about it afterward. In light of the foregoing, no error occurred.[25]

---

[25] Lewis suggests counsel's representation on mental competence was not vigorous, competent, or conflict free. Lewis highlights counsel's statements to the court about whether Lewis was feigning mental illness, counsel's willingness to discuss the matter while Lewis was absent from court, counsel's failure to seek the recusal of the court based on its statements concerning defense expert Dr. Davis, and counsel's failure to find an expert on competence other than Dr. Davis (about whose general approach to evaluating competence the court had expressed skepticism in advance of his testimony). Lewis further suggests the trial court erred in not appointing replacement counsel or recusing itself at this stage. We see no merit in this string of related claims. Counsel's opinion of his client's competence was not irrelevant. (See § 1368, subd. (a).) As an officer of the court, counsel could not paint a misleading picture on the issue. (See Bus. & Prof. Code, § 6068, subd. (d).) Despite counsel's own views on mental competence, he zealously protected Lewis's rights in this regard. Counsel had Lewis examined

## B. *Oliver*

As with Lewis, the issue of Oliver's competence arose between the guilt and penalty trials. On February 10, 1993, the same day that Lewis superficially slit his wrists and the day before the jury reached the guilt verdict, the trial court learned that Oliver had been stabbed the night before by another inmate. The court said it was willing to delay the proceedings until Oliver was well enough to attend. It observed, however, that there would be a "natural break" for preparation of the penalty phase. As noted, the guilty verdict was read in Oliver's absence on February 11, 1993.

Over the next few weeks, the court monitored Oliver's medical condition. On February 22, 1993, counsel told the court that Oliver might have suffered a stroke, that his speech was slurred, and that his leg movement was impaired. Counsel asked for a continuance. The court and counsel agreed to discuss Oliver's condition on March 1. Meanwhile, on February 25, the court learned from Detective Richard Aldahl that Oliver had recovered to the point that he might be able to attend half-days of trial by March 1. If so, the court planned to start the penalty phase on March 1.[26]

On March 1, 1993, all counsel and defendants, including Oliver, were present in court. Counsel explained that Oliver was much improved but was still light-headed. However, counsel obtained a one-week continuance to attend to a personal emergency. One week later, on March 8, all parties and counsel were again present in court. Counsel renewed their request to continue the trial at least one more week based on Oliver's symptoms: coughing, remnants of pneumonia, susceptibility to infection, and possible "brain damage." Counsel cited Oliver's medical records and his insistence that he had trouble speaking, and argued against a penalty trial absent authorization from Oliver's physician. For her part, the prosecutor urged the trial court to rely on medical reports that stated Oliver could participate on a limited basis. The prosecutor stated that Oliver was "certainly [able] . . . to understand the nature of the proceedings to at least assist counsel," and "is even capable of taking the witness stand . . . according to the report of the attending physician."

---

both for mental competence and suicidal tendencies. Both Dr. Davis and Dr. Maloney were involved in this process. Counsel subsequently sought a section 1368 hearing after receiving Dr. Davis's report that Lewis was incompetent. The court, in turn, heard at length from three experts in order to decide whether there was substantial evidence of incompetence to warrant a hearing. It rejected Dr. Davis's views only after hearing his testimony in court, and after giving plausible reasons for doing so. No error or deficient representation occurred.

[26] As noted earlier, Oliver and his counsel were not present in court on February 25, 1993. The hearing primarily concerned Lewis's competence, and touched briefly on scheduling issues relating to Oliver.

In response, the trial court alluded to the fact that one month had passed since the attack, that Oliver had been out of the hospital for at least one week, and that he was well enough to be back in jail. The court confirmed that it had received a facsimile transmission from Oliver's doctor allowing him to undergo trial on a half-day basis. In an abundance of caution, however, the court agreed to hear testimony from the doctor. The court said that if such testimony confirmed counsel's concerns, "we'll just grant a mistrial as to his portion, put him aside, sever it and proceed with Mr. Lewis."

After a brief recess, the court said that it had arranged to hear testimony from Orlando Pile, M.D., Oliver's doctor of internal medicine, concerning Oliver's current condition. The court observed that Dr. Pile was well informed on the issue. Counsel concurred.

On the witness stand, Dr. Pile described Oliver's physical condition and mental acuity based on a recent examination. Oliver was alert and oriented, and answered all questions appropriately. He spoke slowly. Dr. Pile explained that the slowness of speed seemed temporary, and did not establish brain damage even assuming Oliver had suffered a stroke. Dr. Pile blamed Oliver's speech issues mainly on the trauma of his injuries and the recovery process itself. It appeared Oliver would continue to improve. As a result, Dr. Pile concluded Oliver was "able to endure a court proceeding" and "able to understand."

Following this testimony, Oliver's counsel sought a one-week continuance. The court denied the motion. It declined to delay or suspend the proceedings against Oliver, and indicated that his penalty trial would proceed.

Contrary to what Oliver claims, the record contains no substantial evidence that Oliver's physical injuries made him mentally incompetent to stand trial. The only evidence presented was that he was physically recovering from his injuries, and could attend court and understand the process. As noted, the trial court initially considered severing Lewis's case and delaying Oliver's penalty trial until his condition improved. However, Dr. Pile's testimony obviated the need for any such measures. Thus, Oliver did not "come forward" with substantial evidence of his own incompetence to stand trial. (*People v. Stanley* (1995) 10 Cal.4th 764, 804 [42 Cal.Rptr.2d 543, 897 P.2d 481].) There was no denial of his statutory or constitutional rights.

## VI. PENALTY PHASE ISSUES

A. *Notice of Aggravating Evidence (Oliver)*

Oliver insists the prosecution failed to provide adequate notice under section 190.3 of evidence that he (1) was confined in a secure housing unit

populated by high-profile prisoners such as gang members, and (2) participated in certain noncapital crimes against Mizell and her family. Oliver asserts violations of numerous rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments, and under parallel provisions of the state Constitution.

In January 1992, one year before trial, the prosecution filed a written notice of the evidence it would introduce under factors (b) and (c) of section 190.3. No mention was made of the circumstances of the capital crime under factor (a). The document, which was supplemented shortly before the guilt trial, described each prior crime, and the date and place of its commission. One item concerned the "deadly weapon" (plastic knife) found in Oliver's possession in violation of section 4502 on March 2, 1985, in San Quentin Prison. An official report of the incident apparently was attached to the section 190.3 notice.

Shortly before the start of the penalty trial, on March 8, 1993, the prosecution confirmed that it planned to present the evidence outlined in the notice, including Oliver's possession of the plastic knife in prison. The prosecutor told the court that defense counsel knew which incidents and supporting documents were in issue. Counsel did not disagree.

The prosecution introduced evidence, among other things, that Oliver occupied his own cell in a special unit at San Quentin Prison. Sergeant Royal Towns testified that in 1985 the unit "housed infamous members of the Mexican Mafia, Black Guerrilla Family, and Aryan Brotherhood, and we had a number of Crips, Bloods, and bikers. It was a security housing unit." Oliver did not object or cross-examine Towns.

Oliver raised no issue of inadequate notice at trial. Accordingly, he has forfeited his present claims on appeal. (*Partida, supra,* 37 Cal.4th 428, 435; *People v. Farnam* (2002) 28 Cal.4th 107, 175 [121 Cal.Rptr.2d 106, 47 P.3d 988].)

 The claims also lack merit. First, the prosecution was not required to give advance warning about the nature and population of Oliver's prison housing block in 1985. The section 190.3 notice need not recite each and every circumstantial fact surrounding an otherwise duly noticed factor (b) crime. The notice is sufficient if the defendant has a reasonable opportunity to respond. (*People v. Arias, supra,* 13 Cal.4th 92, 166.) Such was the case here, as indicated by the notice itself and the courtroom discussions below.

We reach a similar conclusion with respect to evidence that Oliver participated in terrorizing Mizell and her family before the capital crime— acts that bore on motive and identity on the murder and attempted murder

counts. This evidence was admitted at the penalty phase as a circumstance of the capital crime under section 190.3, factor (a). By their own terms, the notice rules apply "[e]xcept for evidence in proof of the offense or special circumstances which subject a defendant to the death penalty." (§ 190.3, italics added.) Hence, the present notice complied with statutory law. (*People v. Champion, supra,* 9 Cal.4th 879, 942 [prosecution not required to give notice that it would rely at penalty phase on evidence used to prove capital crime at guilt phase].)

### B. *Unadjudicated Criminal Activity (Oliver)*

Oliver challenges the admission of certain aggravating evidence under section 190.3, factor (b), and presents a related instructional claim. He alleges that such errors violated his Eighth Amendment right to a reliable penalty determination.

 The prosecution introduced evidence of *"criminal activity* by the defendant which involved the use or attempted use of force or violence or *the express or implied threat to use force or violence."* (§ 190.3, factor (b), italics added.) This section allows proof of violent conduct, other than the capital crime, that itself is criminal. (*People v. Anderson* (2000) 25 Cal.4th 543, 584 [106 Cal.Rptr.2d 575, 22 P.3d 347].) Such other violent crimes are admissible regardless of when they were committed or whether they led to criminal charges or convictions, except as to acts for which the defendant was acquitted. (*Ibid.*) The penalty instructions must make clear that an individual juror may consider other violent crimes in aggravation only if he or she is satisfied beyond a reasonable doubt that the defendant committed them. (*Ibid.; People v. Griffin, supra,* 33 Cal.4th 536, 585.)

Here, the challenged section 190.3, factor (b) evidence involves (1) Oliver's possession of a long plastic knife in San Quentin Prison, (2) his act of throwing a carton of milk and hot coffee at a prison guard in Chino, and (3) his 1981 death threats over the telephone to Lewis's wife, Jeanett Hudson, and to her sister, Nadine Burchett. On appeal, Oliver argues that these acts did not satisfy the "crime" and/or "violence" requirements of section 190.3, factor (b), and that they were inadmissible in aggravation at the penalty phase. We reject the claim.

As a threshold matter, Oliver failed to object to the admission of the foregoing evidence on any ground at trial. He therefore has forfeited his appellate claims under both statutory (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 588 [15 Cal.Rptr.2d 382, 842 P.2d 1142]) and constitutional (*Partida, supra,* 37 Cal.4th 428, 435) law.

The evidence also was properly admitted under section 190.3, factor (b). Contrary to what Oliver suggests, the jury could infer that he knowingly possessed the knife in prison in violation of penal law. (§ 4502, subd. (a).) Indeed, the jury could infer that the weapon was carefully hidden from view in the rear of his one-man cell. Such possession involves an implied threat of violence. (*People v. Tuilaepa, supra,* 4 Cal.4th 569, 589.) The prosecution was not required to show that Oliver intended to use the weapon in a provocative or threatening manner. (*Ibid.; People v. Hughes* (2002) 27 Cal.4th 287, 383 [116 Cal.Rptr.2d 401, 39 P.3d 432].) The complaints about admissibility therefore fail.

As to the second incident, in which Oliver threw a carton of milk and hot coffee at a prison guard, the jury could infer that he committed an unlawful and physically threatening act, i.e., an assault. (§ 240.) The evidence showed that Oliver threw the items at the guard, who had to dodge the coffee to avoid being hit. (Cf. *People v. Tuilaepa, supra,* 4 Cal.4th 569, 590.) Such conduct violated penal law and involved the implied threat of violence. It therefore satisfied section 190.3, factor (b).

We similarly reject Oliver's challenge to evidence that he made threatening phone calls to Jeanett Hudson and Nadine Burchett in 1981. Both witnesses testified that the calls threatened lethal harm. The jury could infer that such calls and threats were intended to annoy the recipients, and that they violated misdemeanor prohibitions against making annoying and threatening phone calls. (§ 653m, subd. (a).) Contrary to what Oliver claims, the "remote" nature of these acts does not bar their admission. The penalty jury was entitled to consider and weigh criminal threats of violence committed at any time. (*People v. Anderson, supra,* 25 Cal.4th 543, 585.) Hence, the phone calls were properly admitted below. (*People v. Stanley, supra,* 10 Cal.4th 764, 824.)

We next address Oliver's related claim of instructional error. In general, he argues that the trial court failed to instruct on all the elements of the section 190.3, factor (b) crimes challenged here. He complains that the instruction concerning "possession of a deadly weapon in state prison" omitted the requisite knowledge element. Oliver also observes that the instructions allowed the jury to consider the "battery and assaults" on correctional officers, including the Chino assault on Valiente, without defining those crimes. Finally, Oliver observes that the jury never learned the criminal mental state required to make the "threatening [and] harassing phone calls" generally described in the instructions.

However, contrary to what Oliver implies, this is not a case in which the trial court was asked to instruct on the elements of other crimes, and failed to

do so accurately. (See *People v. Cain* (1995) 10 Cal.4th 1, 72 [40 Cal.Rptr.2d 481, 892 P.2d 1224] [trial court has no sua sponte duty to instruct on elements of section 190.3, factor (b) crimes].) Counsel on both sides specifically declined the court's offer to instruct on "the elements of the prior criminal acts." Oliver and Lewis indicated that they considered and rejected such instructions because—in the words of Lewis's counsel—"they don't help us." Hence, no instructional error occurred insofar as the court was induced to use the more generic instructions about which Oliver now complains. Any technical lapse also was harmless under any applicable standard. "[T]he evidence and argument properly focused the jury's attention on the moral assessment of defendant's actions[.] . . . [T]he instructions now suggested were not essential to the jury's consideration of this issue." (*People v. Cain, supra,* 10 Cal.4th at p. 73.)

## C. *Reference to Prison Gangs and Housing (Oliver)*

Oliver argues that evidence admitted during the penalty phase suggesting he was a dangerous inmate was irrelevant and unduly prejudicial under state law. (Evid. Code, §§ 350, 352.) He also claims it violated numerous guaranties under the federal and state Constitutions ("fair trial," "trial by jury," "due process," and "reliable and individualized penalty").

As mentioned, three correctional officers testified that Oliver was housed in high-security settings reserved for inmates with disciplinary problems or violent histories at the time he committed misconduct in jail or prison. This testimony was provided by (1) Officer Valiente about the beverage-throwing incident in the Chino prison, (2) Sergeant Towns about the plastic knife found in San Quentin Prison, and (3) Deputy Cacheiro about the typewriter and scuffle incident in county jail. The San Quentin incident included testimony that notorious gang members occupied the same housing block. Oliver suggests such testimony was not relevant to any permissible statutory aggravating factor, and that it was admitted solely to inflame the jury into concluding that he was a violent person who deserved to die.

Oliver did not object to this testimony on any ground at trial. He therefore has forfeited his present claims under both statutory (*People v. Farnam, supra,* 28 Cal.4th 107, 160–161) and constitutional (*Partida, supra,* 37 Cal.4th 428, 435) law.

The contention also lacks merit. The challenged testimony merely placed in context other admissible incidents in aggravation at the penalty phase. The evidence tended to show the gravity of Oliver's violent and threatening criminal conduct behind bars, namely, that he was undeterred by heightened supervision and special security measures. (See *People v. Melton* (1988) 44

Cal.3d 713, 757 [244 Cal.Rptr. 867, 750 P.2d 741] [jury is entitled to know seriousness of other violent crimes in deciding penalty].) Contrary to what Oliver suggests, the prosecution did not insinuate that defendant himself was a gang member or had any involvement in gang violence. (Cf. *People v. Tuilaepa, supra,* 4 Cal.4th 569, 588.) We reject the claim.

D. *Photographs of the Murder Victims (Lewis, Oliver)*

Defendants claim the trial court erred in admitting, over their objection under Evidence Code section 352, crime scene photographs that were unduly prejudicial (*People v. Ayala, supra,* 24 Cal.4th 243, 282) and cumulative. (*People v. Osband* (1996) 13 Cal.4th 622, 677 [55 Cal.Rptr.2d 26, 919 P.2d 640].) They assert the error resulted in violations of the Fifth Amendment due process guaranty, the Eighth Amendment concern for a reliable penalty determination, a state-created liberty interest under the Fourteenth Amendment, and the Sixth Amendment generally.

Except for due process, the constitutional claims are forfeited. (*Partida, supra,* 37 Cal.4th 428, 435.) We find no error under state law.

On March 1, 1993, before the penalty trial began, the prosecution sought to admit several crime scene photographs that the trial court had excluded at defendants' request from the guilt phase. Defendants timely objected to three of them, all involving Patrinella Luke. One photograph showed her lying in blood on the floor, and the other two photographs showed her fatal head wound from different angles. Defendants claimed the evidence was cumulative, irrelevant, and inflammatory. The prosecution insisted the jury was entitled to see the close range of the killing for the first time, and to assess the callousness of the act. The trial court overruled the defense objections. It decided to "remove the sanitation artificially placed in the guilt phase."

■ The prosecution has wide latitude at the penalty phase to illustrate the crime through photographs. Such evidence cannot prejudice the defendant as to guilt, and the brutal circumstances assist the jury in making its normative (*People v. Schmeck* (2005) 37 Cal.4th 240, 262 [33 Cal.Rptr.3d 397, 118 P.3d 451]) penalty decision. (*People v. Burgener, supra,* 29 Cal.4th 833, 872; *People v. Anderson, supra,* 25 Cal.4th 543, 592–593.) Photographs that accurately depict the manner of death are relevant to " 'malice, aggravation, and penalty.' " (*People v. Farnam, supra,* 28 Cal.4th 107, 185.)

■ No abuse of discretion occurred here. (*People v. Cox* (2003) 30 Cal.4th 916, 955 [135 Cal.Rptr.2d 272, 70 P.3d 277].) We have examined the photographs. They are unpleasant. However, in evaluating defendants' moral culpability for the capital crime, the jury was entitled to have a complete

picture of the brutal manner in which Patrinella Luke was killed. (See *People v. Cunningham* (2001) 25 Cal.4th 926, 1036 [108 Cal.Rptr.2d 291, 25 P.3d 519] [court's discretion under Evid. Code, § 352 to exclude evidence of circumstances of capital crime is more limited at penalty phase than at guilt phase].)

Defendants also maintain that the court failed to adequately articulate its reasons for introducing the photographs into evidence. But the trial court need not expressly weigh prejudice against probative value, or even state that it has done so. (*People v. Box, supra,* 23 Cal.4th 1153, 1200.) The assertion fails.

### E. *Victim Impact Evidence (Lewis, Oliver)*

Defendants claim the trial court erred under state law by allowing victim impact evidence that was statutorily irrelevant and unduly prejudicial. (§ 190.3, factor (a).) The error allegedly violated defendants' right to due process and to a reliable penalty determination under the Eighth and Fourteenth Amendments.

Before the penalty phase, Oliver filed written motions to exclude the victim impact testimony and related videotape evidence. The hearing occurred on March 1, 1993, after the court ruled on the admissibility of the crime scene photographs. Lewis joined Oliver in opposing the victim impact evidence. They argued at trial, as on appeal, that it was redundant and inflammatory, and violated both federal and state law. (*Payne v. Tennessee* (1991) 501 U.S. 808 [115 L.Ed.2d 720, 111 S.Ct. 2597] (*Payne*); *People v. Edwards* (1991) 54 Cal.3d 787 [1 Cal.Rptr.2d 696, 819 P.2d 436].) The trial court disagreed. It subsequently denied their motion to strike the testimony of the first witness to give such testimony.

In *Payne, supra,* 501 U.S. 808, the high court overruled *Booth v. Maryland* (1987) 482 U.S. 496, 509 [96 L.Ed.2d 440, 107 S.Ct. 2529], insofar as it barred states from admitting evidence of the "specific harm" the defendant had caused, namely, the loss to society and the victim's family of a "unique" individual. (*Payne, supra,* 501 U.S. at p. 825.) *Payne* reasoned that the prosecution has a legitimate interest in counteracting the relevant mitigating evidence that the defendant must be allowed to introduce. (*Ibid.*) The federal Constitution bars victim impact evidence only if it is "so unduly prejudicial" as to render the trial "fundamentally unfair." (*Ibid.*) State law is consistent with these principles. Unless it invites a purely irrational response from the jury, the devastating effect of a capital crime on loved ones and the community is relevant and admissible as a circumstance of the crime under

section 190.3, factor (a). (*People v. Edwards, supra,* 54 Cal.3d 787, 835–836; cf. *People v. Robinson* (2005) 37 Cal.4th 592, 644–652 [36 Cal.Rptr.3d 760, 124 P.3d 363].)

The victim impact evidence presented here satisfied *Payne* and did not surpass constitutional limits. Nor was such evidence excessive, inflammatory, or otherwise prejudicial under state law. "Family members spoke of . . . how they missed having the victims in their lives." (*People v. Boyette* (2002) 29 Cal.4th 381, 444 [127 Cal.Rptr.2d 544, 58 P.3d 391].) The evidence concerned the kinds of loss that loved ones commonly express in capital cases. Moreover, these defendants knew their victims. The whole purpose of the capital crimes was to inflict maximum damage on one family. The jury's consideration of such damage on surviving family members was not unfair or improper.

Defendants raise numerous other claims about the proper scope of victim impact evidence. As in prior cases, we reject the claims as follows: (1) Section 190.3, factor (a) is not unduly vague insofar as it allows victim impact evidence as a circumstance of the crime (*People v. Wilson, supra,* 36 Cal.4th 309, 358); (2) victim impact testimony is not limited to the victims' relatives or to persons present during the crime (*People v. Pollock* (2004) 32 Cal.4th 1153, 1183 [13 Cal.Rptr.3d 34, 89 P.3d 353]); (3) victim impact evidence is not limited to circumstances known or foreseeable to the defendant at the time of the crime (*Pollock, supra,* at p. 1183); (4) nothing precludes the children of murder victims (like Peter Luke, Jr.) from describing their loss simply because they are not adults at the time of trial (see, e.g., *People v. Boyette, supra,* 29 Cal.4th 381, 441, 444); (5) surviving victims (like Peter Luke, Sr.) may describe their physical injuries and other effects of the crime (*People v. Brown* (2004) 33 Cal.4th 382, 397 [15 Cal.Rptr.3d 624, 93 P.3d 244]); and (6) permissible victim impact evidence can include a murder victim's charitable and church activities (*Pollock, supra,* at pp. 1180–1181).

Defendants further challenge the testimony of Peter Luke, Sr., who was the husband of murder victim Patrinella Luke, and whom Oliver maimed and almost killed. The prosecutor asked Luke, Sr., "Is there anything else you would like to tell us?" The witness answered, "I personally would just like to speak to the jury. It's from me. [¶] Even though—this is not a time where justice is a popular thing. Right is reversed and nobody wants to do the right thing. But I ask you today on my behalf, please just do the right thing. Do the right thing."

On appeal, defendants insist Peter Luke, Sr.'s plea violated the Eighth-Amendment-based rule barring " 'the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and

the appropriate sentence.' " (*People v. Smith, supra*, 30 Cal.4th 581, 622, quoting *Payne, supra*, 501 U.S. 808, 830.) The Attorney General responds that the witness spoke with appropriate restraint and merely asked the jury to reach the "right" result.

Defendants failed to object to Peter Luke, Sr.'s testimony. Accordingly, they have forfeited the claim on appeal. (*People v. Mickle* (1991) 54 Cal.3d 140, 187 [284 Cal.Rptr. 511, 814 P.2d 290].) Even assuming such testimony offended the constitutional principle on which defendants rely, any error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].) Luke, Sr.'s suggestion that the jury should "do the right thing" was brief, fleeting, and mild. It paled in comparison to other evidence in aggravation, i.e., the circumstances of the capital crime, the tragic impact on the victims, Oliver's extensive criminal and violent history, and Lewis's campaign of fear and violence toward Hudson and her family. The challenged evidence could not have tipped the balance in favor of death.

F. *Defense References to the Bible (Lewis, Oliver)*

Defendants contend the trial court erred under state decisional law, and violated their rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments, by prohibiting defense counsel from invoking the Bible in closing arguments at the penalty phase. They misread the record.

On March 11, 1993, after each side had presented its final witness and the court and counsel began discussing penalty instructions, the court mentioned the prosecutor's inquiries as to whether Oliver's counsel might refer to the Bible in closing argument. Defense counsel questioned whether he should be told in advance what not to say. The trial court suggested that existing law did not allow "any reference to the Bible." However, the court said it was not prepared to discuss or decide the issue "right now." The court encouraged defense counsel to review the law in preparation for a later hearing. Charles Lloyd, counsel for Oliver, responded with humor. Later, in closing argument, Lloyd alluded to the Bible, saying that "[v]iolence begets violence." Counsel also twice mentioned God, reminded jurors that the murders occurred in a church, and commented on the needs of a person's "soul."

Defendants have not preserved the present claims. They did not object to the trial court's tentative suggestion that the law barred biblical references in closing argument. Nor did they accept the court's offer to litigate the issue fully at a later time. Having deprived the court of the opportunity to make a record and resolve the issue one way or the other, defendants have forfeited their claims on appeal. (*Partida, supra*, 37 Cal.4th 428, 435.)

Moreover, contrary to defendants' argument, the record contains no indication that counsel were precluded from mentioning the Bible or other religious themes as they wished. As we have seen, the trial court never held a hearing or made a ruling in this regard. The court offered to debate and decide the issue at a later time. No debate or decision occurred. As a result, the defense freely invoked the Bible, God, the church venue, and the human soul in closing argument. Nothing in the record suggests that defendants would have been prevented from saying more along those lines had they sought to do so. No error occurred.

### G. *Prosecutorial Misconduct/Religion (Lewis, Oliver)*

Defendants complain the prosecutor exploited religious imagery in closing argument, and that she invoked divine law as the basis for death. Such statements purportedly rendered the penalty trial fundamentally unfair (thus violating federal law), and involved deceptive and reprehensible conduct (thus violating state law). (See *Darden v. Wainwright* (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144, 106 S.Ct. 2464]; *People v. Farnam, supra*, 28 Cal.4th 107, 167.) In making these arguments, defendants cite the Fifth, Sixth, Eighth, and Fourteenth Amendments, and parallel provisions of the state Constitution. Emphasis is placed on due process principles, and the requirement of separation between church and state.

Defendants focus on various religious references. The prosecutor referred to the crime scene as a "house of God." She also stated that defendants appeared "evil," "soulless," and "coward[ly]."[27]

---

[27] The prosecutor argued: "These criminals violated the one safe haven we have in this troubled world, the place where we go to enrich and glorify what is best in us, where we reaffirm our faith in all that is good and righteous, where we renew our souls and seek solace in the spiritual from a troubled world, a house of God. . . . [¶] . . . [A] place where . . . we . . . drop our defenses and enjoy our oneness as all creations of the Lord, all brothers and sisters bound together by . . . our belief in God. [¶] Surely there can be no place so sacred, a place . . . to reach the spiritual and purify our souls . . . . [¶] . . . the holiest of places where all . . . may go to seek sanctuary from pain and trouble . . . ." "Who would violate the sanctity of a house of God to commit the most heinous of crimes known to Man? [¶] Only the most vile, soulless coward could commit crimes so foul and so evil. In these defendants, we have the very epitome of evil and cowardice." "These defendants," then, "are equally bereft of soul or humanity." If you spare them, the prosecutor told the jury, "you will sit on your hands and send the message that evil will be tolerated" "in the sanctity of a house of God." Rather, the jurors should "send a message that the wasting of innocent lives will not be tolerated in our society and that he who dares to violate our laws, and our only refuge for spiritual redemption, shall pay with his life, because nothing else can ever be called justice." Otherwise, "these evil monsters will have escaped justice and they will live."
In addition, the prosecutor made these two passing references to God: "After all you have heard of what [Oliver] has done, both in and out of prison, is this the kind of person you want to visit little children? God forbid." Oliver "will seek them [smaller and weaker inmates] out wherever he can find them, and God help them."

Defendants did not object to the foregoing remarks on any ground at trial. Hence, they have forfeited their misconduct claims on appeal. (*People v. Ervin, supra,* 22 Cal.4th 48, 100; *People v. Wash* (1993) 6 Cal.4th 215, 259–260 [24 Cal.Rptr.2d 421, 861 P.2d 1107] [counsel "not only failed to object to the prosecutor's remarks, but countered them by citing a number of religious authorities to support his argument"].)

Oliver counters that no objection was required because defendants did not anticipate the prosecutor's appeal to religion. Oliver claims that because the prosecutor had earlier tried to "block" defense references to religion, counsel assumed religion would play no role at argument. As we have seen, however, there was never any vigorous argument or clear ruling on the issue. The record shows no surprise or other excuse justifying departure from the general rule requiring a timely objection and preservation of misconduct claims.

The claims also lack merit under settled law. To be sure, "we have condemned prosecutorial reliance on the Bible as support or approval of the death penalty [citations], or prosecutorial invocations to a different or higher law than that found in the state Penal Code [citation]." (*People v. Ervin, supra,* 22 Cal.4th 48, 100.) But nothing of the sort occurred here.

The decision whether to impose the ultimate punishment is a "normative" one assigned to the jury under California's death penalty law. (*People v. Schmeck, supra,* 37 Cal.4th 240, 262.) Here, defendants committed two murders in a church filled with adults and children. Fortuitously, a third shooting victim survived. The prosecutor was not required to ignore these compelling facts.

In particular, the prosecutor was free to argue, and the jury was free to infer, that defendants showed exceptional moral depravity in following their victims to a religious sanctuary in order to kill them ruthlessly and in cold blood. Whether it is a church, synagogue, mosque, or temple, any "house of God" is—by history and tradition—the last place anyone expects to encounter lethal violence. The prosecutor could properly urge jurors to consider evidence of the location in which defendants chose to commit their crimes in making the normative decision whether to impose death under the secular law in which they had been instructed.

Moreover, any prosecutorial misconduct was harmless under any test of prejudice. (See *People v. Lenart* (2004) 32 Cal.4th 1107, 1130 [12 Cal.Rptr.3d 592, 88 P.3d 498].) The jury could only have seen defendants' crimes as base and vile. Their impact on the victims—including the churchgoers who witnessed the shootings inside the church—was quite painful. Of course, the

jury knew about Oliver's criminal record and violent history. Jurors also knew about Lewis's pattern of domestic violence. We discern no prejudice.

H. *Prosecutorial Misconduct/Facts Not in Evidence*

Defendants maintain that in closing argument the prosecutor improperly (1) represented that Oliver's poststabbing injuries were temporary, (2) complimented defense counsel, and (3) remarked that the police felt they lacked sufficient evidence to arrest Lewis for violence perpetrated against Jeanett Hudson. These references are attacked as being unsupported by the trial record.

There was no objection on any ground below to the prosecutorial comments challenged here. The claims therefore are forfeited on appeal. (*People v. Ayala* (2000) 23 Cal.4th 225, 284 [96 Cal.Rptr.2d 682, 1 P.3d 3].)

On the merits, prosecutors have wide latitude to discuss and draw inferences from the evidence and information duly presented at trial. " 'Whether the inferences the prosecutor draws are reasonable is for the jury to decide.' " (*People v. Wilson, supra,* 36 Cal.4th 309, 337.)

No misconduct occurred. First, jurors could largely see and assess Oliver's physical condition and gradual recovery in the courtroom. They previously had learned of the nature, extent, and cause of his medical problems. The prosecutor did not state or imply that there was no possibility of lingering ill effects.

Second, the prosecutor complimented defense counsel as "formidable adversaries and . . . good people." This statement was rhetorical, and was not a comment on the evidence. It was not misconduct for the prosecutor to appear gracious, or to imply that even highly qualified counsel could not distract the jury from the facts.

The third item concerns the prosecutor's comment explaining why Lewis was never prosecuted for the crimes against Jeanett Hudson. Hudson testified that she repeatedly told the police about the attacks on her and her family in 1981, and that she was repeatedly told that the police could do nothing absent concrete evidence identifying Lewis as the perpetrator. In closing argument, the prosecutor said that "without a gun to match the bullets, without a witness who saw the shooters, the police did not feel they could make an arrest." This

remark was a fair inference. In light of Hudson's testimony about the shots Lewis fired at her family's house and her car in 1981, the prosecutor could properly offer the jury suggestions as to the kind of evidence that the police apparently lacked.

I. *Motion for New Trial (Oliver)*

Oliver contends that the court failed to articulate sufficient reasons for denying his motion for new trial, and thereby violated section 1181, paragraph 6.[28] He also argues that the court's actions denied him due process and a reliable penalty determination under the Fifth and Eighth Amendments, and violated parallel provisions of the state Constitution.

On May 21, 1993, after the jury returned the death verdicts and before sentence was pronounced, the trial court considered each defendant's written motion for a new trial. Pertinent here is Oliver's motion. The first four grounds concerned rulings on the *Wheeler* motion (*Wheeler, supra,* 22 Cal.3d 258), the courtroom assault, prosecutorial comments about the assault, and Oliver's request for a continuance of the penalty trial. As his fifth reason in support of a new trial, Oliver complained that the guilt verdict was "contrary to the evidence," apparently in violation of section 1181, paragraph 6. He stressed the lack of either motive evidence or identification testimony.

In a lengthy ruling from the bench, the trial court individually discussed each ground raised in the motion. As to the first four issues, it set forth its reasons for the challenged rulings, and explained why those rulings were correct. With regard to the fifth and final ground raised in the new trial motion, the court disagreed with Oliver's evaluation of the evidence of guilt. Specifically, the court stated, "Finally, with respect to the verdict [being] contrary to the evidence, I disagree with you on that."

Oliver suggests that the trial court's ruling under section 1181, paragraph 6, was so perfunctory that we cannot be confident that the court properly exercised its discretion, or exercised any discretion at all. Relying on *People v. Robarge* (1953) 41 Cal.2d 628, 634 [262 P.2d 14], Oliver claims the court failed to reach an "independent conclusion as to the sufficiency of credible evidence to support the verdict."

---

[28] Section 1181 provides, in part: "When a verdict has been rendered or a finding made against the defendant, the court may, upon his application, grant a new trial . . . . [¶] . . . [¶] 6. When the verdict or finding is contrary to law or evidence."

The claim lacks merit. Although the trial court's rejection of Oliver's insufficient evidence argument was stated succinctly, we infer from the record of the hearing itself that the court properly "discharge[d] [its] duty to conscientiously consider [the] motion for new trial . . . . The hearing transcript reveals that [the court] was well acquainted with the briefs and the transcript of the trial and carefully considered those claims before denying the motion." (*People v. Burgener, supra,* 29 Cal.4th 833, 893.) Because no manifest or unmistakable abuse of discretion appears, we will not disturb the ruling on appeal. (*People v. Staten* (2000) 24 Cal.4th 434, 466 [101 Cal.Rptr.2d 213, 11 P.3d 968].)

### J. *Motion to Modify the Verdict (Oliver)*

Oliver claims the trial court erred in applying section 190.4, subdivision (e), when evaluating his automatic motion to modify the verdict. He also asserts that the court violated his due process rights under the Fifth and Fourteenth Amendments, his Sixth Amendment right to confront witnesses (by failing to give advance notice that his uncharged crimes would be used against him), his Eighth Amendment rights generally (by refusing to evaluate mitigating evidence and thereby undermining his right to a reliable penalty determination), a state-created liberty interest under the Fourteenth Amendment (by failing to follow the requirements of section 190.4, subdivision (e)), and parallel provisions of the state Constitution.

At a hearing on May 21, 1993, the trial court described its duties to independently reweigh the evidence in aggravation and mitigation, and to determine whether, in its own judgment, the evidence supported the verdict. The court stated that it had reviewed the entire record, including the transcripts and its own "extensive notes." Exercising its independent judgment, the court found that the aggravating evidence substantially outweighed mitigation, and that the jury's death verdict was supported by the record. The court then discussed the specific sentencing factors applicable to each defendant.

Section 190.4, subdivision (e) provides as relevant here: "In ruling on the application, the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings." The trial

court must make an "independent" determination concerning the propriety of the death verdict in light of the evidence and the applicable law. (*People v. Burgener, supra,* 29 Cal.4th 833, 891.) The court need not, however, recount "every detail" supporting its determination. (*People v. Arias, supra,* 13 Cal.4th 92, 192.) The ruling need only be sufficiently articulated to assure meaningful appellate review. (*Id.* at p. 191.)

Oliver contends the trial court improperly considered irrelevant aggravating evidence, namely, the noncapital crimes that Lewis alone committed against Mizell and her family. Oliver also claims the court failed to consider relevant mitigating evidence, namely, his age at the time of the capital crimes.

Oliver did not object below to any aspect of the court's recitation of its reasons for denying the automatic modification motion. He has forfeited his claims. (*People v. Riel* (2000) 22 Cal.4th 1153, 1220 [96 Cal.Rptr.2d 1, 998 P.2d 969] [applying the forfeiture rule to hearings on such motions following the finality of *People v. Hill, supra,* 3 Cal.4th 959, a 1992 case]; see *Partida, supra,* 37 Cal.4th 428, 435.)

In any event, Oliver's assertions lack merit. As to the contention that the trial court considered irrelevant aggravating evidence, the court observed that the motive for the murders could be found in the "terrorist campaign" that Lewis waged against Mizell, and in Oliver's "close partnership" with Lewis in that campaign. It also noted that "arson, shooting, [and] threatening telephone calls" preceded the murders, and that Oliver "personally engaged" in some of these acts. Nothing in the record, however, indicates that the court blamed Oliver for all such acts, or used against Oliver acts that Lewis alone committed.

As for the trial court's consideration of Oliver's age at the time of the crimes, no error occurred. There is no evidence that the trial court failed to consider this sentencing factor. Rather, the court stated that it was "aware of its obligation to . . . weigh the evidence, including reviewing all the designated factors under Penal Code section 190.3." It further stated that it "has further carefully examined, considered and been guided by every mitigating factor . . . ." The court's ruling indicates its clear understanding of its duty to weigh all the aggravating and mitigating evidence. " '[T]he failure to mention [certain] specific matters in mitigation implies, not that they were overlooked or deemed legally irrelevant, but simply that the court found them insubstantial and unpersuasive.' " (*People v. Weaver* (2001) 26 Cal.4th 876, 991 [111 Cal.Rptr.2d 2, 29 P.3d 103].) Such is the case here. (Cf. *People v. Burgener, supra,* 29 Cal.4th 833, 891–892.) Oliver was not a vulnerable youth when the capital crime occurred. The court's failure to mention the age factor implies that it carried little weight. (*People v. Arias, supra,* 13 Cal.4th 92, 192.)

### K. *Request for Trial Court's Notes (Lewis, Oliver)*

Defendants complain that, long after trial, the court declined to augment the record with personal notes it mentioned when denying their motion to modify the penalty verdict at trial. (See § 190.4, subd. (e).) Defendants primarily claim that this circumstance violated their right to a reliable penalty determination under the Eighth and Fourteenth Amendments.

In 1993, in ruling on the motion to modify the verdict, the trial court stated it had relied in part on its "extensive notes." In 1999, however, in response to Oliver's augmentation request, the court said, "I am not going to turn those over. I object to that. Those are kept immediately after trial until I get to the motion for reconsideration and then they are gone."

 No error occurred. It appears the trial court had discarded its private notes by the time they were requested. But even if the court had not done so, it was not required to augment the record to include them. The notes were the court's own work product, and personal to the judge. (*Copley Press, Inc. v. Superior Court* (1992) 6 Cal.App.4th 106, 114–115 [7 Cal.Rptr.2d 841] [holding that "rough" minutes of court clerk are public records open for inspection, and distinguishing personal bench notes of trial judge].) Under the principles applied in *Copley,* "bench notes are constructed so as to remind [the judge], in his personal fashion and not in a form digestible by the public, of the aspects of the case he thought important." (*Id.* at p. 114.) They are not public or court records in the sense that they represent or record the official work or actions of the judge or his clerk. (*Id.* at p. 113; see also *Beuhler v. Small* (2003) 115 Wn.App. 914, 921 [64 P.3d 78]; *State v. Panknin* (Ct.App. 1998) 217 Wis.2d 200, 212 [579 N.W.2d 52]; *State ex rel. Steffen v. Kraft* (1993) 67 Ohio St.3d 439, 439–440 [1993 Ohio 32, 619 N.E.2d 688, 689]; *Peery v. Peery* (Tex.Crim.App. 1986) 709 S.W.2d 392, 395.) Oliver cites no contrary law. We decline to find error.

Moreover, in ruling on the modification motion, the trial court said that it was "aware of its obligation to . . . weigh the evidence, including reviewing all the designated factors under Penal Code section 190.3." It was in that context that the court stated it had reviewed its notes of the trial proceedings. Based on the record, the court consulted its private notes only for the purpose of complying with the mandate of section 190.4, subdivision (e). (See *People v. Ray* (1996) 13 Cal.4th 313, 360 [52 Cal.Rptr.2d 296, 914 P.2d 846] [trial court relied in part on its notes in considering motion to modify verdict].) We discern no impropriety in the trial court's actions that might make its notes material to defendants on appeal. In sum, defendants were not entitled to have the record augmented with the notes. They are not now entitled to reversal on appeal.

## L. Cumulative Error (Lewis, Oliver)

Defendants argue that their rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments compel reversal of the convictions and sentence because of the cumulative effects of error at the guilt and penalty phases. We disagree. We have found no reversible error in any particular instance. Any errors that did occur do not combine to compel reversal of the judgment. Defendants were entitled to a fair trial. They received a fair trial despite their repeated efforts to disrupt it. (See *People v. Osband, supra*, 13 Cal.4th 622, 702.)

## M. Miscellaneous Claims (Lewis, Oliver)

Defendants raise additional challenges to California's death penalty statute and to other aspects of California law. We affirm the decisions that have rejected similar claims, and decline to reconsider such authorities, as follows:

Victim impact evidence does not violate due process or ex post facto principles. (*People v. Brown, supra*, 33 Cal.4th 382, 394–395.) The use of victim impact evidence is constitutionally permissible. (*Id.* at p. 403.)

Standard penalty phase instructions do not inherently encourage the double counting of aggravating factors. (*People v. Ayala, supra*, 24 Cal.4th 243, 289.)

Factor (b) of section 190.3 is not impermissibly overbroad or fundamentally unfair. (See *People v. Balderas* (1985) 41 Cal.3d 144, 204–205 [222 Cal.Rptr. 184, 711 P.2d 480].)

The judgment and sentence against defendants do not violate international law. (*People v. Brown, supra*, 33 Cal.4th 382, 403–404.) The record contains no suggestion that either defendant is a foreign national or a dual national.

The death penalty law is not unconstitutional for failing to impose a burden of proof—whether beyond a reasonable doubt or by a preponderance of the evidence—as to the existence of aggravating circumstances, the greater weight of aggravating circumstances over mitigating circumstances, or the appropriateness of a death sentence. (*People v. Brown, supra*, 33 Cal.4th 382, 401.) Nor, contrary to defendants' assertion, does section 190.3's lack of imposition of a burden of proof violate Evidence Code section 300, which provides that, "Except as otherwise provided by statute, this code applies in every action before the Supreme Court or a court of appeal or superior court, including proceedings in such actions conducted by a referee, court commissioner, or similar officer, but does not apply in grand jury proceedings."

Section 190.3 is such an excepting statute. Although we have said that "[t]he California death penalty statute is silent on the burden of proof" (*People v. Carpenter* (1997) 15 Cal.4th 312, 417 [63 Cal.Rptr.2d 1, 935 P.2d 708]), section 190.3 makes clear that the sentencing function " 'is inherently moral and normative, not factual; the sentencer's power and discretion . . . is to decide the appropriate penalty for the particular offense and offender under all the relevant circumstances.' [Citation.] Because of this, instructions associated with the usual fact-finding process—such as burden of proof—are not necessary." (*People v. Carpenter, supra,* at pp. 417–418; see *People v. Schmeck, supra,* 37 Cal.4th 240, 262 [normative nature of penalty decision].)

The trial court instructed the jury with a modification of the 1989 version of CALJIC No. 8.84.1, to which counsel did not object. The modified language included: "You are to be guided by the previous instructions given in the first phase of this case which are applicable and pertinent to the determination of penalty. However, you are to completely disregard any instructions given in the first phase which had prohibited you from considering pity or sympathy for a defendant." The trial court did not err in failing to instruct on which guilt phase instructions continued to apply at the penalty phase. (*People v. Sanders* (1995) 11 Cal.4th 475, 561 [46 Cal.Rptr.2d 751, 905 P.2d 420].)

The trial court did not need to define the presumption of innocence, i.e., the beyond-a-reasonable-doubt standard, at the penalty phase. (*People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1020 [30 Cal.Rptr.2d 818, 874 P.2d 248].)

Notwithstanding defendants' motion to have the trial court instruct on lingering doubt, the trial court was within its authority to deny the motion. (*People v. Cleveland, supra,* 32 Cal.4th 704, 739; *People v. Sanchez* (1995) 12 Cal.4th 1, 77 [47 Cal.Rptr.2d 843, 906 P.2d 1129].) In any event, there is no doubt that defendants committed the crimes. (See *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1187 [36 Cal.Rptr.2d 235, 885 P.2d 1] ["Under these circumstances, we do not believe defendant would have derived any additional benefit had the requested instruction been given"]; *People v. Fauber* (1992) 2 Cal.4th 792, 864 [9 Cal.Rptr.2d 24, 831 P.2d 249] [same].)

There is no requirement to define life imprisonment without possibility of parole. (*People v. Prieto* (2003) 30 Cal.4th 226, 269–271 [133 Cal.Rptr.2d 18, 66 P.3d 1123].)

The statutory scheme does not deny capital defendants the equal protection of the laws or any other constitutional right insofar as it does not contain disparate sentence review (i.e., comparative or intercase proportionality review). (*People v. Lawley, supra,* 27 Cal.4th 102, 169; see *People v. Prieto, supra,* 30 Cal.4th 226, 276.)

Death by lethal injection is not cruel and unusual punishment under current law. (*People v. Martinez* (2003) 31 Cal.4th 673, 704 [3 Cal.Rptr.3d 648, 74 P.3d 748].)

Defendants have not shown that the Department of Corrections and Rehabilitation has violated due process principles or state law in respect of its standards for the administration of lethal injection under section 3604, and in any event, this type of claim does not entitle a criminal defendant to relief at this stage. (*People v. Young, supra*, 34 Cal.4th 1149, 1234; see *People v. Boyer, supra*, 38 Cal.4th 412, 485, fn. 55 [mentioning recent federal court challenge to validity of lethal injection procedures].)

Any delay in appointing counsel, processing the appeal, and executing sentence was necessary to carefully review the judgment and protect Oliver's rights, and is not unconstitutional. (*People v. Holt, supra*, 15 Cal.4th at p. 709.)

The death penalty law adequately narrows the class of death-eligible offenders. (*People v. Prieto, supra*, 30 Cal.4th 226, 276.)

Neither *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], nor *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], has changed our prior conclusions regarding burden of proof or jury unanimity. In particular, the jury need not make a unanimous finding under section 190.3, factor (b), i.e., evidence of unadjudicated criminal activity involving actual or attempted force or violence or the express or implied threat of force or violence. (See *People v. Griffin, supra*, 33 Cal.4th 536, 585; *People v. Brown, supra*, 33 Cal.4th 382, 402; *People v. Prieto, supra*, 30 Cal.4th 226, 275.)

The prosecutor's discretion whether to seek the death penalty does not impair any constitutional right. (*People v. Brown, supra*, 33 Cal.4th 382, 403.)

CALJIC No. 2.90 is constitutional as currently phrased. (*People v. Lewis* (2001) 25 Cal.4th 610, 651–652 [106 Cal.Rptr.2d 629, 22 P.3d 392].) So are CALJIC Nos. 2.01, 8.83, 2.21.2 (*People v. Maury* (2003) 30 Cal.4th 342, 428–429 [133 Cal.Rptr.2d 561, 68 P.3d 1]), and 2.72 (*People v. Frye* (1998) 18 Cal.4th 894, 957–958, 959–960 [77 Cal.Rptr.2d 25, 959 P.2d 183]).

To refer to the complaining party as "The People" does not violate due process or other constitutional principles. (See *People v. Black* (2003) 114 Cal.App.4th 830, 832–834 [7 Cal.Rptr.3d 902].)

## VII. CONCLUSION

The judgment against both defendants is affirmed in its entirety.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellants' petitions for a rehearing were denied November 1, 2006, and the opinion was modified to read as printed above.